IN THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW,<br><br>        Plaintiff,<br><br>    v.<br><br>PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; GENERAL SERVICES ADMINISTRATION; EXECUTIVE OFFICE OF THE PRESIDENT; OFFICE OF THE VICE PRESIDENT; OFFICE OF ADMINISTRATION; MICHAEL R. PENCE, IN HIS OFFICIAL CAPACITY AS CHAIR OF THE PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; KRIS W. KOBACH, IN HIS OFFICIAL CAPACITY AS VICE CHAIR OF THE PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; ANDREW KOSSACK, IN HIS OFFICIAL CAPACITY AS DESIGNATED FEDERAL OFFICER FOR THE PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; TIMOTHY R. HORNE, IN HIS OFFICIAL CAPACITY AS ACTING ADMINISTRATOR OF THE GENERAL SERVICES ADMINISTRATION; MARCIA L. KELLY, IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE OFFICE OF ADMINISTRATION,<br><br>        Defendants. | Docket No. ___ |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................................ 1

FACTUAL BACKGROUND ...................................................................................................... 3

    A.    President Trump Creates a Commission to Support His Claim That Millions of Persons Voted Illegally in Presidential Election ................................ 3

    B.    President Trump Establishes the Commission Pursuant to FACA ...................... 4

    C.    Vice Chair Kobach Uses the Commission to Promote His Candidacy for Governor and to Legitimate His Long History of Unsubstantiated Allegations Regarding Voter Fraud ........................................... 5

    D.    The Commission Schedules and Conducts Meetings ........................................... 6

    E.    The Commission Ignores the Lawyers' Committee's Request for Records ................................................................................................................... 8

ARGUMENT ................................................................................................................................ 9

I.    Likelihood of Success on the Merits ............................................................................... 10

    A.    Defendants Continue to Violate Section 10(b) of FACA .................................. 10

    B.    Defendants Will Violate Section 10(a) of FACA ............................................. 11

II.    Plaintiff Will Suffer Irreparable Harm Absent a Temporary Restraining Order .................................................................................................................................. 12

III.    The Balance of Equities Weigh in Favor of a Temporary Restraining Order .................................................................................................................................. 14

IV.    The Public Interest Weighs in Favor of a Temporary Restraining Order ....................... 15

CONCLUSION ........................................................................................................................... 16

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                              **Page(s)**

*Cummock v. Gore*,
   180 F.3d 282 (D.C. Cir. 1999) ............................................................................................. 1, 11

*Fish v. Kobach*,
   189 F. Supp. 3d 1107 (D. Kan. 2016) .......................................................................................... 6

*Fish v. Kobach*,
   840 F.3d 710 (10th Cir. 2016) ..................................................................................................... 6

*Fish v. Kobach*,
   No. 16-2105-JAR, 2017 WL 2719427 (D. Kan. June 23, 2017) ................................................. 6

*Food Chem. News v. Dep't of Health & Human Servs.*,
   980 F.2d 1468 (D.C. Cir. 1992) ................................................................................................. 10

*Food Chemical News, Inc. v. Davis*,
   378 F. Supp. 1048 (D.D.C. 1974) ........................................................................................ 13, 14

*Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Private Sector Survey on
   Cost Control*,
   711 F.2d 1071 (D.C. Cir. 1983) ........................................................................................... 10, 11

*Pub. Citizen v. Nat'l Econ. Comm'n*,
   703 F. Supp. 113 (D.D.C. 1989) .......................................................................................... 13, 15

*Pub. Citizen v. U.S. Dep't of Justice*,
   491 U.S. 440 (1989) ................................................................................................................... 10

*Singh v. Carter*,
   168 F. Supp. 3d 216 (D.D.C. 2016) ................................................................................. 9, 10, 15

**Statutes & Other Authorities**

5 U.S.C. app. II § 3(2) .................................................................................................................... 10

5 U.S.C. app. II § 10(a) ............................................................................................................... 2, 12

5 U.S.C. app. II § 10(b) ............................................................................................................... 2, 10

41 C.F.R. § 102-3.75 ........................................................................................................................ 5

41 C.F.R. § 102-3.140(e) ............................................................................................................... 12

2017 Fed. Reg. 14210 .................................................................................................................. 7, 8

**INTRODUCTION**

This case seeks to ensure public accountability and transparency in what could be one of the most consequential federal advisory committees ever created: the recently launched Presidential Advisory Commission on Election Integrity (the "Commission").

The Federal Advisory Committee Act ("FACA") demands no less. FACA imposes strict transparency requirements whenever the Executive Branch—including the President—seeks the advice or recommendations of a group that includes non-federal officials. Congress mandated that such advisory committees be "open to public scrutiny" out of particular concern that members of such committees could seek to "advance their own agendas" through the committee's work. *Cummock v. Gore*, 180 F.3d 282, 284-85 (D.C. Cir. 1999) (internal quotation marks omitted).

That is precisely the case here. President Trump has made clear that he seeks to use the Commission to validate his unsubstantiated claim that there were 3 to 5 million voters who illegally cast ballots in the 2016 Presidential election. The Commission's Vice Chair, Kris Kobach, is exploiting his role on the Commission to promote his candidacy for Governor of Kansas, including to generate campaign contributions. Moreover, Kobach is using the Commission to acquire a patina of respectability for his long-running efforts to suppress the vote of certain populations under the guise of preventing "voter fraud." Kobach is joined in this regard by other commission members such as former Ohio Secretary of State Ken Blackwell and former Justice Department official Hans von Spakovsky, who have a long history of attempting to suppress the vote. Kobach and these Commission members have already inflicted significant damage through the Commission. Their unprecedented request for sensitive voter information from States—following a Commission meeting held with no public notice, no public attendance,

and no access to the Commission's records—has led to scores of voters canceling their voter registrations. The need to conduct this Commission with the transparency required by FACA could not be more urgent or important.

But Defendants have already violated, and continue to violate, FACA's transparency requirements. FACA requires that the Commission publicly disclose of all its records and make of all its meetings open to the public. 5 U.S.C. app. II §§ 10(a)-(b). Defendants have ignored the request of Plaintiff Lawyers' Committee for Civil Rights Under Law (the "Lawyers' Committee" or "Plaintiff") for the Commission's records. And Defendants have already held one Commission meeting that was improperly closed to the public, and they plan to hold another meeting on July 19, 2017 that is closed to the public—for which they will have not released the Commission's records beforehand.

The Commission's disregard of its transparency obligations begs the question: "What are they trying to hide?" Compl. Ex. I (tweet of President Trump discussing the Commission). The public, whose voting rights are at stake, has a right to know the Commission's activities, and it will be irreparably injured absent this Court's intervention.

The Lawyers' Committee satisfies all of the requisite elements for a TRO. The Lawyers' Committee is likely to succeed on the merits because Defendants have admitted that FACA applies to the Commission, and yet Defendants have not complied with FACA's requirements to produce the Commission's records in advance of its meetings, and to open the meetings to public attendance and participation. The Lawyers' Committee, and the public, will suffer irreparable harm because their statutory rights to receive the Commission's records prior to its meetings, and to participate in those meetings, cannot be satisfied after the fact. The balance of equities also weighs decisively in the Lawyers' Committee's favor because an injunction would impose no

harm on Defendants, and certainly not one that outweighs the harm to the Lawyers' Committee. And the requested relief serves the public interest in transparency and effectuates the principles that prompted Congress to enact FACA—principles that are paramount in this case given the potential consequences for American democracy of the Commission's work, given the strong evidence that the Commission has ulterior motives, and given the harm the Commission has already inflicted through its request for personal information of voters.

The Lawyers' Committee respectfully requests that this Court enter a temporary restraining order: (1) directing Defendants to produce records responsive to the Lawyers' Committee's request before the Commission's currently scheduled July 19 meeting; (2) requiring the Commission to open all meetings to in-person public attendance and participation; and (3) enjoining the Commission from holding the July 19 meeting, or any future meeting, until it has met its records and public access obligations under FACA.

## FACTUAL BACKGROUND

### A. President Trump Creates a Commission to Support His Claim That Millions of Persons Voted Illegally in Presidential Election

On November 27, 2016, then-President-Elect Donald J. Trump declared that he would have won the popular vote, in addition to the electoral college, if not for millions of purported illegal votes cast for his opponent.  Compl. Ex. A.

Though most elected officials on both sides of the aisle rejected this claim, along with virtually every political scientist and experts of all stripes, Kris Kobach vouched for it.  Kobach told a local newspaper on November 30, 2016, "I think the president-elect is *absolutely correct* when he says the number of illegal votes cast exceeds the popular vote margin between him and Hillary Clinton."  Compl. Ex. B (emphasis added).  Kobach proclaimed that a "reasonable estimate" was that 3.2 million people had voted illegally in the election.  *Id.*

Five days after taking office, on January 25, 2017, the President announced that he would launch an investigation into voter fraud. Compl. Ex. C. In an interview later that same day, the President explained that he launched this investigation to evaluate his claim that millions of people had voted illegally in the election. Compl. Ex. D. Ten days later in another interview, the President announced that Vice President Pence would chair a commission to conduct the investigation. Compl. Ex. E.

On February 12, 2017, Assistant to the President and Senior Advisor Stephen Miller reiterated the Administration's prejudgment of the Commission's conclusions in an interview with George Stephanopoulos. Miller stated that the Administration firmly believed there was rampant illegal voting in the election, and he named someone who professed the same view, Kansas Secretary of State Kris Kobach, as a purported expert who could validate the claim. Compl. Ex. F.

**B.     President Trump Establishes the Commission Pursuant to FACA**

President Trump established the Commission by Executive Order (the "Order") on May 11, 2017. Exec. Order 13799 (Compl. Ex. G). As the President had indicated he would, he appointed Vice President Pence to serve as Chair of the Commission. *Id.* § 2. The Order declared that the Commission's purpose is to "study the registration and voting processes used in Federal elections" and to report to the President on topics including "those vulnerabilities in voting systems and practices used for Federal elections that could lead to improper voter registrations and improper voting, including fraudulent voter registrations and fraudulent voting." *Id.* § 3.

The Commission from the outset identified itself as a federal advisory committee subject to FACA. It filed a Charter as required by FACA on June 23, 2017, stating in the "Authority" section: "The Commission is established in accordance with Executive Order 13799 of May 11,

- 4 -

2017, . . . *and the provisions of the Federal Advisory Committee Act ('FACA'), as amended (5 U.S.C. app.).*" Compl. Ex. H § 2 (emphasis added).

The Charter endeavors to provide the information required by law for federal advisory committee charters, 41 C.F.R. § 102-3.75, including the Commission's objectives and scope, the time necessary to carry out the Commission's work, the Federal officer to whom the advisory committee reports (here, the President), and the agency responsible for providing the Commission necessary support (here, GSA). Compl. Ex. H §§ 3–11. The Charter also provides that "[t]he records of the Commission and any subcommittees shall be maintained pursuant to the Presidential Records Act of 1978 *and FACA*." *Id.* § 13 (emphasis added). The Commission is registered in GSA's "FACA database" and the Charter has been posted to the Commission's page within that database.[1]

### C. Vice Chair Kobach Uses the Commission to Promote His Candidacy for Governor and to Legitimate His Long History of Unsubstantiated Allegations Regarding Voter Fraud

The same day the President established the Commission, the White House announced the appointment of Kansas Secretary of State Kris Kobach as the Commission's Vice Chair.[2] The Commission has since announced eight additional members, all but one of whom are not full-time federal employees. *Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity ("EPIC")*, No. 1:17-cv-01320-CKK (D.D.C.), ECF No. 11-1.

The public requires information to understand the central role that is being played by Vice Chair Kobach. Shortly after the Commission was announced, Vice Chair Kobach quickly

---

[1] FACA Database, http://www.facadatabase.gov/committee/committee.aspx?cid=2612&aid=74.

[2] *President Announces Formation of Bipartisan Presidential Commission on Election Integrity*, May 11, 2017, WhiteHouse.gov, https://www.whitehouse.gov/the-press-office/2017/05/11/president-announces-formation-bipartisan-presidential-commission.

began using the Commission to advance his own partisan and personal interests. He declared his candidacy for Governor of Kansas on June 8, 2017, and soon thereafter began aggressively touting his role on the Commission to promote his candidacy—and even to solicit campaign donations. He has done so repeatedly and conspicuously on his campaign website, on his official campaign social media accounts, and in his public appearances.[3]  Compl. Exs. J, K.

Kobach's political stock in trade has been to stoke fears of voter fraud, particularly by racial and ethnics minorities, and he now seeks the Commission's stamp of "respectability" for his scurrilous claims. Recently, a federal court granted a preliminary injunction against Kobach to prevent implementation of a law requiring documentary proof of citizenship for voter registration. *Fish v. Kobach*, 189 F. Supp. 3d 1107 (D. Kan. 2016), *affirmed*, 840 F.3d 710 (10th Cir. 2016). Even more recently in the same case, a United States Magistrate Judge fined Kobach $1,000 for making false statements to the court while attempting to withhold documents that the court had ordered to be disclosed. *Fish v. Kobach*, No. 16-2105-JAR, 2017 WL 2719427, at *5 (D. Kan. June 23, 2017). Kobach's record casts a cloud over the integrity of the Commission and further elevates the need for transparency.

### D.   The Commission Schedules and Conducts Meetings

On June 28, 2017, Vice President Pence presided over a meeting of the Commission held via phone conference. On the call, the Commission's members deliberated over the Vice Chair's plan to send a request to all 50 states and the District of the Columbia for the personal

---

[3] The Lawyers' Committee has filed complaints with the Office of Special Counsel and the Office of Government Ethics alleging that these actions violate the Hatch Act and federal ethics rules, since Kobach holds the status of a special government employee as Vice Chair of the Commission. Compl. Exs. J, K.

information of registered voters.[4]  There was no public notice of this June 28 meeting, nor was the public permitted to attend.

Kobach sent the letter to state officials the next day, June 29, 2017, and the request already is causing significant harm.  There have been widespread reports of voters canceling their voter registrations out of fear of what the Commission will do with their personal information.  For instance, Colorado officials have reported a 2,150 percent increase in registration cancellations since the Kobach letter was sent.[5]  The North Carolina state elections board has been "deluged with calls" from concerned voters, many of whom have requested that their registrations be cancelled.[6]  Officials in Florida and Arizona have reported similar responses from their residents.[7]

Against this backdrop of intense public concern regarding the Commission's activities, GSA posted notice in the Federal Register on July 5, 2017, that the Commission would meet on July 19, 2017.  2017 Fed. Reg. 14210.  The Federal Register notice explained that "[t]he Commission was established in accordance with E.O. 13799 of [May] 11, 2017, the Commission's charter, *and the provisions of FACA*."  *Id.* (emphasis added).  But despite the Commission's repeated self-identification as an entity governed by FACA, and despite FACA's

---

[4] Readout of the Vice President's Call with the Presidential Advisory Commission on Election Integrity, June 28, 2017, WhiteHouse.gov, https://www.whitehouse.gov/the-press-office/2017/06/28/readout-vice-presidents-call-presidential-advisory-commission-election.

[5] Sam Levine, *Colorado Voters Are Canceling Their Registrations After Trump Request For Voter Data, July 8*, 2017, HuffPost, http://www.huffingtonpost.com/entry/colorado-voter-registration_us_59612aa4e4b02e9bdb0d072c.

[6] Lynn Bonner, *NC elections office swamped with calls about voter data going to fraud commission*, July 7, 2017, http://www.charlotteobserver.com/latest-news/article160188674.html.

[7] *Flagler Voters Opting to Cancel Registration in Response to Trump Commission's Sweeping Records Request*, FlagerLive, July 7, 2017, https://flaglerlive.com/109922/voter-registration-commission/; Yvonne Wingett Sanchez & Ronald J. Hansen, *Arizona to oppose handing over voter information to Trump commission*, Ariz. Republic, July 3, 2017, http://www.azcentral.com/story/news/politics/arizona/2017/07/04/arizona-oppose-handing-over-voter-information-trump-commission/449221001/.

requirement that meetings be open to public attendance and participation, the notice indicated that the meeting would be closed to public attendance and participation. The notice stated that the public could only watch the meeting via livestreaming on the White House's website. *Id.*

There is also significant public concern regarding how the Commission will operate. While the Commission's Charter indicated that GSA is to provide administrative support services to the Commission, during a recent court hearing, lawyers for the Administration indicated that the data requested from state official would instead be maintained at the White House. And while the Commission provided a file transfer site to for state election officials to transmit the data, there is evidence that the site is was not secure. Finally, the Commission's unprecedented data request was, in several instances, directed to the wrong local officials, including ones who bear no responsibility for the voting and election process in their states. This evidence suggests that the Commission is not operating with an appropriate level of oversight and accountability, and further underscores the need for transparency.

### E.     The Commission Ignores the Lawyers' Committee's Request for Records

On July 3, 2017, the Lawyers' Committee submitted a request for the Commission's records pursuant to Section 10(b) of FACA. Compl. Ex. L. The Lawyers' Committee requested that the recipients produce:

> All emails since May 11, 2017 relating to the Commission's establishment, organization, operation, or work sent from or to the Commission's Chair, Vice Chair, other Commission members, or any federal employee (including special government employees) providing support to the Commission; and

> All other documentary materials created or received since May 11, 2017, including but not limited to records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, or agenda, relating to the Commission's establishment, organization, operation, or work that were made available to, or prepared by, the Commission's Chair, Vice Chair, other Commission members, or any federal employee (including special government employees) providing support to the Commission.

The Lawyers' Committee further asked that Defendants include within their search responsive files and emails in the personal custody of the Chair, Vice Chair, other Commission members, and relevant federal employees, including in personal and state and local government email accounts, to the extent they are reasonably likely to include responsive records. *Id.*

The Lawyers' Committee emailed this request on July 3, 2017, and additionally mailed hard copies that were delivered on July 5, 2017. Ex. M. The Lawyers' Committee requested that Defendants produce responsive materials sufficiently in advance of the Commission's July 19, 2017 meeting to permit adequate time for review, and no later than July 14, 2017. Ex. L.

On July 5, 2017, in response to a separate lawsuit filed by the Electronic Privacy Information Center and contrary to the Commission's Charter, Defendants wrote that they "do not concede that FACA applies to the Commission." *Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*, No. 1:17-cv-01320-CKK (D.D.C.), ECF No. 8 at 12. Defendants thus suggested—for the first time and contrary to the Commission's prior admissions and actions—that the Commission does not consider itself bound by FACA's requirements.

On July 9, 2017, the Lawyers' Committee sent a follow-up email confirming that it had not received any response to its request. Compl. Ex. N. To date, the Lawyers' Committee has not received any response, or even acknowledgement, of its request for records.

## ARGUMENT

"The standard for a temporary restraining order is the same as that for preliminary injunction." *Singh v. Carter*, 168 F. Supp. 3d 216, 223 (D.D.C. 2016). The Lawyers' Committee must show: (1) likelihood of success on the merits; (2) that it is likely to suffer

irreparable harm absent preliminary relief; (3) that the balance of equities tips in its favor; and (4) that the requested relief is in the public interest. *Id.*  The Lawyers' Committee can establish each of these elements here.

## I.    Likelihood of Success on the Merits

### A.    Defendants Continue to Violate Section 10 of FACA

Section 10(b)'s disclosure requirements are clear and mandatory.  The Commission "shall [make] available for public inspection" all "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the Commission and its members.  5 U.S.C. app. II § 10(b).  This provision "affirmatively obligates the Government to provide access to the identified materials." *Food Chem. News v. Dep't of Health & Human Servs.*, 980 F.2d 1468, 1472 (D.C. Cir. 1992).  And the Commission must provide access to its records "before or at" its meetings. *Id.*

These disclosure obligations apply to all federal advisory committees subject to FACA—including Presidential advisory committees.  Section 10(b) applies to "each advisory committee" as defined under FACA, and Section 3 defines "advisory committee" to include committees "established or utilized by the President."  5 U.S.C. app. II §§ 3(2); 10(b).  While several courts have declined to apply FACA's disclosure requirements to groups of Presidential advisors, the question in those cases was whether the group qualified as a "federal advisory committee" that fell under FACA at all. *See, e.g.*, *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 466-67 (1989).  The D.C. Circuit has squarely held that when the President does designate a Presidential advisory committee as established under FACA, it is subject to all of FACA's requirements. *Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Private Sector Survey on Cost Control*, 711 F.2d 1071, 1073 n.1 (D.C. Cir. 1983).  The court explained:  "where the President formally

convenes an advisory committee pursuant to the FACA, he cannot claim that enforcement of the Act's requirements would unconstitutionally impede his ability to perform his functions." *Id.*

Indeed, the D.C. Circuit has specifically applied Section 10(b)'s disclosure requirements to a Presidential advisory committee constituted just like this one. In *Cummock v. Gore*, 180 F.3d 282 (D.C. Cir. 1999), the court assessed the obligations of a Presidential advisory committee that was chaired by the Vice President and housed at the White House. The court held that the public "possesse[d] an enforceable right" to the committee's records under Section 10(b). *Id.* at 292.

Section 10(b) plainly applies to the Commission here, and Defendants have failed to meet their obligations under that provision. They previously held the June 28 telephonic meeting in violation of FACA's open access requirements, and without disclosing the Commission's records beforehand. And Defendants have not responded to, or even acknowledged, the Lawyers' Committee's request for records, nor have they provided any indication they will produce the Commission's records prior to the July 19 meeting. In fact, Defendants intimated in their July 5, 2017 brief in the *Electronic Privacy Information Center* case that they do not consider the Commission bound by FACA's requirements. *EPIC*, No. 1:17-cv-01320-CKK (D.D.C.), ECF No. 8 at 12. The Lawyers' Committee has a compelling basis to conclude that Defendants will not provide the requested materials before or at the meeting.

FACA indisputably applies to the Commission, and Defendants must abide by its requirements. They must immediately produce the Commission's records responsive to the Lawyers' Committee's request before the July 19 meeting.

...

### B. Defendants Will Violate Section 10(a) of FACA

Defendants will also violate Section 10(a) of FACA if this Court does not intervene. Section 10(a) of FACA requires that all meetings of the Commission "shall be open to the public" and "[i]nterested persons shall be permitted to attend, appear before, or file statements" with the Commission. 5 U.S.C. app. II § 10(a).

The Commission's planned July 19, 2017 meeting does not meet these requirements for public access and participation. The Commission is not allowing a *single member of the public* to attend the meeting, despite the extraordinarily high public interest in attending. Instead, members of the public will only be able to view the proceedings if they have the means and wherewithal to access a livestream from the White House's website. Even if the livestream does not crash due to thousands of people trying to access the White House website at all once, and even if the livestream video somehow captures all of the Commission members at all times (both of which are doubtful), internet viewing capability—with no opportunity for public interaction or participation—simply does not meet FACA's public access requirements. Regardless of whether a livestream would be consistent with FACA's open meeting requirements for a committee with low public interest or relatively small responsibilities, *see* 41 C.F.R. § 102-3.140(e), it does not meet the letter or purposes of FACA for a committee with the size of membership, scope of duties, and national import that this Commission possesses. The Commission must open the July 19 meeting to in-person public attendance and participation.

## II. Plaintiff Will Suffer Irreparable Harm Absent a Temporary Restraining Order

The Lawyers' Committee and other members of the public will suffer irreparable harm absent this Court's intervention. The Lawyers' Committee devotes considerable resources to protecting the voting rights of Americans and has a history of collaborating with federal law

enforcement agencies, including the U.S. Department of Justice, in this work. The work and activity of a new federal Commission focused on voting and elections is highly germane to the work of the Lawyers' Committee.

Access to the Commission's records before the July 19 meeting is essential to the Lawyers' Committee's ability to evaluate, inform the public about, and respond to the Commission's activities, including the July 19 meeting. And this access is especially important for the Lawyers' Committee and others to be able to assess what steps, if any, the Commission has taken to protect the security of the sensitive voter information it requested from states.

Absent a temporary restraining order, the Lawyers' Committee will have no other way to vindicate its right under FACA to access the Commission's records before it first meets. Any possible remedy that comes after the July 19 meeting will be too late. The Lawyers' Committee and other members of the public will suffer irreparable harm if denied access to the Commission records that FACA guarantees them. *See Pub. Citizen v. Nat'l Econ. Comm'n*, 703 F. Supp. 113, 129 (D.D.C. 1989) (granting temporary restraining order enjoining FACA meeting, based on finding of irreparable harm if were meeting conducted in contravention of FACA); *Food Chemical News, Inc. v. Davis*, 378 F. Supp. 1048, 1049 (D.D.C. 1974) (enjoining future FACA meetings until defendants complied with FACA's requirements).

Likewise, the Lawyers' Committee and other members of the public will suffer irreparable harm if denied the ability to attend and participate in the July 19 meeting. The right to attend the meeting will obviously be forever gone once the meeting concludes, and the ability to attend the first public meeting of the Commission is especially critical. *See Pub. Citizen*, 703 F. Supp. at 129 ("In the absence of injunctive relief, plaintiffs will be irreparably harmed" if FACA meeting conducted "behind closed doors," because they would be "denied, perhaps for all

time, but at a minimum during the on-going course, that which Congress expressly protected through FACA."); *Food Chemical News*, 378 F. Supp. at 1052 ("[I]t is imperative that public access to advisory committee meetings be provided by the Government if the Act is to become a reality and individuals such as Plaintiff are to have the opportunity to discharge their responsibility to inform the public.")

The risk of irreparable harm is also particularly acute here given the history of Vice Chair Kobach and other members of the Commission in suppressing the vote of certain populations. For instance, Commission member Ken Blackwell, as Ohio Secretary of State, once ordered local Ohio election boards to reject voter registration applications unless they were printed on paper of at least 80-pound thickness (as opposed to standard paper).[8] And Commission member Hans von Spakovsky, while at the Department of Justice in the early 2000s, "led unsuccessful suits to purge voter rolls in Missouri" and "steamrolled the recommendations of career Justice lawyers."[9] These Commission members now have the weight of a Presidential Advisory Commission that could potentially help them carry out their long-standing efforts to undermine voting rights.  It is essential that there be full transparency, as required by FACA, so that the public can determine whether these individuals are attempting to use the Commission to generate new voter suppression schemes or other efforts to restrict voting rights.

---

[8] *Block the Vote, Ohio Remix*, N.Y. Times, June 7, 2006, http://www.nytimes.com/2006/06/07/opinion/07wed1.html?mcubz=1.

[9] Alex Horton & Gregory S. Schneider, *Trump's pick to investigate voter fraud is freaking out voting rights activists*, June 30, 2017, https://www.washingtonpost.com/news/post-nation/wp/2017/06/30/trumps-pick-to-investigate-voter-fraud-is-freaking-out-voting-rights-activists/?utm_term=.ba8eff324e2d.

**III.     The Balance of Equities Weigh in Favor of a Temporary Restraining Order**

This Court considers whether the request relief would "substantially injure other interested parties" in weighing the balance of equities. *Singh*, 168 F. Supp. 3d at 223. Here, the requested relief would not injure Defendants nor anyone else. It would simply require Defendants to comply with their legal obligations. *See Pub. Citizen*, 703 F. Supp. at 129. Nor can Defendants claim imminent harm that would result from delaying the July 19 meeting until they have complied with their obligations. Indeed, there is nothing at all talismanic about that date and the fact that the Commission waited several months after it was created—and nearly six months after the President first announced his intention to investigate voter fraud when taking office—goes to show that a temporary delay of the July 19 meeting will not harm Defendants in any way. In contrast, if the requested TRO is not granted, the Lawyers' Committee will have forever lost its rights under FACA to access the Commission's records before it first meets and to exercise its statutory rights to attend the Commission's first meeting. The balance of harms tips entirely to one side in this case.

**IV.     The Public Interest Weighs in Favor of a Temporary Restraining Order**

Finally, the public interest weighs decisively in favor of granting the relief requested. FACA's entire purpose is to vindicate "the public . . . right to know how its government is conducting the public's business." *Pub. Citizen*, 703 F. Supp. at 129. That public interest is at its peak here given the enormous import and potential consequences of the Commission's work, as well as the significant reasons to believe that the Commission is being used for ulterior motives.

Moreover, the need for immediate public access to the Commission's records and meetings is especially important given the consequences of the Commission's request to states for voter data. In an era of rampant identity theft, hacking, and invasions of privacy, millions of

- 15 -

Americans are understandably concerned with any dissemination of their personal identifying information. Added to these concerns is the widespread fear of the Commission's activities and what it will do with their data, a fear that secrecy only fuels. As explained, in consequence, voters across the nation have begun cancelling their voter registrations in response to the Commission's data request. The public must know the Commission's true intentions to address these concerns. Indeed, if the Commission has no improper motives, as its members have suggested, the Commission should be anxious to fully disclose its records and open its meetings to put the public at ease. And if the Commission's motives are in fact improper, transparency could not be more important to the public interest.

## CONCLUSION

The Lawyers' Committee respectfully requests that this Court enter a temporary restraining order: (1) ordering Defendants to produce records responsive to the Lawyers' Committee's request prior to the Commission's July 19 meeting; (2) requiring the Commission to open the July 19 meeting to in-person public attendance and participation; and (3) enjoining the Commission from holding the July 19 meeting until it has met its records and public access obligations under FACA.

DATED: July 10, 2017

Respectfully Submitted,

_/s/ John A. Freedman_

| | |
|---|---|
| Kristen Clarke (D.C. Bar # 973885) | John A. Freedman (D.C. Bar # 453075) |
| Jon Greenbaum (D.C. Bar # 489887) | Robert N. Weiner (D.C. Bar # 298133) |
| Ezra D. Rosenberg (D.C. Bar # 360927) | David J. Weiner (D.C. Bar # 499806) |
| Marcia Johnson-Blanco (D.C. Bar # 495211) | R. Stanton Jones (D.C. Bar # 987088) |
| LAWYERS' COMMITTEE FOR | Daniel F. Jacobson* (D.C. Bar # 1016621) |
| CIVIL RIGHTS UNDRE LAW | ARNOLD & PORTER KAYE SCHOLER LLP |
| 1401 New York Ave., NW | 601 Massachusetts Ave., NW |
| Washington, DC  20005 | Washington, DC  20001 |
| Telephone: +1 202.662.8600 | Telephone: +1 202.942.5000 |

Facsimile:  +1 202.783.0857
erosenberg@lawyerscommittee.org

Facsimile:  +1 202.942.5999
John.Freedman@apks.com

Kathryn W. Hutchinson**
ARNOLD & PORTER KAYE SCHOLER LLP
44th Floor
777 South Figueroa Street
Los Angeles, CA  90017-5844
Telephone:  +1 213.243.4000
Facsimile:  +1 213.243.4199

Counsel for Plaintiff Lawyers' Committee for Civil Rights Under Law

*D.D.C. application forthcoming
** *Pro hac vice* application forthcoming

- 17 -