**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, <br><br>      *Plaintiff*, <br><br>      v. <br><br> PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY, *et al.*, <br><br>      *Defendants*. | Civil Action No. 17-1354 (CKK) |

**MEMORANDUM OPINION**
(July 18, 2017)

This case arises from the establishment by Executive Order of the Presidential Advisory Commission on Election Integrity (the "Commission"). Plaintiff alleges that the Commission is an advisory committee subject to the disclosure, notice, and reporting requirements of the Federal Advisory Committee Act, codified at 5 U.S.C. app. 2 ("FACA"). Pending before the Court is Plaintiff's [3] Motion for Temporary Restraining Order and Preliminary Injunction. That motion seeks an order requiring the Commission to hold a scheduled July 19, 2017 meeting "open to in-person public attendance and participation" and to disclose certain records to the public prior to the meeting. Proposed Order, ECF No. 3-2. Although the Commission's affairs have drawn substantial public attention, the legal issues involved are highly technical, implicating the jurisdiction of this Court and its ability to afford judicial review for Plaintiff's claims, and requiring a fine-grained analysis of a federal law—FACA—that is likely unfamiliar to even seasoned legal practitioners. Given the preliminary and emergency nature of the relief sought, the Court need not at this time decide conclusively whether Plaintiff is, or is not, ultimately entitled

to relief on the merits. Rather, if Plaintiff has standing to bring this lawsuit, then relief may be granted if the Court finds that Plaintiff has a likelihood of succeeding on the merits, that it would suffer irreparable harm absent injunctive relief, and that other equitable factors—that is, questions of fairness, justice, and the public interest—warrant such relief.

At this juncture, the Court finds that although Plaintiff has standing, it has not shown a likelihood of success on the merits, principally because it has not demonstrated that, at the present time, Defendants are out of compliance with FACA's open meetings and document disclosure provisions. The Court further concludes that Defendants' disclosures to date are sufficient for the public and Plaintiff to engage in an informed debate regarding the activities of the Commission, meaning that Plaintiff has not demonstrated that it will suffer an irreparable informational injury. Finally, the balance struck to date between the equitable and public interests in prompt disclosure, on the one hand, and permitting the Commission to operate without undue burden, on the other, obviates the need for emergency injunctive relief, at least for the time being. Nonetheless, to the extent the factual or equitable circumstances change, the Court may be required to revisit this and other determinations made herein. Accordingly, upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, Plaintiff's [3] Motion for Temporary Restraining Order and Preliminary Injunction is **DENIED WITHOUT PREJUDICE**.[2]

---

[1] The Court's consideration has focused on the following documents:
- Pl.'s Mem. in Supp. of Mot. for TRO and Prelim. Inj., ECF No. 3-1 ("Pl.'s Mem.");
- Defs.' Mem. in Opp'n to Pls.' Mots. for TRO and Prelim. Inj., ECF No. 15 ("Opp'n Mem.");
- Pl.'s Reply Mem. in Supp. of Mot. for TRO and Prelim. Inj., ECF No. 16 ("Pl.'s Reply Mem.").

[2] Plaintiff has consented to the contemporaneous adjudication of both its motion for a temporary restraining order and its motion for a preliminary injunction.

# I. BACKGROUND

## A.  Statutory Background

FACA imposes a number of procedural requirements on "advisory committees," which are defined to include "any committee . . . which is . . . established or utilized by the President . . . in the interest of obtaining advice or recommendations for the President . . . ." 5 U.S.C. app. 2 § 3(2). The statute exempts "any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government . . . ." *Id*. FACA was enacted out of

> a desire to assess the need for the numerous committees, boards, commissions, councils, and similar  groups which have been established to advise officers and agencies in the executive branch of the Federal Government. . . . Its purpose was to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature.

*Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 445–46 (1989) (internal quotation marks and citations omitted).

To achieve that purpose, FACA requires that an advisory committee, *inter alia*, file a charter before meeting or taking any action, 5 U.S.C. app. 2 § 9(c), hold its meetings "open to the public," *id*. § 10(a)(1), publish "timely notice" of each such meeting in the Federal Register, *id*. § 10(a)(2), keep minutes and other records of its meetings, *id*. § 10(c), and allow "interested persons . . . to attend, appear before, or file statements with" the committee, *id*. § 10(a)(3). FACA also mandates that, unless an exception applies under the Freedom of Information Act ("FOIA"), "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made

available to or prepared for or by each advisory committee shall be available for public inspection and copying . . . ." *Id.* § 10(b). Finally, FACA requires that each advisory committee be "fairly balanced in terms of the points of view represented and the functions to be performed," *id.* § 5(b)(2), and "not be inappropriately influenced by the appointing authority or by any special interest," *id.* § 5(b)(3).

### B. Factual Background

The Commission was established by Executive Order on May 11, 2017. Executive Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017) ("Exec. Order"). According to the Executive Order, the Commission's purpose is to "study the registration and voting processes used in Federal elections." *Id.* § 3. The Executive Order states the Commission is "solely advisory," and that it shall disband 30 days after submitting a report to the President on three areas related to "voting processes" in Federal elections. *Id.* §§ 3, 6. The Vice President is the chair of the Commission, and the President may appoint 15 additional members. From this group, the Vice President is permitted to appoint a Vice Chair of the Commission. On the same day the Commission was established, the Vice President appointed Kris W. Kobach, Secretary of State for Kansas, to serve as the Vice Chair. Compl. ¶ 32; Decl. of Kris Kobach, *Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*, No. 17-cv-1320 (D.D.C. July 3, 2017) ("*EPIC*"), ECF No. 8-1, at 1.

Apart from the Vice President and the Vice Chair, there are presently ten other members of the Commission, including Commissioner Christy McCormick of the Election Assistance Commission (the "EAC"), who is currently the only federal agency official serving on the Commission, and a number of state election officials, both Democratic and

Republican, and a Senior Legal Fellow of the Heritage Foundation. Decl. of Andrew J. Kossack, ECF No. 15-1 ("Kossack Decl."), ¶ 1. According to Defendants, "McCormick is not serving in her official capacity as a member of the EAC." *EPIC*, Second Decl. of Kris W. Kobach, ECF No. 11-1, at 2. The Executive Order also provides that the General Services Administration ("GSA"), a federal agency, will "provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission on a reimbursable basis," and that other federal agencies "shall endeavor to cooperate with the Commission." Exec. Order, §§ 7(a), (b). Furthermore, the Administrator of General Services—the agency head of the GSA—is charged with performing "any functions of the President under [FACA], except for those in section 6[,]" to the extent that FACA applies to the Commission. *Id*. § 7(c).

The Commission filed a charter on June 23, 2017. Compl. § 29, Ex. A. In pertinent part, the Charter provides that the Commission "will function solely as an advisory body," *id*. ¶ 4; that the Commission is established in accordance with the Executive Order "and the provisions of the Federal Advisory Committee Act," *id*. ¶ 2; and that the GSA "shall provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission[,]" *id*. ¶ 6. Defendants represent that the Commission is voluntarily complying with FACA. Kossack Decl. ¶ 2.

On June 28, 2017, the Vice President held a teleconference with members of the Commission, during which the Vice Chair discussed his intention to send letters to state election officials requesting certain information on registered voters. Compl. ¶ 35. There is no evidence in the record that advance notice of this teleconference was provided by the

Commission, or that it was accessible to the public, but a "readout" of the call has been made publicly available, which describes the event as an "organizational call" and states that the Commission "set July 19 as its first meeting, which will take place in Washington, D.C." *Id*.; *see* Readout of the Vice President's Call with the Presidential Advisory Commission on Election Integrity, *available at* https://www.whitehouse.gov/the-press-office/2017/06/28/readout-vice-presidents-call-presidential-advisory-commission-election (last accessed on July 18, 2017). According to Defendants, the teleconference was merely a preliminarily, organizational call, and members were expressly advised that the conversation "would be limited to preparatory and administrative work, and would not address matters on which the Commission was charged with advice and recommendations." Kossack Decl. ¶ 4 (citing Ex. A). Furthermore, although "[t]he Vice Chair and staff described the request, . . . members were not given a copy of any requests in advance of the call and did not see the request until shortly before it was sent to states." *Id*. ¶ 5. The request was, however, discussed for several minutes, and although members did not vote on whether to send the request or any other matter, the "request was modified in response to some of [their] comments." *Id*.

Subsequently, on June 29, 2017, the Vice Chair directed that identical letters "be sent to the secretaries of state or chief election officers of each of the fifty states and the District of Columbia." *EPIC*, Decl. of Kris Kobach, ECF No. 8-1, at 2. In addition to soliciting the views of state officials on certain election matters by way of seven broad policy questions, each of the letters requests that state officials provide the Commission with the "publicly available voter roll data" of their respective states, "including, if publicly available under the laws of [their] state, the full first and last names of all registrants, middle

names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information." *Id.*, Ex. 3 (June 28, 2017 Letter to the Honorable John Merrill, Secretary of State of Alabama). A substantial number of states have either fully or partially declined to comply with the Commission's request for voter roll data—the exact number and the specific details of the states' responses are unknown to the Court and are not relevant to the disposition of the pending motion. Without doubt, however, substantial public attention has been focused on the Commission's request for voter roll information. *See, e.g.,* Compl. ¶¶ 37–38.

On July 5, 2017, a meeting notice was published in the Federal Register indicating that the "first Commission meeting will be held on Wednesday, July 19, 2017, from 11:00 a.m., Eastern Daylight Time (EDT) until no later than 5:00 p.m., EDT." 82 Fed. Reg. 31063 (July 5, 2017). The notice appears to have been published by the GSA, and under the section entitled "Agency," both the GSA, and the Office of Government-wide Policy ("OGP"), a component of the GSA, are listed. Furthermore, the notice states that the Commission is "a Federal Advisory Committee established in accordance with the Federal Advisory Committee Act . . . ." The notice further provides that the July 19 meeting "will be open to the public through livestreaming on https://www.whitehouse.gov/live," which is the "same livestreaming system regularly used by the White House to stream White House press briefings, speeches by the President and Vice President, and other events with significant viewership." Kossack Decl. ¶ 7. The notice states that individuals may submit

written comments to the Commission via email in advance of the meeting, and that the meeting "will consist of a ceremonial swearing in of Commission members, introductions and statements from members, a discussion of the Commission's charge and objectives, possible comments or presentations from invited experts, and a discussion of next steps and related matters." Although the notice indicates that there "will not be oral comments from the public at th[e] initial meeting[,]" it adds that "[t]he Commission will provide individuals interested in providing oral comments the opportunity to do so at subsequent meetings." According to Defendants, members of the general public will be excluded from the July 19 meeting due to security concerns posed by the attendance of the Vice President, but "a number of accredited members of the White House press corps will be invited to attend in person," as space permits. Kossack Decl. ¶ 8.

In a submission to this Court, Defendants have represented that the Commission intends to "publish to a public webpage all documents which were made available to or prepared for or by the Commission, in accordance with FACA." *Id*. ¶ 2. Furthermore, prior to the July 19 meeting, the Commission will post to its website the agenda of the meeting, "public comments received through the Commission's staff email account within a reasonable time in advance of the meeting, and other documents that are prepared for or by the Commission." *Id*. ¶ 10. The Commission has received over 30,000 public comments via the Commissions' email address. *Id*.

On July 3, 2017, Plaintiff submitted a request for the Commission's records pursuant to section 10(b) of FACA. In particular, Plaintiff requested that, prior to the July 19 meeting, the Commission produce:

> All emails since May 11, 2017 relating to the Commission's establishment, organization, operation, or work sent from or to the Commission's Chair,

> Vice Chair, other Commission members, or any federal employee (including special government employees) providing support to the Commission; and
>
> All other documentary materials created or received since May 11, 2017, including but not limited to records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, or agenda, relating to the Commission's establishment, organization, operation, or work that were made available to, or prepared by, the Commission's Chair, Vice Chair, other Commission members, or any federal employee (including special government employees) providing support to the Commission.

Compl., Ex. L. A follow-up email was sent by Plaintiff on July 9, 2017. *Id.*, Ex. N. Defendants concede that they did not respond directly to the request before this suit was filed. Kossack Decl. ¶ 3.

## II. LEGAL STANDARD

Preliminary injunctive relief, whether in the form of a temporary restraining order or a preliminary injunction, is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (emphasis in original; quotation marks omitted)). A plaintiff seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (quoting *Winter*, 555 U.S. at 20) (alteration in original; quotation marks omitted)). When seeking such relief, "the movant has the burden

to show that all four factors, taken together, weigh in favor of the injunction.'" *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)). "The four factors have typically been evaluated on a 'sliding scale.'" *Davis,* 571 F.3d at 1291 (citation omitted). Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291-92.[3]

## III. DISCUSSION

### A.  Subject-Matter Jurisdiction

#### 1.  *Standing and Ripeness*

With respect to Plaintiff's claim under section 10(b), which seeks the disclosure, prior to the July 19 meeting, of two broad categories of materials related to the Commission, Defendants contend that Plaintiff has not suffered an injury-in-fact, or, in the alternative, that Plaintiff's section 10(b) claim is not yet ripe. The Court must assess its subject-matter jurisdiction with respect to a particular claim before ruling on the merits. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999).

---

[3] The Court notes that it is not clear whether this circuit's sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (concurring opinion)). However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis. *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112. In any event, this Court need not resolve the viability of the sliding-scale approach today, as it finds that Plaintiff has failed to show a likelihood of success on the merits and irreparable harm, and that the other preliminary injunction factors are in equipoise.

Standing requires that a plaintiff have "a personal stake in the outcome of the controversy . . . ." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Consequently, a plaintiff cannot be a mere bystander or interested third-party, or a self-appointed representative of the public interest; he or she must show that defendant's conduct has affected them in a "personal and individual way." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The familiar requirements of Article III standing are:

> (1) that the plaintiff have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 167 (1997) (citing *Lujan*, 504 U.S. at 560–61). Here, Defendants do not contest that Plaintiff may suffer an informational injury, sufficient to confer standing, if Plaintiff has been denied advisory committee materials that are due to it pursuant to section 10(b). Opp'n Mem. at 8. Indeed, the Supreme Court and the D.C. Circuit have both recognized that plaintiffs have informational standing when they are denied materials allegedly due to them under FACA. *Pub. Citizen*, 491 U.S. at 449; *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 583 F.3d 871, 873 (D.C. Cir. 2009) ("In the context of a FACA claim, an agency's refusal to disclose information that the act requires be revealed constitutes a sufficient injury.) Rather, Defendants argue that Plaintiff has not suffered an injury because the Commission "has announced its intent to release the relevant July 19 materials in advance of the meeting." Opp'n Mem. at 9. However, this is not a jurisdictional argument, but instead one that drives at the heart of the merits dispute between the parties; that is, whether Defendants disclosures to date, and representations

regarding future disclosures, are sufficient to satisfy the requirements of section 10(b). Plaintiff claims that they are not, and as the Court must assume the validity of Plaintiff's view of the law for purposes of the jurisdictional inquiry, Plaintiff has accordingly stated an informational injury that is sufficient to confer standing in this case. *See Parker v. D.C.*, 478 F.3d 370, 378 (D.C. Cir. 2007), *aff'd sub nom. D.C. v. Heller*, 554 U.S. 570 (2008).

Defendants also challenge the section 10(b) claim as unripe for judicial review. The ripeness doctrine aims at preventing the courts from adjudicating cases "not involving present injury." *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999). "Ripeness, while often spoken of as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of standing that an injury in fact be certainly impending." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). A plaintiff must "demonstrate[ ] that it faces an imminent or certainly impending injury" to pass the "ripeness test." *Chlorine Inst. v. Federal R.R. Admin.*, 718 F.3d 922, 927 (D.C. Cir. 2013). "Additionally, the ripeness doctrine has a prudential aspect; in which the court balances the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration—that extends beyond standing's constitutional core." *Delaware Riverkeeper Network v. Fed. Energy Regulatory Comm'n*, No. 16-CV-416 (TSC), 2017 WL 1080929, at *3 (D.D.C. Mar. 22, 2017) (internal quotation marks omitted; citing *Nat'l Treasury*, 101 F.3d at 1427).

 Essentially, Defendants contend that the section 10(b) claim is not yet ripe because Defendants intend to publish materials, that in their view, satisfy the disclosure obligations current placed upon them by FACA, and that Plaintiff's claim is consequently based on Defendants failing to abide by their representations in this case. Opp'n Mem. at 9 (citing

*Texas v. United States*, 523 U.S. 296, 300 (1998) (a claim is not ripe for adjudication "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all")). The Court disagrees with this view of the law. On the basis of *Food Chemical*, Plaintiff contends that they are entitled to the disclosure of materials *now*, not at some point in the future, and that the disclosures to date, and the promised disclosures in the future, are insufficient to satisfy section 10(b). Put differently, there is a merits disagreement here both about the scope and *timing* of Defendants' disclosure obligations. *Food Chem. News v. Dep't of Health & Human Servs.*, 980 F.2d 1468, 1472 (D.C. Cir. 1992). This is not to say that Plaintiff is correct, but merely that for purposes of this Court's subject-matter jurisdiction, Plaintiff has asserted an informational injury that is both imminent and certain—assuming its view of the law wins the day—and therefore ripe for judicial review. *See Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (for purposes of informational standing, Plaintiff must show that "it has been deprived of information that, *on its interpretation*, a statute requires the government or a third party to disclose to it" (emphasis added)).

　　　*2.　Mandamus Jurisdiction*

Among other avenues of potential redress, Plaintiff also seeks relief pursuant to 28 U.S.C. § 1361, which provides that "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." In this case, that relief would be an injunction in the form of mandamus requiring Defendants to comply with FACA.

Mandamus is a "drastic remedy, to be invoked only in extraordinary circumstances." *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (internal quotation

marks omitted; citing *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980)). "To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). These requirements are jurisdictional. *Id.* Even when these requirements are met, however, "a court may grant relief only when it finds compelling equitable grounds. . . . The party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable." *Id.* (citing *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)).

Mandamus jurisdiction is not presently available in this case for several reasons. First, the Court does yet not conclude that there is no "adequate alternative remedy," because it need not rule out the availability of judicial review pursuant to the Administrative Procedure Act ("APA"), as even if APA review were available, Plaintiff has not demonstrated an entitlement to relief at this time. *Infra* at 16. Second, the particular provisions of FACA sought to be enforced by Plaintiff do not provide a "clear and indisputable right" to the relief sought by Plaintiff in its motion for emergency injunctive relief. The document disclosure provision of FACA—section 10(b)—albeit broad in scope, does not itself create a right to the *imminent* release of all relevant, non-exempt materials. And the open meetings and public participation requirements—sections 10(a)(1) and 10(a)(3)—do not, on their face, require the public to be able to physically attend and provide oral commentary at *every* advisory committee meeting. *Infra* at 19. Third, for the reasons detailed below, Defendants appear to have, for the time being, complied with FACA as that law has been interpreted by the D.C. Circuit. *Infra* at 19, 22.

This is not to say that mandamus relief may never be appropriate for alleged FACA violations—other district courts have found, in different legal and factual circumstances, that such relief may indeed be available. *See, e.g., Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 32 (D.D.C. 2011); *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 31 (D.D.C. 2010). The Court merely concludes that, given the factual and legal circumstances of this case, it lacks jurisdiction to confer relief in the form of mandamus at the present time.

## B. Likelihood of Success on the Merits

FACA does not provide for a private cause of action. *Ctr. for Biological Diversity v. Tidwell*, No. CV 15-2176 (CKK), 2017 WL 943902, at *4 (D.D.C. Mar. 9, 2017). Accordingly, judicial review must be sought through some alternative route. Plaintiff contends that review is available pursuant to section 702 of the APA, which provides that a "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. If judicial review is available, the district court may, among other things, "compel agency action unlawfully withheld or unreasonably delayed . . . ." *Id.* § 706(1). "[A] a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original). This latter limitation, that the allegedly withheld action be one that the agency was *required to take*, "rules out judicial direction of even discrete agency action that is not demanded by law." *PETA v. USDA*, 797 F.3d 1087, 1098 (D.C. Cir. 2015) (internal quotation marks omitted); *see also Norton*, 542 U.S. at 66 (noting that section 706(1) carried forward "the traditional

practice prior to its passage, when judicial review was achieved through use of the so-called prerogative writs–principally writs of mandamus under the All Writs Act"). In addition, the Court may set aside agency action—in this case, presumably the convening of the July 19 meeting—that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A). A party challenging agency action as arbitrary and capricious "must show the agency action is not a product of reasoned decisionmaking." *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016). "This is a heavy burden, since *State Farm* entails a very deferential scope of review that forbids a court from substituting its judgment for that of the agency." *Id.* (internal quotation marks and alterations omitted); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Defendants strenuously oppose the availability of APA review, principally on the basis that, in their view, the Commission is not an "agency." *See* Opp'n Mem. at 10–13. The Court need not reach this issue, as it finds that even if APA review were available, Plaintiff has not demonstrated that it has a likelihood of success on the merits. *See Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006) ("the APA's final agency action requirement is not jurisdictional"); *PETA*, 797 F.3d at 1098 (declining to decide whether judicial review was available pursuant to the APA, and instead dismissing on the basis that agency action was not "unlawfully withheld" pursuant to section 706(1)).

Plaintiff's request for injunctive relief is predicated on Defendants' alleged violations of three FACA requirements. The first, section 10(a)(1), mandates that "[e]ach advisory committee meeting shall be open to the public"; the second, section 10(a)(3), mandates that "[i]nterested persons shall be permitted to attend, appear before, or file

statements with any advisory committee, subject to such reasonable rules or regulations as the Administrator may prescribe"; and the third, section 10(b), mandates that "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist." Plaintiff alleges that the Commission will violate FACA unless it holds the July 19 meeting open to "in-person public attendance and participation . . . ." Compl. ¶ 59. And that the Commission has violated and will continue to violate section 10(b) because it has not disclosed materials responsive to Plaintiff's July 3 request. *Id.* ¶ 53. The Court assesses each of these claims in turn.

First, section 10(a)(1) does not prescribe the manner in which advisory committee meetings are supposed to be "open to the public." Defendants have provided for public viewing of the July 19 meeting through a livestreaming service used by the White House for events with substantial viewership, such as official press briefings and speeches by the President and the Vice President. *See supra* at 7. Furthermore, section 10(a)(3) does not require that interested persons be permitted to attend *each* advisory committee meeting, nor does it even seem to require that an advisory committee provide an opportunity for in-person attendance at all, if interested persons are permitted to "file statements" with the committee. *See Holy Cross Neighborhood v. Julich*, 106 F. Supp. 2d 876, 887 (E.D. La. 2000) (noting "Congress' use of the disjunctive: the Plaintiffs do not have the right to attend, appear before *and* file statements"). Here, the Commission has permitted interested persons to submit written comments in advance of the meeting, and has stated that it "will

provide individuals interested in providing oral comments the opportunity to do so at subsequent meetings[,]" presumably where the security concerns posed by the attendance of the Vice President are not present. *See supra* at 8. Consequently, section 10(a) does not appear to require Defendants to do anything more to comply with FACA, at this point, than what they have already done.

This conclusion is buoyed by a review of pertinent regulations promulgated by the GSA elaborating on how federal advisory committees are expected to comply with FACA. *See generally* 41 C.F.R., part 102-3 ("Federal Advisory Committee Management"). These regulations do not necessarily carry the force of law, but they are at very least instructive because the GSA is "the agency responsible for administering FACA . . . ." *Pub. Citizen*, 491 U.S. at 465 n.12 (citing 5 U.S.C. App. § 7(c), which authorizes the GSA to "prescribe administrative guidelines and management controls applicable to advisory committees . . . ."). Moreover, section 10(a)(3) specifically subjects the right of "persons . . . to attend, appear before, or file statements with any advisory committee, . . . to such reasonable rules or regulations as the Administrator [of the GSA] may prescribe." With respect to the open meetings requirement of section 10(a)(1), the pertinent regulations require only that an advisory committee meeting be "held at a reasonable time and in a manner *or* place reasonably accessible to the public," that the "meeting room or *other forum* selected is sufficient to accommodate . . . a reasonable number of interested members of the public," and that any "advisory committee meeting conducted in whole or part by a teleconference, videoconference, the Internet, or other electronic medium [must meet] the requirements of this subpart." 41 C.F.R. § 102-3.140 (emphasis added). Consequently, the regulations anticipate that some advisory committee meetings will be made publicly accessible via

internet access, and that this is permissible so long as this method is "reasonably accessible to the public," and can accommodate "a reasonable number of interested members of the public." *Id.* Based on Defendants' representations, the livestreaming service offered for the July 19 meeting appears likely to satisfy both of these requirements, and indeed will offer more members of the public the opportunity to observe proceedings than had only physical access been permitted.[4] With respect to the requirements of section 10(a)(3), the pertinent regulations, like the statutory text, do not require that interested persons be permitted to provide oral comments at *every* advisory committee meeting. *See id.* § 102-3.140(d) ("[a]ny member of the public may speak to or otherwise address the advisory committee if the agency's guidelines so permit"). Accordingly, the Court finds that Plaintiff has failed to demonstrate a likelihood of success with respect to its claim that Defendants' arrangements for the July 19 meeting are violative of sections 10(a)(1) or 10(a)(3) of FACA.

Turning to the section 10(b) claim, Plaintiff has requested the disclosure, prior to the July 19 meeting, of two broad categories of materials related to the Commission and

---

[4] In a related case, *American Civil Liberties Union, et. al., v. Donald Trump, et. al.*, No. 17-cv-1351 (D.D.C. July 10, 2017) ("*ACLU*"), plaintiffs have argued, in essence, that Defendants are violating these regulations because the meeting is being held in-person, while public access is being provided via the internet. *ACLU*, ECF No. 17, at 16. The Court does not read the statute or regulations so narrowly. For example, the regulations provide that each "advisory committee meeting [must be] held at a reasonable time and in a manner or place reasonably accessible to the public . . . ." 41 C.F.R. § 102-3.140(a). This only requires that the "manner" *or* "place" be reasonably accessible to the public, not both. Furthermore, the regulations seem to anticipate that meetings may be held in a mixed medium, as they provide for an "advisory committee meeting [to be] conducted in whole *or part* by a teleconference . . . ." *Id.* § 102-3.140(e) (emphasis added). Finally, it must be remembered that the statutory mandate only requires generally that each "advisory committee meeting shall be open to the public." 5 U.S.C. app. 2 § 10(a)(1). No particular mode of access is specified.

its members. The first category seeks email correspondence between Commission members, including the Vice President and the Vice Chair, and any federal employee providing support to the Commission, that relates "to the Commission's establishment, organization, operation, or work . . . ." Compl., Ex. L. The second category seeks to capture "[a]ll other documentary materials created or received . . . relating to the Commission's establishment, organization, operation, or work that were made available to, or prepared by, the Commission's Chair, Vice Chair, other Commission members, or any federal employee . . . providing support to the Commission." *Id*. Whether some or all of these materials should be made publicly available under section 10(b) *at some point* is not the question before the Court given the nature of the pending motion for injunctive relief. Rather, the pertinent question is what materials must be made publicly available by the Commission prior to the July 19 meeting.

Section 10(b) itself contains no deadline by which advisory committee materials must be made "available for public inspection and copying . . . ." However, in *Food Chemical*, the D.C. Circuit instructed that, pursuant to section 10(b), "whenever practicable, parties [should] have access to the relevant materials before or at the meeting at which the materials are used and discussed, [because opening] meetings to the public would be meaningless if the public could not follow the substance of the discussions." *Food Chem.*, 980 F.2d at 1472. Here, Defendants represent that because the July 19 meeting "is an initial meeting where the commissioners will introduce themselves and discuss the general direction for the Commission's work, there are few documents that pertain to the meeting." Kossack Decl. ¶ 10. Nonetheless, Defendants, in a declaration submitted to the Court under penalty of perjury, have represented that prior to the July 19 meeting, they will

make publicly available: (i) the agenda for the meeting; (ii) public comments received by the Commission via its email account within a reasonable time in advance of the meeting; and (iii) "other documents that are prepared for or by the Commission." *Id*. Documents "prepared for or by the Commission" invariably must include documents that will be "used and discussed" at the July 19 meeting. Accordingly, Defendants have satisfied their obligation under *Food Chemical* "to release those materials before or on the date of the advisory committee meeting for which those materials were prepared." *Food Chem.*, 980 F.2d at 1472. True, Plaintiff's request for documents is broader than what Defendants have said they will produce, and section 10(b) in the final analysis may indeed require additional disclosures. But neither section 10(b) nor the law of this circuit require additional disclosures *prior* to the July 19 meeting on which the pending motion for injunctive relief is predicated, and as such, Defendants shall not be required to disclose more, at least for the time being.

The parties also spar over the significance of the June 28 teleconference. Defendants contend that this call was a preliminary organizational meeting, which GSA regulations exclude from the ambit of FACA's disclosure obligations. Opp'n Mem. at 20–21 (citing 41 C.F.R. § 102-3.160). And to the extent that FACA applies, Defendants contend that they have now remedied any failure to comply by attaching to their pleadings the call's agenda and an email sent shortly before the call. *Id*. at 29. Plaintiff objects, arguing that there must have been additional documents prepared before, during, or after the meeting, including "earlier drafts of the letter [sent] to states," and contemporaneous notes or transcripts of the meeting. Pl.'s Reply Mem. at 16. Again, however, the issue before the Court is not what must be disclosed eventually, but what must be disclosed before the July

19 meeting. According to Defendants, drafts of the letter were not distributed to members before or during the teleconference; the request was only discussed orally. Kossack Decl. ¶ 5. And needless to say, contemporaneous notes or records of the teleconference could not have been disclosed before the teleconference occurred. Consequently, Defendants appear to have now disclosed the only materials that were prepared for the teleconference: the agenda and an invitational email apprising Commission members that the June 28 teleconference would be limited to preparatory and administrative discussions, and that substantive deliberations would not be permitted. Kossack Decl. Exs. A, B.

Nonetheless, the issue of whether section 10(b) requires additional disclosures with respect to the June 28 teleconference is certainly not moot. Like Plaintiff contends, additional documents may have been generated during the call, and Plaintiff may also be entitled to declaratory relief for Defendants failure to release the agenda and email before the teleconference—assuming that Defendants are incorrect that the meeting fell outside of FACA's reach. *See Byrd v. EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999). However, based on the information presently available to the Court, Defendants are not required by section 10(b) and *Food Chemical* to disclose any additional materials prior to the scheduled July 19 meeting, and accordingly, Plaintiff has failed to show a likelihood of success on its section 10(b) claim, at this time.

### C.  Irreparable Harm, Balance of the Equities, and the Public Interest

"Although the concept of irreparable harm does not readily lend itself to definition, the courts have developed several well known and indisputable principles to guide them in the determination of whether this requirement has been met." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Chief among them is that "the injury must be both

certain and great; it must be actual and not theoretical." *Id.* District courts in this circuit have recognized that, where an obligation to disclose exists, plaintiffs may suffer irreparable harm if they are denied access to information that is highly relevant to an ongoing public debate. *See Washington Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006) ("Because the urgency with which the plaintiff makes its FOIA request is predicated on a matter of current national debate, due to the impending election, a likelihood for irreparable harm exists if the plaintiff's FOIA request does not receive expedited treatment."); *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006) (finding that plaintiff would be irreparably harmed because it would be "precluded, absent a preliminary injunction, from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of the Administration's warrantless surveillance program").

There is no doubt that the Commission and its request for voter roll information have generated substantial public interest and debate. Nonetheless, Plaintiff has failed to demonstrate that, absent preliminary injunctive relief, its ability to engage in this public debate would be substantially impaired in a manner that is both "certain and great." Defendants have represented that, with respect to the July 19 meeting of the Commission, they will disclose the materials that will be used at the meeting. Moreover, the public will be permitted to view the meeting, to submit written comments, and to provide oral comments at subsequent meetings. There may be other documents that could, in theory, further facilitate this public debate, but based on the information presently available, it appears that the principal documents have or will be disclosed, and that the public and Plaintiff will have a substantial opportunity to debate and provide input with respect to the

work of the Commission. Accordingly, the harm that would flow from the failure to disclose *additional* materials, *prior to* the July 19 meeting, is at this time too speculative to warrant injunctive relief.

Finally, the equitable and public interest factors are in equipoise. Plainly, as an equitable and public interest matter, more disclosure, more promptly, is better than less disclosure, less promptly. But this must be balanced against the interest of advisory committees to engage in their work without, prior to each meeting, having to disclose every document that could possibly be disclosed pursuant to section 10(b). Similarly, sometimes advisory committees must, for practical reasons, defer in-person public commentary until subsequent meetings, so long as the public may access each meeting and submit written comments. This is a balancing act, and in this case, the Court finds that the balance struck to date is sufficient to obviate the need for emergency injunctive relief. Nonetheless, to the extent the factual or equitable circumstances change, the Court may be required to revisit this and other determinations made herein.

## IV. CONCLUSION

Accordingly, for all of the foregoing reasons, Plaintiff's [3] Motion for Temporary Restraining Order and Preliminary Injunction is **DENIED WITHOUT PREJUDICE**.

An appropriate Order accompanies this Memorandum Opinion.

Dated: July 18, 2017

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge