**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW,<br><br>   Plaintiff,<br><br>v.<br><br>PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; *et al.*,<br><br>   Defendants. | Civil Action No. 1:17-cv-1354 (CKK) |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
A STATUS CONFERENCE, FOR LIMITED EXPEDITED DISCOVERY, AND FOR
<u>APPROPRIATE RELIEF</u>**

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ........................................................................................................................1

BACKGROUND ........................................................................................................................3

ARGUMENT ..............................................................................................................................5

I.     THE COMMISSION HAS COMPLIED WITH ITS REPRESENTATIONS
TO THE COURT, AS WELL AS WITH FACA'S REQUIREMENTS ...........................5

        A.     The Commission Has Acted Consistently With Its Representations to
This Court ..........................................................................................................5

        B.     The Commission Has Complied With FACA Section 10(b)'s Disclosure
Requirements .....................................................................................................9

II.    PLAINTIFF DOES NOT HAVE A CAUSE OF ACTION SUFFICIENT TO
GIVE THE COURT JURISDICTION TO COMPEL DEFENDANTS TO
COMPLY WITH FACA OR TO SUBMIT TO DISCOVERY........................................15

III.   PLAINTIFF'S REQUEST FOR EXPEDITED DISCOVERY SHOULD BE
DENIED.........................................................................................................................19

CONCLUSION.........................................................................................................................22

# TABLE OF AUTHORITIES

**CASES**                                                               **PAGE(S)**

*American Hospital Association v. Burwell*,
  812 F.3d 183 (D.C. Cir. 2016) ............................................................... 17

*Armstrong v. Executive Office of the President*,
  90 F.3d 553 (D.C. Cir. 1996) ................................................................ 16

*Center for Arms Control and Non-Proliferation v. Lago*,
  No. 05-682 (RMC), 2006 WL 3328257 (D.D.C. Nov. 15, 2006), *aff'd sub nom.*
  *Ctr. for Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836 (D.C. Cir. 2008) ............... 10

*Center for Biological Diversity v. Tidwell*,
  No. CV 15-2176 (CKK), 2017 WL 943902 (D.D.C. Mar. 9, 2017) ........................................ 15

*\*Cheney v. United States District Court for District of Columbia*,
  542 U.S. 367 (2004) ............................................................................... 15, 19

*Citizens for Responsibility and Ethics in Washington v. Office of Administration*,
  566 F.3d 219 (D.C. Cir. 2009) ................................................................ 16

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ............................................................................. 21

*Clinton v. Jones*,
  520 U.S. 681 (1997) ............................................................................. 19

*Commercial Drapery Contractors, Inc. v. United States*,
  133 F.3d 1 (D.C. Cir. 1998) .................................................................... 21

*Electronic Privacy Information Center v. Presidential Advisory Commission on
  Election Integrity*,
  No. 1:17-cv-01320-CKK (D.D.C. July 24, 2017) ................................................. 15

*\*Food Chemical News v. Department of Health and Human Services*,
  980 F.2d 1468 (D.C. Cir. 1992) ................................................................ 9, 10, 13

*Fornaro v. James*,
  416 F.3d 63 (D.C. Cir. 2005) .................................................................. 17

*\*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ............................................................................. 16, 18

*Heckler v. Ringer*,
    466 U.S. 602 (1984) ......................................................................................... 17

*In re Cheney*,
    334 F.3d 1096 (D.C. Cir. 2003) ...................................................................... 15

*Judicial Watch v. Department of Energy*,
    412 F.3d 125 (D.C. Cir. 2005) ........................................................................ 20

*Meyer v. Bush*,
    981 F.2d 1288 (D.C. Cir. 1993) ...................................................................... 16

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1866)........................................................................... 18

*\*National Anti-Hunger Coalition v. Executive Committee of the President's Private Sector
    Survey on Cost Control*, 557 F. Supp. 524 (D.D.C.), *aff'd* 711 F.2d 1071
    (D.C. Cir. 1983).................................................................................... 11, 12

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ......................................................................................... 19

*Pittston Coal Group v. Sebben*,
    488 U.S. 105 (1988) ......................................................................................... 17

*Public Citizen v. United States Department of Justice*,
    491 U.S. 440 (1989) ......................................................................................... 15

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ........................................................................ 18

*Thomas v. Holder*,
    750 F.3d 899 (D.C. Cir. 2014) ........................................................................ 17

*United States v. Armstrong*,
    517 U.S. 456 (1996) ......................................................................................... 21

*United States v. Chemical Foundation*,
    272 U.S. 1 (1926) ............................................................................................. 21

*Washington Legal Foundation v. United States Sentencing Commission*,
    89 F.3d 897 (D.C. Cir. 1996) .......................................................................... 20

*Washington Legal Foundation v. United States Sentencing Commission*,
  17 F.3d 1446 (D.C. Cir. 1994) ............................................................................ 20

**STATUTES**

5 U.S.C. app. 2 § 10(a)(2)................................................................................ 14
5 U.S.C. app. 2 § 10(b) ......................................................................... *passim*
28 U.S.C. § 1361.............................................................................................. 17

**FEDERAL RULES FOR CIVIL PROCEDURE**

Fed. R. Civ. P. 12(a)(2)................................................................................ 2, 15
Fed. R. Civ. P. 26(d) ...................................................................................... 20

**RULES AND REGULATIONS**

41 C.F.R. § 102-3.150................................................................................... 14
41 C.F.R. § 102-3.170................................................................................... 11

Public Hearings Before a Public Advisory Committee; Examination of Administrative
  Record and Other Advisory Committee Records (Food and Drug Administration),
  66 Fed. Reg. 1257 (2001).............................................................................. 10

Federal Advisory Committee Management, 66 Fed. Reg. 37,728, 37,732 (2001)....................... 11

**EXECUTIVE ORDERS**

Executive Order No. 13,799 ........................................................................... 3, 9

**MISCELLANEOUS**

*Disclosure of Advisory Committee Deliberative Materials,
  12 U.S. Op. Off. Legal Counsel 73, 76 (1988) ........................................... 7, 11, 13

https://twitter.com/srl/status/887693877674692608 (Tweet from Sam Levine,
  Associate Politics Editor at HuffPost) .........................................................9

https://www.whitehouse.gov/blog/2017/07/13/presidential-advisory-commission-election-
  integrity ..................................................................................................1, 3

https://www.whitehouse.gov/presidential-advisory-commission-election-
  integrity-resources..................................................................................1, 14

Presidential Advisory Commission on Election Integrity,

https://www.youtube.com/watch?v=oZI27wB8-po&feature=youtu.be ......................................3

Remarks by Vice President Pence and Elected Officials at the First Meeting of the
   Presidential Advisory Commission on Election Integrity, https://www.whitehouse.gov
   the-press-office/2017/07/19/remarks-vice-president-pence-and-elected-officials-first
   -meeting ..................................................................................................................................3

## **INTRODUCTION**

Plaintiff requests a status conference, expedited discovery and other undefined relief.  But plaintiff's motion is premised on unsupported accusations, misunderstandings, and, ultimately, a mistaken view of what the Federal Advisory Committee Act ("FACA") requires.  Accordingly, the motion should be denied.

The Presidential Advisory Commission on Election Integrity ("Commission") has fully complied with its prior representations to this Court and with all applicable requirements of FACA.  As the Second Declaration of the Commission's Executive Director makes clear, the Commission has posted online all of the documents prepared by the Commission's staff ahead of the July 19, 2017, meeting and all of the documents that were distributed by individual members to the Commission during that meeting.[1]  The latter set of documents were not available in advance of the meeting because the individual members had not submitted them to the full Commission membership before the meeting began.  The meeting was successfully livestreamed without any known interruptions, and the full video is available online for viewing by the public, as is a written transcript of the first half of the meeting.

The Commission's proceedings cannot be more transparent and in full compliance with FACA's disclosure requirements – all of the July 19 meeting materials and the meeting content are easily accessible to plaintiff and other members of the public.  Plaintiff is not prevented from fully carrying out its mission to educate the public and engage in informed public debate.  Notably, the Commission has not yet embarked on substantive deliberations, nor was there

---

[1] Documents, video, and transcripts are available at https://www.whitehouse.gov/blog/2017/07/13/presidential-advisory-commission-election-integrity and https://www.whitehouse.gov/presidential-advisory-commission-election-integrity-resources.

interactive public participation at its one meeting, so any asserted delay (and there was none) in plaintiff's having access to the complete set of materials is inconsequential.

In any event, although the Commission is complying fully with FACA, and intends to continue to do so, plaintiff does not have a cause of action under either the Administrative Procedure Act ("APA") or the mandamus statute to compel the Commission to comply with the FACA. Accordingly, the case should be dismissed, as defendants will argue when their responsive pleading is due in September. *See* Fed. R. Civ. P. 12(a)(2). At the very least, plaintiff has not at this stage established a sufficient basis for a viable cause of action to entitle it to discovery, let alone expedited discovery, or to any sort of judicial intervention in the Commission's proceedings.

Nor has plaintiff established that, even if judicial review were available, unprecedented and expedited discovery against this presidential commission is justified or appropriate. Plaintiff's allegations of omissions by the Commission with regard to the July 19 meeting are incorrect, so plaintiff's reasoning for discovery well in advance of the normal timeframe under the civil rules – allegedly to forestall similar feared "problems" in the lead-up to the second Commission meeting – also fails. And discovery against a presidential advisory committee chaired by the Vice President raises serious separation-of-powers concerns, which require that any such discovery be narrowly tailored to meet a compelling need, more especially where, as here, discovery is sought in advance of the normal timeframe provided for by the civil rules. Plaintiff's unfocused request for depositions addressing "recordkeeping" or for a "*Vaughn*" index of "withheld" materials does not meet this standard, as no meeting materials have been "withheld," nor is the Commission subject to the Freedom of Information Act. Accordingly,

plaintiff's request for discovery, as well as for a "status conference" or any other judicial action at this stage, should be denied.

## BACKGROUND

The Commission held its first public meeting on July 19, 2017. During that meeting, the members considered how they would fulfil the Commission's charge of, as Vice President Pence put it, "study[ing] the registration and voting processes used in federal elections." Remarks by Vice President Pence and Elected Officials at the First Meeting of the Presidential Advisory Commission on Election Integrity, https://www.whitehouse.gov/the-pressoffice/2017/07/19/ remarks-vice-president-pence-and-elected-officials-first-meeting. The President gave brief remarks before the meeting began, which (along with the introductory comments of the Vice President, the Vice Chair, and the Commission members) have been transcribed and posted on the Commission's webpage. *See* https://www.whitehouse.gov/ blog/2017/07/13/presidential-advisory-commission-election-integrity. Commission staff were not aware of the possibility of the President's appearance until the late afternoon of the day prior to the meeting, and the start of the meeting was delayed because of logistical issues associated with his attendance. Second Decl. of Andrew J. Kossack ("Second Kossack Decl.") ¶¶ 5, 8 [attached hereto]. As represented to this Court, the meeting was livestreamed to the public through the White House's livestream system, and the livestream began when the Vice President commenced his remarks introducing the President. *Id.* ¶ 8. The livestream system worked: the Commission's Executive Director and Designated Federal Officer is not aware of any technical issues with the livestream. *Id.* The full video of the meeting is available online. *See* Presidential Advisory Commission on Election Integrity, https://www.youtube.com/watch?v=oZI27wB8-po&feature=youtu.be.

In advance of the meeting, members of the Commission were provided with Executive Order No. 13,799, the Commission's charter, the Commission's draft by-laws, and the revised

3

meeting agenda.  Second Kossack Decl. ¶ 2.  These documents were all posted to the
Commission's webpage in advance of the meeting, and were given to all the Commission
members in a tabbed binder at the meeting.  *Id.* ¶ 2.  Several Commission members introduced
documents during the meeting that were not provided to other Commission members in advance
of that meeting.  *Id.* ¶¶ 3, 4, 6, 7.  These materials have all been posted to the Commission's
webpage.  *Id.* ¶¶ 4, 6, 7.

On the evening of July 19, just hours after the conclusion of the Commission's meeting,
plaintiff's counsel emailed defendants' counsel, demanding their position on "a motion for
temporary restraining order, preliminary injunction, mandamus relief, and/or reconsideration of
the Court's July 18 memorandum opinion."  ECF No. 21-10.  Defendants' counsel wrote back
that same evening, asking for the legal basis for plaintiff's motion, and, the next day, explained
that all documents given to the Commission members in advance of the meeting were posted
online before the meeting began, and that all materials that individual members brought to the
meeting and shared with their colleagues were in the process of being posted.  *Id.*  Defendants'
counsel followed up that email with another communication on Friday morning, stating that,
while they believed all materials had been posted, if plaintiff's counsel believed there was
something missing from the webpage, plaintiff's counsel should let defendants' counsel know
and counsel would make appropriate inquiries.  *Id.*  Before filing the present motion, plaintiff's
counsel had not identified to defendants' counsel any documents that they believed to be missing
from the webpage.

## ARGUMENT

### I.    THE COMMISSION HAS COMPLIED WITH ITS REPRESENTATIONS TO THE COURT, AS WELL AS WITH FACA'S REQUIREMENTS.

Contrary to plaintiff's aspersions, the Commission has complied, and will continue to comply, with its representations to this Court, and, more generally, with FACA's requirements. Accordingly, plaintiff's demand for a status conference to micromanage the Commission's FACA responsibilities, and plaintiff's implicit demand for a declaratory judgment and advisory opinion about the scope of FACA section 10(b), is wholly unwarranted.

### A.    The Commission Has Acted Consistently With Its Representations to This Court.

The Commission has acted consistent with its representations to this Court – it posted all relevant materials submitted to the Commission in conjunction with the July 19 meeting in the timeframe to which it committed and provided a viable livestream and video recording of the meeting itself.

In his first declaration to this Court, Mr. Kossack stated that, "the agenda, public comments received through the Commission's staff email account within a reasonable time in advance of the meeting, the attachments to this declaration, and other documents that are prepared for or by the Commission will be posted to the Commission's webpage prior to the meeting, and by July 14 if possible."  First Kossack Decl. ¶ 10.  That was done – the agenda, public comments, and the attachments to Mr. Kossack's first declaration were all posted in advance of the meeting, as was a revised agenda.  Second Kossack Decl. ¶ 2.

Mr. Kossack also represented that the Commission would, as a general matter, publicly post "all documents which were made available to or prepared for or by the Commission."  First Kossack Decl. ¶ 4.  Pursuant to this commitment, the Commission posted those documents that were made available to the Commission for the first time at the meeting (the only set of prepared

remarks distributed to the Commission, two reports, an article, a PowerPoint presentation, and a list of "Possible Topics," *i.e.*, all the documents listed in plaintiff's memorandum, Pl.'s Mot, at 4, ECF No. 21-1, shortly after the meeting.  Second Kossack Decl. ¶¶ 3, 4, 6, 7.  To be sure, Mr. Kossack also stated in his first declaration that the Commission would post documents "*prepared for* or by the Commission" prior to the July 19 meeting.  First Kossack Decl. ¶ 10 (emphasis added).  But that paragraph of Mr. Kossack's declaration did not contemplate that Commission members would be bringing their *own* documents or reports to the meeting for distribution, as in fact happened.  As Mr. Kossack explained, "the July 19 meeting is an initial meeting where the commissioners will introduce themselves and discuss the general direction for the Commission's work."  First Kossack Decl. ¶ 10.  Apart from introductions, the only item of business was to approve the proposed by-laws, which were among the documents posted in advance of the meeting.  Accordingly, Mr. Kossack believed "there are few documents that pertain to the meeting," *id.*, and that all those documents had been posted in advance.

Until members distributed their documents at the meeting, Mr. Kossack was unsure whether Commission members would share any documents with the full Commission members. Second Kossack Decl. ¶ 3.  Accordingly, he could not have made those materials public in advance of the meeting, and did not believe it was necessary to post such materials publicly until such materials were distributed to the full Commission.  *Id.*  Those materials were distributed for the first time to the Commission members during the meeting, which some Commission members did as part of their introductory remarks.  *Id.* ¶¶ 4, 6, 7.  Neither Mr. Kossack's declaration, nor FACA, contemplates the *advance* public disclosure of materials individually prepared by individual Commission members but not distributed to or "used by the advisory committee."  *See* Memorandum for the Assistant Attorney General, from John O. McGinnis,

6

Deputy Assistant Attorney General, Disclosure of Advisory Committee Deliberative Materials,

12 U.S. Op. Off. Legal Counsel 73, 76 (1988).  Nor could the Committee have posted in advance

materials that were not presented until the meeting itself, and which individuals members

decided to include with their introductory remarks.

Plaintiff nonetheless claims that these individual documents brought to the meeting by

individual Commission members should have been posted online before the meeting – and

therefore before they were ever given to the Commission members.  Pl.'s Mot. at 11, ECF No.

21-1.  Neither the Commission's representations to this Court nor FACA (as discussed below)

supports such a requirement.  These documents were posted as soon as practicable after they

were provided to the Commission.  Neither FACA nor defendants' representations required more

than this.

The Commission also complied with its other representations, many of which went

beyond the requirements of FACA.  Mr. Kossack stated that the meeting would be made public

through livestreaming.  First Kossack Decl. ¶ 7.  It was, without any reported technical problems.

Plaintiff states that "[t]he livestream failed at every turn," Pl.'s Mot. at 10, but the facts it

provides do not support this blanket conclusion.  First, plaintiff complains that before the

meeting began, "all the public saw on the livestream page was a notification that the event was

'Beginning Shortly.'"  Pl.'s Mot. at 10.  But, as plaintiff acknowledges, the event *had not begun*;

rather, the meeting was delayed due to last-minute logistical issues associated with the

President's attendance, and, although Commission members were gathered in the meeting room

for part of that time, no business was conducted during that delay.  Second Kossack Decl. ¶ 8.

The livestream commenced as soon as the Vice President began speaking and introduced the

President, which was well in advance of when the Vice President commenced the actual meeting and called it to order.  *Id.*

Second, plaintiff claims that the livestream was inaccessible and "entirely inoperable for extended period."  Pl.'s Mot. at 10.  The Commission is not aware of any technical issues with the livestream.  Second Kossack Decl. ¶ 8.  Although there was a brief break in the livestream while the members had lunch, that was simply because the meeting had been recessed at the time.  As evidence to support its allegation, plaintiff points to a post on Vice Chair Kobach's Facebook page, which stated that "[w]e are having trouble with our internet service which is causing a disruption in our live system."  Pl.'s Mot. at 10.  But this post was written by one of the Vice Chair's staffers in Kansas who was attempting to permit members of the public to view the meeting on the Vice Chair's Facebook Page.  Second Kossack Decl. ¶ 9.  The staffer had difficulties in carrying that livestream on Facebook, and suggested that members of the public go directly to the White House website to view the livestream.  *Id.*  That site is where the Commission had directed the public to go. [2]

Third, plaintiff claims that "viewers could not see or hear side conversations between Commissioners and/or their staff."  Pl.'s Mot. at 10.  But these conversations, to the extent they existed, were not part of the meeting, and members of the public would not necessarily be able to see or hear them even if they were in the meeting room themselves.  Nor does FACA provide the public a right to hear side conversations.  And the photographs included by plaintiff in its brief

---

[2]  Plaintiff also asserts that the livestream was inaccessible on Internet Explorer.  Pl's Mot. at 10.  Defendants' counsel, who still have Internet Explorer on their desktop work computers, can confirm that the livestream was not available on that browser.  However, it was available on other, newer browsers, and plaintiff does not assert that it or anyone it knows was prevented from watching the livestream because of lack of access to a compatible browser.  Defendants' counsel, for example, watched via their work phones (using Chrome).  The entire archived video can now be viewed on Internet Explorer, as well as other browsers.

demonstrates that its statement that the camera focused "solely on the speaker," Pl.'s Mot. at 10, is false.

Finally, Mr. Kossack also stated that the video would be captured and posted to the Internet after the meeting, First Kossack Decl. ¶ 7, even though such posting was not required. It has been. Second Kossack Decl ¶ 4. And he stated that members of the White House press corps would be invited to attend the meeting in public. First Kossack Decl. ¶ 8. They were and tweeted from the room to provide further context for the public. *See, e.g.,* https://twitter.com/srl/ status/887693877674692608 (Tweet from Sam Levine, Associate Politics Editor at HuffPost, referencing fact that he was in the Commission meeting room).

### B.     The Commission Has Complied With FACA Section 10(b)'s Disclosure Requirements.

The Commission's actions are also fully consistent with FACA. Section 10(b) of FACA states that, with certain exceptions, "documents which were made available to or prepared for or by each advisory committee shall be made available for public inspection and copying." 5 U.S.C. app. 2 § 10(b). The D.C. Circuit requires that, "whenever practicable," section 10(b) materials be made available to the public "before or at the meeting at which the materials are used and discussed." *Food Chem. News v. HHS*, 980 F.2d 1468, 1472 (D.C. Cir. 1992). That is what the Commission did here. As plaintiff itself admits, the Commission posted the meeting agenda, revised agenda, comments received from members of the public and the states, and the draft by-laws, before the meeting began. Pl.'s Mot. at 4; Second Kossack Decl. ¶ 2. At the meeting, the Commission members were given a binder that contained copies of these materials (plus a copy of Executive Order No. 13,799, which was also posted in advance the meeting, as well as blank pages for notetaking). Second Kossack Decl. ¶ 2. These were the only meeting materials that were shared with the full Commission members in advance of the meeting. *Id.*

During the meeting, a few individual Commission members distributed handouts to other members; those documents were not given to all the Commission members before the meeting. Second Kossack Decl. ¶¶ 4, 6, 7.  These materials have been posted online in accordance with section 10(b).  *Id.* ¶¶ 3, 4, 6, 7.

As this Court has acknowledged, materials that are given to advisory committee members in advance of the meeting where those materials are to be considered and discussed should be disclosed to the public in advance of that meeting if practicable, as they were here.  *See, e.g.*, *Food Chem. News*, 980 F.2d at 1469 (draft reports to be discussed at a meeting); *Ctr. for Arms Control & Non-Proliferation v. Lago*, No. 05-682 (RMC), 2006 WL 3328257, at *4 (D.D.C. Nov. 15, 2006) (concluding that "[i]f the Commission was covered [by FACA], it had an obligation to release all background materials before or at the time of its meetings"), *aff'd sub nom. Ctr. for Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836 (D.C. Cir. 2008.  Such a rule recognizes the fact that, in many cases, committee members are presented with documents well in advance of a meeting, and those documents will either directly or indirectly be discussed at a meeting.  *See, e.g.*, Public Hearings Before a Public Advisory Committee; Examination of Administrative Record and Other Advisory Committee Records (Food and Drug Administration), 66 Fed. Reg. 1257, 1257-58 (2001) ("To assist committee members in preparing to discuss the issues that will be raised at a committee meeting, the agency and, in certain circumstances, affected members of the regulated industry prepare written background materials for committee members.  Generally, advisory committee members are provided these materials soon after they are completed, often weeks before a committee meeting.").  Advance disclosure of materials provided to the committee in advance, therefore, "provide[s] [the public] a meaningful opportunity to comprehend fully the work undertaken by the advisory committee."

41 C.F.R. § 102-3.170.  In other words, the public should be able to observe a meeting knowing as much as the committee members themselves.

But section 10(b) does not require the advance disclosure of documents that individual Commission members bring to a meeting (and which they may or may not decide to share with the Commission).  Rather, FACA only requires that such documents be released once they are shared with all Commission members, at which point they become records subject to section 10(b).  FACA's structure and its interpretive history make this proposition clear.

Section 10(b) does not require that every document connected with every advisory committee be disclosed.  Instead, the committee must first make a "threshold determination of whether particular records are subject to the section 10(b) disclosure requirements."  Federal Advisory Committee Management, 66 Fed. Reg. 37,728, 37,732 (2001) (General Services Administration ("GSA") notice implementing FACA rule).  Documents created by staff members, or even by subcommittees chaired by committee members, need not be disclosed.  *See Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Private Sector Survey on Cost Control*, 557 F. Supp. 524, 529 (D.D.C.) ("[S]urely Congress did not contemplate that interested parties like the plaintiffs should have access to every paper through which recommendations are evolved . . . ."), *aff'd*, 711 F.2d 1071 (D.C. Cir. 1983).   Instead, as the Office of Legal Counsel ("OLC") has concluded, "FACA compels disclosure [only] of a limited subset of information, namely *material used by the advisory committee*."  Disclosure of Advisory Committee Deliberative Materials, 12 U.S. Op. Off. Legal Counsel at 76 (1988).  As OLC explained in that opinion, materials used in earlier stages of the advisory committee process, including by individuals or entities that "did not provide advice *directly* to the President," did not fall within section 10(b).  *See id*. (emphasis added).  Therefore, because individual members do not advise the President

directly – that prerogative belongs only to the committee as a whole – any materials individual members create do not constitute documents for the purposes of section 10(b) unless and until those materials are shared with the committee.[3]

FACA's text accords with the conclusion that materials only need to be disclosed under section 10(b) after they are given to the advisory committee. The statute requires that "documents which were made available to or prepared for or by each advisory committee" shall be publicly disclosed by the committee. 5 U.S.C. app. 2 § 10(b). The reference to documents that "were made available to . . . each advisory committee" necessarily implies that the relevant materials were actually presented to or otherwise accessible to the committee itself. Documents produced by individual members and not shared with their colleagues would not be available *to the committee*. FACA also speaks in terms of materials "prepared for" an advisory committee; however, a committee can only make public in advance those materials *it* prepares for the committee, which it did here. What individual members bring to a meeting – and what may or may not be given to other members of the advisory committee– only become subject to section 10(b) once these materials are provided to the committee. Interpreting the "prepared for" requirement so broadly as to reach all materials produced by individual members – even if never shared – would conflict with the interpretation that this Court, OLC, and GSA have given section 10(b), which focuses on materials given to the committee itself, not to individual members or staffers.

---

[3] It does not matter that the records of individual Commission members are at issue, as opposed to those of staff members. In *National Anti-Hunger Coalition*, for example, the task forces at issue were co-chaired by members of the advisory committee, *see* 557 F. Supp. at 526. Key to the court's analysis – and to OLC's – was the preliminary work they were doing and their relationship to the President or agency decisionmaker, rather than the body's composition.

In accordance with this framework – which, contrary to plaintiff's contention, is not a "new legal theory," Pl.'s Mot. at 8 – the Commission was not obligated to post materials that individual members brought to the meeting until those materials were actually presented to the Commission. (And, indeed, all of these materials have since been posted. Second Kossack Decl. ¶¶ 3, 6, 7.) This Circuit does not require that material that *could* be given to an advisory committee at a meeting be preemptively disclosed before that meeting. *Food Chemical News*, upon which plaintiff relies, only requires that "whenever practicable, *all 10(b) materials* must be available for public inspection and copying before or on the date of the advisory committee meeting to which they apply." 980 F.2d at 1469 (emphasis added). But, as discussed above, documents do not become "10(b) materials" until they are given to the Commission, and so they need not be disclosed until they are so presented. Nor would such a requirement make practical sense; were it otherwise, individual Commission members would have to preemptively disclose all documents they *might* share with their colleagues, regardless of whether those documents were actually shared with the other members or "used by the advisory committee." 12 U.S. Op. Off. Legal Counsel at 76.

Plaintiff claims that this principle "would create a gaping loophole to FACA's requirement that Defendants make available all materials necessary for the public to follow the Commission's discussions." Pl.'s Mot. at 8. It would not. If the Commission members intend to discuss in depth a document at a meeting, it will be to their advantage to circulate it before hand, so they can intelligently discuss its contents. Under those circumstances, those materials would be disclosed in advance, just as the Commission did in this case with the meeting agenda and draft by-laws. *Food Chem. News*, 980 F.2d at 1469. And if the documents are shared with the Commission members for the first time at the meeting, those materials would still be available to

13

the public shortly afterwards, as they were in this case.  Indeed, given that the meetings were recorded and members of the public can review the meeting at their leisure, and that, as this Court has already recognized, FACA does not "seem to require that an advisory committee provide an opportunity for in-person attendance at all," Slip op. at 17, plaintiff cannot credibly claim that it has been harmed.

Finally, the Commission complied with FACA's requirements in other respects.  The Commission livestreamed the July 19 meeting in accordance with its representations to this Court and in excess of FACA's requirements.  Video of the entire meeting is available on the Commission's webpage.  *See* Pl.'s Meeting Materials, https://www.whitehouse.gov/presidential-advisory-commission-election-integrity-resources.  Plaintiff complains that the Commission did not notify the public that President Trump would be addressing the Commission members.  Pl.'s Mot. at 10.  However, the President's appearance and remarks to members prior to the meeting were not contemplated until late afternoon the day before the meeting.  Second Kossack Decl. ¶ 5.  Nor does FACA or its regulations require advance notice of every person who will be attending the meeting, much less notice of every person who will be in the meeting room prior to the start of the meeting.  *See* 5 U.S.C. app. 2 § 10(a)(2); 41 C.F.R. § 102-3.150.  And, as stated before, the President's remarks were contemporaneously covered by the livestream and the video and written transcript are on the Commission's webpage.  In sum, the Commission has been and remains committed to transparency, and defendants have complied with both FACA and their representations to this Court.  Plaintiff's request for a conference to discuss these issues, or other relief, should therefore be denied.

14

## II.    PLAINTIFF DOES NOT HAVE A CAUSE OF ACTION SUFFICIENT TO GIVE THE COURT JURISDICTION TO COMPEL DEFENDANTS TO COMPLY WITH FACA OR TO SUBMIT TO DISCOVERY.

In any event, plaintiff does not have a cause of action under either FACA, the

Administrative Procedure Act ("APA") or the mandamus statute to compel the Commission to

comply with FACA.  Accordingly, instead of the Court intervening to grant plaintiff the relief it

requests, the case should instead be dismissed, as defendants will argue when their responsive

pleading is due in September.  *See* Fed. R. Civ. P. 12(a)(2).

As this Court has already recognized, FACA does not provide for a private cause of

action.[4]  Slip op. at 15 (citing *Ctr. for Biological Diversity v. Tidwell*, No. CV 15-2176 (CKK),

2017 WL 943902, at *4 (D.D.C. Mar. 9, 2017)).  Judicial review is thus available for claims such

as plaintiff's, alleging noncompliance with FACA's requirements, only through either (1) the

APA, or (2) a mandamus action.  The APA provides for review of FACA-based claims against

"agencies"; mandamus is theoretically available for review of FACA claims against non-

agencies.  However, it is unlikely that either avenue will eventually provide plaintiff with a

viable cause of action here.  *See* Slip op. at 14; *Electronic Privacy Information Center v.*

*Presidential Advisory Commission on Election Integrity*, No. 1:17-cv-01320-CKK (D.D.C. July

---

[4]  Although the Commission is voluntarily agreeing to comply with FACA, defendants do not concede that FACA can be constitutionally applied to the Commission.  *See Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 385 (2004) ("[T]he Executive's constitutional responsibilities and status are factors counseling judicial deference and restraint in the conduct of litigation against it.") (internal quotation marks and citation omitted); *In re Cheney*, 334 F.3d 1096, 1113 (D.C. Cir. 2003) (Randolph, J., dissenting) ("As applied to committees the President establishes to give him advice, FACA has for many years teetered on the edge of constitutionality."); *see also Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 466 (1989) (noting that the application of FACA to the President "present[s] formidable constitutional difficulties"); *id.* at 488-89 (Kennedy, J., with whom, Rehnquist, C.J., and O'Connor, J. join, concurring in the judgment) ("The mere fact that FACA would regulate [such] as to interfere with the manner in which the President obtains information necessary to discharge his duty assigned under the Constitution . . . is enough to invalidate [FACA].").

24, 2017) (Dkt. No. 40) ("*EPIC*").  First, as the Court recently held in *EPIC*, the record does not establish that the Commission is an "agency" for purposes of the APA, because "there is no evidence that it has exercised any independent authority that is unrelated to its advisory mission." *EPIC* slip op. at 27-28.  Though the Court suggested that this determination could possibly be revisited if the factual circumstances change, and the Commission expands its powers beyond those of a purely advisory body, *id.* at 2, there have been no such changes since the date of the Court's *EPIC* opinion (July 24, 2017).

Neither are the other defendants relevant to plaintiff's motion "agencies" subject to the APA.  The Vice President and the Office of the Vice President are not "agencies," *Meyer v. Bush*, 981 F.2d 1288, 1295, (D.C. Cir. 1993) ("Because of his constitutional position, according to the government, we must treat the Vice President and his staff in the same manner as the President and his staff."); *see Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992) ("Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA."); the Office of Administration is not an "agency," *Citizens for Resp. & Ethics in Wash. v. Office of Admin.,* 566 F.3d 219, 224-25 (D.C. Cir. 2009); and the Executive Office of the President is not itself an agency but rather a collection of units, some of which are agencies and some of which are not. *Armstrong v. Exec. Office of the President*, 90 F.3d 553, 558 (D.C. Cir. 1996).  The sole named defendant which is an APA "agency," GSA, is not relevant here because its role is limited to "administrative support." *EPIC* Slip op. at 28; Second Kossack Decl. ¶ 10.  It has no role in the actions that are the subject of plaintiff's motion.  Accordingly, on the record as it currently stands, review is not available to plaintiff under the APA.

16

Second, despite suggestions in previous cases, review is likely also not available to plaintiff under mandamus.  Mandamus is a "drastic remedy, to be invoked only in extraordinary circumstances." *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (internal quotation marks omitted).  "To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016).  "Mandamus petitioners can satisfy neither of the first two requirements if the act they seek to compel is discretionary, as government officials have no clear duty to perform such acts and petitioners have no clear right to compel them to do so." *Thomas v. Holder*, 750 F.3d 899, 903-04 (D.C. Cir. 2014).  Thus, "[t]he extraordinary remedy of mandamus under 28 U.S.C. § 1361 will issue only to compel the performance of a 'clear nondiscretionary duty.'" *Pittston Coal Group v. Sebben*, 488 U.S. 105, 121 (1988) (quoting *Heckler v. Ringer*, 466 U.S. 602, 616 (1984)).

As the Court indicated in its earlier decision in this case, it does not appear that plaintiff will be able to meet this standard.  Specifically, the document disclosure provision of FACA, section 10(b), on which plaintiff's motion relies, "albeit broad in scope, does not itself create a [clear, nondiscretionary] right to imminent release of all relevant, non-exempt materials."  Slip op. at 14.  To be sure, the Court's opinion was addressing what documents needed to be released at a time when the meeting had not yet occurred, finding no bright-line test under FACA, and plaintiff's motion now seeks to take a retrospective look at whether the pre-meeting disclosures were adequate, with a view towards establishing a bright-line test for the future.  *See* Pl.'s Mot. at 11.  But, as this brief discusses, the available authority does not suggest that any such a bright line exists, or could be parsed from the applicable statute or regulations, so as to impose a "clear

17

nondiscretionary" duty on the Commission.  In fact, the Court's opinion appears to recognize that, as a general matter, the timing and scope of disclosure under FACA is a "balancing act" that must weigh the "equitable" principle that "more disclosure, more promptly is better than less disclosure, less promptly," against "the interest of the advisory committees to engage in their work without, prior to each meeting, having to disclose every document that could possibly be disclosed."  Slip op. at 24.  Such a balancing test does not support a cause of action in the nature of mandamus.

Moreover, issuing an order in the nature of mandamus against the President or Vice President would be extraordinary.  *Cf. Franklin*, 505 U.S. at 802 ("[T]he District Court's grant of injunctive relief against the President himself is extraordinary, and should have raised judicial eyebrows."); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866) ("[W]e are fully satisfied that this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties; and that no such bill ought to be received by us."); *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) ("[W]hile the Court in *Franklin* explicitly left open the question of whether a court may enjoin the President to perform a ministerial duty, it also issued a stern admonition that injunctive relief against the President personally is an extraordinary measure not lightly to be undertaken.").  It should only be contemplated in the most serious, indisputably appropriate cases.  There is nothing about this case that suggests it is a candidate for such a serious, unprecedented remedy.  Accordingly, it appears that plaintiff also lacks a cause of action under mandamus.  In the absence of a more viable theory regarding its cause of action, plaintiff's motion for Court intervention should be denied.

**III.   PLAINTIFF'S REQUEST FOR EXPEDITED DISCOVERY SHOULD BE DENIED.**

Even if the Court finds that plaintiff has a cognizable claim here, its request for expedited discovery at this early stage should be denied.  Discovery against a presidential advisory committee chaired by the Vice President raises serious separation-of-powers concerns.  *See Cheney*, 542 U.S. at 383.  The Supreme Court has accordingly recognized that "special considerations control" when "discovery requests are directed to the Vice President and other senior Government officials who served on the [advisory commission] to give advice and make recommendations to the President."  *Id.*  "This Court has held, on more than one occasion, that '[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the . . . the timing and scope of discovery,' *Clinton* [*v. Jones*, 520 U.S. 681, 707 (1997)], and that the Executive's 'constitutional responsibilities and status [are] factors counseling judicial deference and restraint' in the conduct of litigation against it, *Nixon v. Fitzgerald*, 457 U.S. [731, 753 (1982)]."  *Id.*  In remanding to the lower courts for further proceedings in *Cheney*, the Court suggested that discovery, if any, must be precisely and narrowly tailored and not "ask for anything under the sky," in order to avoid "unnecessary intrusion into the operation of the Office of the President" or Vice President.  542 U.S. at 387.

Plaintiff's request for discovery here does not (and cannot) meet this high standard.  Plaintiff seeks information regarding documents "withheld" by the Commission in its response to plaintiff's written request and "a small number of depositions, including one or more depositions pursuant to Rule 30(b)(6), focused on questions regarding the Commission's records and recordkeeping practices."  Pl.'s Mot. at 13.  Plaintiff has established neither a right to any of these materials nor a compelling need for them to litigate this case.  Nor has it established a

sufficient reason to expedite discovery beyond the normal timeframe provided in the Federal

Rules of Civil Procedure.  *See* Fed. R. Civ. P. 26(d).

First, FACA does not provide the public with the right to a "*Vaughn*"-type index of

withheld materials.  The case cited by plaintiff, *Washington Legal Foundation v. U.S. Sentencing

Commission*, 17 F.3d 1446, 1452 (D.C. Cir. 1994), suggested that a *Vaughn* index might be

appropriate for a non-FACA advisory group's records, which might be subject to "the common

law right of access" to "public records."  But, in the same case, the Court later defined "public

record" as "a government document created and kept for the purpose of memorializing or

recording an official action, decision, statement, or other matter of legal significance, broadly

conceived" and held that the documents at issue were *not* public records.  *Washington Legal

Foundation v. U.S. Sentencing Comm'n*, 89 F.3d 897, 905 (D.C. Cir. 1996).  None of the

documents potentially at issue here meets this definition of "public record."  In any event, the

Commission has not "withheld" any documents subject to section 10(b) from the public to date,

Second Kossack Decl. ¶ 7, and the Commission, a non-agency, is not subject to FOIA, *Judicial

Watch v. Dep't. of Energy*, 412 F.3d 125, 129 (D.C. Cir. 2005).  Plaintiff's request for

information regarding "withheld" materials is therefore premature.

Second, plaintiff's generalized and unfocused request for depositions, one or more of

which would be to address "records and recordkeeping practices," is insufficient to overcome the

separation-of-powers considerations counseling against discovery against a presidential advisory

commission chaired by the Vice President.  Plaintiff's cursorily-outlined request does not meet

the *Cheney* Court's admonition that, if discovery is ever to be permitted in this situation, it must

be narrowly tailored and avoid intrusion into the Executive's operations.  Plaintiff has attempted

to justify the need for discovery by listing alleged defects in the Commission's release of

documents relevant to the July 19 meeting, apparently to establish that there is some systemic problem with the Commission's "records and recordkeeping practices" that warrants discovery. But the supposed defects on which plaintiff relies are illusory.  The Second Kossack declaration addresses plaintiff's allegations, fully explains the sequence of events, and states that all documents prepared for the Commission's proceedings have been posted on line.  Second Kossack Decl. ¶ 7.  There is thus no evidence of any impropriety or irregularity, and certainly nothing sufficient to justify discovery well in advance of both the Rule 26 conference and defendants' responsive pleading.  "[I]n the absence of clear evidence to the contrary, courts presume that [public officers] have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Chemical Found.*, 272 U.S. 1, 14-15 (1926)).  As the Court explained in *Armstrong* when addressing decisions by federal prosecutors, the presumption of regularity "rests in part on an assessment of the relative competence" of Executive Branch officials and courts, as well as on "a concern not to unnecessarily impair the performance of a core executive constitutional function." *Armstrong*, 517 U.S. at 464-65.

Indeed, the discovery requested here would be inappropriate in a normal APA action.  As this Court's decisions make clear, judicial review under the APA is generally based on an administrative record, not on discovery.  *See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971) (discovery inappropriate under the APA absent "strong showing of bad faith or improper behavior"); *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998).  Even under ordinary principles of APA review, therefore, plaintiff's request for expedited discovery should be denied.

21

**CONCLUSION**

For the foregoing reasons, plaintiff's motion for a status conference, for limited expedited discovery, and for appropriate relief should be denied.

Dated: July 31, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ Joseph E. Borson*
CAROL FEDERIGHI
Senior Trial Counsel
JOSEPH E. BORSON
KRISTINA A. WOLFE
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 514-1944
Email: joseph.borson@usdoj.gov
*Counsel for Defendants*