**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, | |
| Plaintiff, | Docket No. 1:17-cv-01354-CKK |
| v. | Electronically Filed |
| PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; GENERAL SERVICES ADMINISTRATION, et al., | |
| Defendants. | |

**REPLY IN SUPPORT OF PLAINTIFF LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW'S MOTION FOR A STATUS CONFERENCE, FOR LIMITED
EXPEDITED DISCOVERY, AND FOR APPROPRIATE RELIEF BASED ON
DEFENDANTS' FAILURE TO HONOR COMMITMENTS TO THE COURT TO
<u>PRODUCE RELEVANT RECORDS PRIOR TO JULY 19 COMMISSION MEETING</u>**

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ....................................................................................................................1

ARGUMENT ..........................................................................................................................2

I.     There is Good Cause for Expedited Discovery and a Status Conference ...........................2

        A.     Defendants' New Theory of Section 10(b) is Erroneous and
                Demonstrates the Need for Expedited Discovery ....................................................2

        B.     The Commission's Planned Statistical Analysis Adds to the
                Urgency of Resolving the Merits as Quickly as Possible .......................................5

        C.     The Commission Failed to Produce Promised Records Before the
                July 19 Meeting and Will Not Produce Relevant Records Before
                Its Next Meeting ....................................................................................................8

II.     Defendants' Objections to the Requests for Expedited Discovery and a
        Status Conference are Unavailing ....................................................................................12

III.    This Court May Review the Lawyers' Committee's Claims ............................................15

CONCLUSION .......................................................................................................................18

i

## TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE**

*Cummock v. Gore*, 180 F.3d 282 (D.C. Cir. 1999) ................................................. *passim*

*Fish v. Kobach*, 16-cv-02105-JAR-JPO (D. Kan.) ............................................5, 14, 15

*Food Chem. News v. Dep't of Health & Human Servs.*, 980 F.2d 1468 (D.C. Cir.
    1992) .......................................................................................................................9

*Jasperson v. Fed. Bureau of Prisons*, 460 F. Supp. 2d 76 (D.D.C. 2006).....................17

*Malibu Media, LLC v. John Doe*, 177 F. Supp. 3d 554 (D.D.C. 2016)....................2, 13

*Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440 (1989) .............................................4

*Wash. Legal Found. v. U.S. Sentencing Comm'n,* 17 F.3d 1446 (D.C. Cir. 1994)......................13

**FEDERAL RULES**

Fed. R. Civ. P. 12(a)(2).................................................................................................15

Fed. R. Civ. P. 26(d)(1).................................................................................................13

Fed. R. Civ. P. 30(b)(6).................................................................................................12

**MISC. MATERIAL**

41 C.F.R. § 102-3.25......................................................................................................4

*Frequently Asked Questions (FAQs) about GRS 6.2, Federal Advisory Committee
    Records* (Aug. 2015)................................................................................................3-4

H.R. Rep. No. 92-1017 (1972), reprinted in 1972 U.S.C.C.A.N. 3491 ........................14

Ltr. from Presidential Advisory Commission on Election Integrity to The Hon. John
    Merrill, July 26, 2017.................................................................................................6

*Presidential Advisory Commission on Election Integrity Briefing*, July 19, 2017 ......................16

*Remarks by Vice President Pence and Elected Officials at the First Meeting of the
    Presidential Advisory Commission on Election Integrity*, July 19, 2017 .................................6

S. Rep. No. 92-1098, 92nd Cong. (1972) ...................................................................14

Sharad Goel et al., *One Person, One Vote: Estimating the Prevalence of Double
    Voting in U.S. Presidential Elections* 31 (Jan. 13, 2017) .........................................6

**INTRODUCTION**

Defendants fail to show any credible reason why the Court should not grant the limited, narrow relief that the Lawyers' Committee requests in its motion for a status conference and for targeted, expedited discovery.  Rather, their brief is an exercise in legal and linguistic gymnastics.  Defendants ignore their prior commitments to the Court to produce, in advance of the July 19 meeting, any documents "related to the July 19 meeting" and "any materials that have been or *will be distributed* to the Commission's members for the July 19 meeting."  Instead, Defendants concoct a radical new theory of Section 10(b) in order to retroactively justify their actions with respect to the July 19 meeting and to shrink their overall disclosure obligations under Section 10(b) to a virtual nullity.  However, Defendants' newly hatched theory of Section 10(b)—that the Commission need only disclose materials that are "shared with all Commission members"—is squarely foreclosed by D.C. Circuit precedent.  *See Cummock v. Gore*, 180 F.3d 282 (D.C. Cir. 1999) (holding Section 10(b) requires the disclosure of records that have not been shared with all commissioners).

Defendants' unduly narrow view of their legal obligations, not to mention of their own prior statements, only strengthens the case for expedited discovery and a status conference. Defendants' new, erroneous theory of Section 10(b) demonstrates the Commission will not comply with its disclosure obligations, either before future meetings or as a whole, absent judicial intervention.  And the harm that will result from this failure to comply with FACA—and thus the need to expeditiously resolve the full scope of Section 10(b)—is magnified by the Commission's most recent letter to states requesting voter data.  The letter indicates that the Commission intends to conduct a statistical analysis of the number of potential illegal voters across the nation, but that the Commission will not disclose to the public the work behind its

conclusions.  The potential impact of the Commission's statistical analysis, in conjunction with the enormous import of the Commission's work more broadly, renders it essential that the Commission comply with Section 10(b)'s disclosure requirements in a timely manner, so that the public can meaningfully evaluate the Commission's work as it operates.

Accordingly, the Lawyers' Committee respectfully requests a status conference and targeted expedited discovery to facilitate the expeditious resolution of the merits of this case.

## ARGUMENT

### I.     There is Good Cause for Expedited Discovery and a Status Conference

This Court has "broad discretion" to grant requests for expedited discovery where there is "good cause" shown.  *Malibu Media, LLC v. John Doe*, 177 F. Supp. 3d 554, 556 (D.D.C. 2016) (internal quotation marks omitted).  There was already ample good cause for expedited discovery when the Lawyers' Committee filed the instant motion.  But Defendants' opposition brief and the Commission's most recent letter to states only adds to the urgency of resolving the ultimate merits question in this case—regarding the full scope of the public's right to information under Section 10(b)—as quickly as possible.

### A.     Defendants' New Theory of Section 10(b) is Erroneous and Demonstrates the Need for Expedited Discovery

Expedited discovery is warranted given Defendants' new theory of Section 10(b), which is patently wrong on the law.  Defendants' new theory is that the Commission need only disclose materials under Section 10(b) that are "shared with all Commission members."  ECF No. 23 at 11 (hereinafter "Opp.").  But *Cummock v. Gore* forecloses this argument.  In *Cummock*, the plaintiff was a commission member who claimed she had not received certain records that other commissioners received and used.  She sought, for example, an "inch thick briefing paper that she saw Commissioners Gore and Deutch reviewing," documents that other commissioners had

2

submitted to or received from an industry association, and a letter that a company had sent to the commission but that she had not seen.  180 F.3d at 287.  That these materials had not been distributed to all commissioners is evident:  the plaintiff herself was a commissioner, and the crux of the her claim was lack of access to documents that only certain commissioners possessed.  *See id.* at 284-87.  Indeed, the court's opinion suggests that only the Vice President and one other commissioner had received the "inch thick briefing paper."  The court nonetheless held that the commission had to provide all of these materials to the plaintiff because "any member of the public" had a right to the materials under Section 10(b), regardless of whether the documents had been distributed to the whole commission.  *Id.* at 292.  *Cummock* is controlling precedent, and it precludes Defendants' argument that Section 10(b) covers only materials distributed to the entire Commission.  Yet Defendants do not even cite, much less attempt to distinguish, *Cummock*.

Defendants' new position is also contrary to the longstanding interpretation of committee records subject to Section 10(b) under General Records Schedule 6.2.  Under GRS 6.2, which Defendants also do not address in their brief, advisory committees must retain and disclose under Section 10(b) a wide range of records, such as any "correspondence documenting discussions, decisions, or actions related to the work of the committee . . . , including electronic mail, exchanged between one or more committee members and/or agency committee staff."  *See* Ex. A (General Records Schedule 6.2 ("GRS 6.2")).  The Frequently Asked Questions for GRS 6.2 explain that such records must be preserved and made available to the public because "[e]xchanges of substantive information between members regarding the work of the committee or subcommittee are records that reflect the work of the committee and document its thought

processes." Ex. B (*Frequently Asked Questions (FAQs) about GRS 6.2, Federal Advisory Committee Records* (Aug. 2015)).[1]

Defendants' interpretation likewise runs completely contrary to Congress' admonition in passing FACA that Section 10(b) should be "liberally construed" to promote Congress' goal of transparency. S. Rep. No. 92-1098, 92nd Cong., at 14 (1972). "FACA's principal purpose was to enhance the public accountability of advisory committees established by the Executive Branch," *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 459 (1989), by "open[ing] to public scrutiny the manner in which government agencies obtain advice from private individuals," *Cummock*, 180 F.3d at 285. Defendants' cramped view of Section 10(b) ignores Congress' goals and would achieve precisely the opposite result Congress intended.

Indeed, Defendants' interpretation would create an enormous loophole in FACA for advisory committees to exploit. Commissions could simply refrain from distributing a document to every commissioner to avoid having to disclose it, before a meeting or ever. For example, under Defendants' theory, there would be no legal obligation for the Commission to produce documents that a commissioner distributed to every commissioner but one, or to only Republican members of the Commission. Defendants' rule would invite mischief, but Congress specifically sought to guard against such gamesmanship in the use of advisory committees in imposing FACA's transparency requirements.

Similarly under Defendants' theory, materials that individual commissioners rely upon in providing advice to the President would not be covered under FACA. Defendants disclaim the existence of such documents, arguing that "individual members do not advise the President

---

[1] In fact, the FAQs explain that such substantive communications may constitute "committee meetings" subject to FACA's open access requirements. *See* Ex. B; *see also* 41 C.F.R. § 102-3.25 (defining "committee meeting").

directly—that prerogative belongs only to the committee as a whole." Opp. 11-12.  But Mr. Kobach recently said something very different to a different federal court.  He argued in separate litigation in Kansas that certain materials he brought to a private meeting with the President should be kept confidential because Mr. Kobach used the materials "*to advise the President privately* on matters within the purview of the Commission." *Fish v. Kobach*, 16-cv-02105-JAR-JPO  (D. Kan. July 28, 2017), ECF No. 376 at 11 (emphasis added).  Given that Mr. Kobach has now asserted in judicial proceedings that the records from his meeting with President Trump discussed matters "within the purview of the Commission," they are necessarily Commission records that are subject to Section 10(b) and must be disclosed in the course of this case.

To be clear, the Lawyers' Committee does not ask this Court to rule on the full scope of Section 10(b) at the present stage.  But Defendants' newly set forth theory of Section 10(b) is plainly wrong on the law and thus cannot justify their failure to produce documents used or discussed at the July 19 meeting or at future meetings, as discussed in further detail below.  Nor does their reading of Section 10(b) provide any assurance to the Court that the Commission will operate transparently and comply with its disclosure obligations over the course of the Commission's work.  Quite the contrary:  Defendants' erroneous and unduly narrow construction of Section 10(b) highlights the need to resolve the merits of this case as expeditiously as possible, which is why the Lawyers' Committee has made its narrow requests for a status conference and targeted discovery.

### B.    The Commission's Planned Statistical Analysis Adds to the Urgency of Resolving the Merits as Quickly as Possible

In addition to Defendants' alarming new legal position, other developments since this Court's prior Memorandum Opinion add to the urgency of resolving the ultimate merits question regarding the full scope of Section 10(b).  Specifically, on July 26, 2017, Mr. Kobach issued a

second letter to state officials requesting voter data and stating that the Commission will conduct an "analysis" using the data.[2]  But the letter indicated that that "[t]he **only** information that will be made public" about the analysis will be "statistical conclusions drawn from the data" and "other general observations that may be drawn from the data."  July 26 Letter, *supra* n.2 (emphasis added).

The Commission's statistical analysis could have significant consequences for voting rights in this country, and therefore it is imperative that the public's right to the Commission's records, as required by FACA, be fully enforced by the time the Commission announces the results.  Mr. Kobach has indicated the analysis will draw from the Crosscheck system that he has implemented in Kansas and other states.[3]  Crosscheck has purportedly found huge numbers of potential illegal voters; for the 2012 election, for example, Crosscheck claimed to have found nearly 1.4 million "potential duplicate voters" in just the 15 states that participated in the program.  Sharad Goel et al., *One Person, One Vote: Estimating the Prevalence of Double Voting in U.S. Presidential Elections* 31 (Jan. 13, 2017), https://tinyurl.com/y8jf6tpp.  But Crosscheck's results are notoriously inaccurate.  *See id.*  Researchers from Harvard, Yale, Stanford, and Microsoft found that, using even a "conservative" approach that further narrows the list of duplicate voters that Crosscheck identifies, Crosscheck inaccurately identifies 200 legal votes as false positives for every 1 legitimate case of double voting it finds.  *Id.* at 32-33.

---

[2] Ltr. from Presidential Advisory Commission on Election Integrity to The Hon. John Merrill, July 26, 2017 (hereinafter "July 26 Letter"), https://tinyurl.com/yc5c7xcf.

[3] *See, e.g.*, *Remarks by Vice President Pence and Elected Officials at the First Meeting of the Presidential Advisory Commission on Election Integrity*, July 19, 2017, https://tinyurl.com/ya66pog8 (suggesting that the Commission will implement Crosscheck on "the national level").

These inaccuracies render it particularly disturbing that the Commission intends to shield its analysis from public scrutiny and verification, and make the timely compliance with FACA's disclosure requirements of the utmost significance. Indeed, the statistical analysis aside, the public has a compelling interest in timely access to the Commission's records given the import of its broad mandate. And because Defendants' current interpretation of Section 10(b) is not tenable under *Cummock*, the Commission necessarily will have to disclose some records under Section 10(b) that it currently takes the position it does not have to disclose. For example, the records subject to the Lawyers' Committee's request that the Commission currently asserts it need not disclose include:

- Emails and other electronic communications from or to commissioners, or among a subset of commissioners, regarding the request to states for voter data, the Commission's motivations for the request, the statistical analysis the Commission will perform and how it intends to perform it, how the Commission presents the findings of that analysis, and other aspects of the Commission's work. Such communications could include:

  o Email chains among only the commissioners of a particular political party, or among Commissioners Kobach, Blackwell, Adams, and von Spakovsky, who describe themselves as "The Fearless Foursome" and have worked together for many years.[4]

  o Emails of commissioners using a non-federal government email address, or of persons who are not commissioners but are secretly participating in the Commission's work. It appears that one or both of these scenarios may exist, as the Commission mysteriously redacted the names and email addresses of all recipients of the email from Mr. Kossack (whose name was not redacted from the email) regarding the June 28 teleconference.[5]

  o Emails among a subset of commissioners deliberating upon the Commission's substantive work, including the Commission's recommendations to the President.

- Drafts of the request to states for voter data, or working papers or notes related to the request.

---

[4] *See* J. Kenneth Blackwell (@kenblackwell), Twitter (July 20, 2017, 3:59 AM), https://twitter.com/kenblackwell/status/887990395900243968.

[5] *See* https://tinyurl.com/y92dlamz.

- Future drafts, working papers, and notes of commissioners and their staff, including of the statistical analysis of the state voter data, so long as the drafts, working papers, or notes are not circulated to all commissioners (which the Commission of course will avoid doing for anything it perceives as sensitive).

If the Court concludes that the Commission must disclose some or all of these records, it is critical that the Commission do so in a timely manner.  Requiring that the Commission's work be transparent to the fullest extent required by FACA, so that others may test the reliability of its statistical and other claims, is strongly in the public interest.

C.     **The Commission Failed to Produce Promised Records Before the July 19 Meeting and Will Not Produce Relevant Records Before Its Next Meeting**

Finally, expedited discovery and a status conference are necessary to address Defendants' failure to honor their commitment to produce records before the July 19 meeting, and to ensure that Defendants produce relevant records before the Commission's next meeting.  Nowhere in their opposition brief do Defendants dispute that (i) in their July 13 brief and in Mr. Kossack's declaration that same day, Defendants repeatedly committed that they would "post[] to the Commission's webpage prior to the meeting" any "documents that are prepared for or by the Commission," including any documents "related to the July 19 meeting" and "any materials that *have been or <u>will be</u> distributed* to the Commission's members for the July 19 meeting"; (ii) prior to the July 19 meeting, the Commission's production of documents related to the meeting was limited to an agenda, a revised agenda, and draft by-laws; and (iii) Commissioners brought with them, distributed, and discussed at the meeting numerous other documents, including written remarks, presentations and databases prepared specifically for the meeting, other articles, and binders full of other materials.  *See* Mem. in Opp'n to Pls.' Mots. for a TRO and/or Prelim. Inj. at 1, 6, 25, 26 (emphasis added) (July 13, 2017), ECF No. 15 (hereinafter, "July 13 Brief"); Mem. in Supp. of Pl. Lawyers' Committee for Civil Rights Under Law's Mot.

for a Status Conf., for Limited Expedited Discovery, and for Appropriate Relief at 2-9 (July 21, 2017), ECF No. 21-1 (hereinafter "Pl.'s. Mot.").

Defendants instead put forward their new theory, that the Commission must produce prior to meeting only materials that are "shared with all Commission members" in advance of the meeting, as a post hoc rationalization for their failure to make good on their representations. Opp. 11.  Defendants never—not once—asserted this limitation in their July 13 submissions opposing the TRO, *compare* Opp. 11 *with* July 13 brief, and this Court's opinion contains no such limitation of Defendants' disclosure obligations.  Rather, the Court held that Defendants would satisfy their pre-meeting disclosure obligations by posting all documents that would be "used and discussed at the July 19 meeting."  Mem. Op., ECF No. 17, at 21.

As explained, *Cummock* squarely forecloses Defendants' new theory of Section 10(b), *supra* 2-3, and the D.C. Circuit's opinion in *Food Chemical News v. Department of Health & Human Services*, 980 F.2d 1468 (D.C. Cir. 1992), likewise forecloses Defendants' arguments as applied to meeting-related materials.  Indeed, *Food Chemical* rejects Defendants' suggestion that their delayed disclosure was "inconsequential."  Opp. 2.  In *Food Chemical*, the court held that Section 10(b) requires an advisory committee to disclose materials "before or at the meeting at which the materials are used and discussed" so that the public can "follow the substance of the discussions."  *Id.* at 1472.  Given the central purpose of meeting-related disclosure—to enable the public to "follow . . . the discussions"—it is immaterial whether documents referenced at a meeting were distributed to all commissioners in advance.  And it is immaterial how quickly materials may be disclosed after a meeting concludes.  What matters is that the public be able to read and evaluate the document as it is being discussed, so that the public can follow the

Commissioners' discussion as it occurs.  Defendants did not afford the public this opportunity

for the July 19 meeting, and appear to have no intention of doing so for future meetings.

Moreover, the materials Defendants failed to produce before the July 19 meeting were

extremely substantive and would have significantly aided the public's ability to follow and

evaluate the Commission's discussions.  The materials included:

- A then-unreleased, 381-page Heritage Foundation database that Commissioner von Spakovsky highlighted at the meeting and claimed showed "1,071 proven instances of voter fraud."  Pl.'s Mot. Ex. C.

- A PowerPoint presentation also prepared by Mr. von Spakovsky—titled "Presidential Advisory Commission on Election Integrity"—that provided state-by-state statistics on the number of voters purportedly registered in multiple states (drawn from Vice Chair Kobach's error-riddled Crosscheck system), and various other alleged statistics on voter fraud and voter registration.  *Id.* Ex. B.

- Vice Chair Kobach's list of "Possible Topics for Commission to Address," which was the subject of approximately one hour of Commission discussion and showed that the Commission's focus would be on the "accuracy of voters rolls" and "fraudulent or improper voting."  *Id.* Ex. D.

- A law journal article that Commissioner Blackwell described for several minutes in his remarks.  *Id.* Ex. F.

- Written prepared remarks of every Commissioner.  *Id.* Ex. A.

Regarding the Heritage Foundation database and Mr. von Spakovsky's presentation in

particular, the public was left unable to meaningfully evaluate Mr. von Spakovsky's claims and

the statistics he was citing.  Interested and knowledgeable observers, including the Lawyers'

Committee, could have evaluated the substance of Mr. von Spakovsky's claims.  As it was, the

Lawyers' Committee and others could not educate the public beforehand, let alone in real time.

The Lawyers' Committee could not even see the documents until after the meeting was already

over, when public attention had moved on to other events, and the iron was no longer hot.

10

Mr. Kossack implies that there were practical reasons why the Commission did not disclose these materials in advance, stating that he "could not have made [the] materials public in advance of the meeting," but nowhere does he explain why this was the case. Second Decl. of Andrew J. Kossack ("Second Kossack Decl.") ¶ 3. Rather, his declaration suggests he simply chose not to ask Commissioners what materials they intended on bringing for discussion at the July 19 meeting, or to provide him with advance copies.[6]

Mr. Kossack also makes questionable assertions with regard to the speed with which the Commission posted materials after the meeting. Mr. Kossack states in his new declaration that he asked the "technical team to post all of the meeting documents to the Commission webpage as soon as possible" and that the materials were in fact "posted to the Commission's webpage shortly after the meeting." Second Kossack Decl. ¶¶ 3, 7; *accord* Opp. 6. But nowhere does he explain, let alone inform the Court, that the Commission did not actually post the Heritage Foundation database on its website until a full week after the meeting, on July 26. *See* Ex. D (showing that Commission website did not include database as of July 25). Mr. Kossack likewise does not explain why the Commission could not post, before the meeting, Mr. Kobach's single-page list of areas of focus for the Commission, given that Defendants now concede Mr. Kobach finalized the list the night before the meeting. Second Kossack Decl. ¶ 7. And

---

[6] Mr. Kossack's declaration raises questions in this regard, however. Mr. Kossack states that he "did not know with certainty what materials individual Commission members would incorporate into their introductory remarks or the discussion period." Second Kossack Decl. ¶ 3. When this hedged statement and the ones that follow it in the declaration are closely parsed, the sleight of hand becomes apparent: Mr. Kossack never actually says he was unaware that commissioners planned on bringing particular documents to the meeting (*e.g.*, the Heritage Foundation database and PowerPoint); he only says he did not know "with certainty" whether the commissioners would *discuss* those documents. *See id.* In any event, even if Mr. Kossack was completely unaware of the documents prior to the July 19 meeting, it is the job of the Designated Federal Officer—and not a particularly burdensome one—to *ask* commissioners to provide advance copies of documents they plan on bringing to a meeting, so that the Commission can then make those materials public in advance as required under FACA.

Defendants still have not posted the written prepared remarks of any Commissioner other than Commissioner Blackwell.[7]

Given Defendants' failure to explain why they did not meet their representation to produce relevant materials before the July 19 meeting, as well as their new asserted position that the Commission has no obligation to produce materials unless they are provided to every commissioner before a meeting, it is clear that absent this Court's intervention, the Commission will again fail to disclose relevant records in advance of future Commission meetings. The Lawyers' Committee therefore respectfully submits that a status conference or other judicial resolution would be in the interests of the parties and the public to resolve the Commission's meeting-relating disclosure obligations sufficiently in advance of the next Commission meeting, rather than through emergency litigation.

## II.     Defendants' Objections to the Requests For Expedited Discovery and a Status Conference Are Unavailing

Defendants oppose the Lawyers' Committee's narrow requests for limited discovery and a status conference on multiple grounds, none of which have merit. Defendants suggest that allowing for limited discovery would raise "serious separation-of-powers concerns," but that concern is unfounded. Opp. 19. To be clear, the Lawyers' Committee does not seek a deposition of the Vice President—as the Lawyers' Committee's opening brief made clear, it is seeking a Rule 30(b)(6) deposition regarding the Commission's records and recordkeeping practices. Because Rule 30(b)(6) allows a party to designate the individual(s) who will be

---

[7] Defendants' statements regarding the technical issues with the livestreaming are even more curious. Defendants definitively assert: "The livestream system worked: the Commission's Executive Director and Designated Federal Officer is not aware of *any* technical issues with the livestream." Opp. 3 (emphasis added). Yet Defendants later admit that the livestream was inoperable on Internet Explorer. Opp. 8 n.2. Lack of functionality on one of the most common and popular browsers in the country would seem to be a rather large "technical issue."

testifying, Defendants can easily avoid their hypothetical constitutional crisis by designating someone other than the Vice President to testify about how the Commission maintains its emails and other records. The Lawyers' Committee attaches in Exhibit C a sample list of topics it would explore in the deposition.

In addition, to the extent Defendants think that including a *Vaughn* index summarizing a communication from or to the Vice President raises executive privilege issues (*e.g.*, from the Vice President to one of his staff members), they are free to seek redactions. The parties, and if necessary the Court, can resolve the issue on a case-by-case basis—the way that privilege issues are supposed to be decided. A *Vaughn* index would hardly intrude on the Vice President's constitutional functions. And as the D.C. Circuit concluded in *Washington Legal Foundation v. U.S. Sentencing Commission,* 17 F.3d 1446 (D.C. Cir. 1994), a *Vaughn* index can be used for records claims outside of the FOIA context where it would substantially aid the Court's analysis by providing clarity as to "precisely what records [are] at issue," *id.* at 1452.

Defendants also oppose the Lawyers' Committee's request for expedited discovery on the ground that "there is no evidence of any impropriety or irregularity," and therefore the Court should apply the "presumption of regularity" applied to federal prosecutors. Opp. 21. The standard for assessing a criminal prosecutor's charging motivations is, to say the least, not the standard for assessing requests for expedited discovery in civil matters. Rather, the timing of discovery is a creature of Federal Rule of Civil Procedure 26(d)(1) and it is well established that this Court has "broad discretion" to grant requests for expedited discovery where there is "good cause" shown. *Malibu Media*, 177 F. Supp. 3d at 556 (internal quotation marks omitted). For the reasons already stated, there is more than good cause here.

There is a reason why no court has ever so much as hinted that discovery (expedited or otherwise) in a FACA action turns on a threshold showing that the committee has taken some action that deprives it of the deference ordinarily afforded to federal officials.  The whole point of FACA is to recognize that federal advisory committees are different from full-time federal officers performing federal functions.  Congress passed FACA because of concerns that non-federal employees could misuse advisory committee "to advance their own agendas," and not the interests of the federal government or the public.  *Cummock*, 180 F.3d at 284-85 (citing H.R. Rep. No. 92-1017 (1972), *reprinted* in 1972 U.S.C.C.A.N. 3491, 3496).  Congress warned that "[o]ne of the great dangers in the unregulated use of advisory committees is that special interest groups may use their membership on such bodies to promote their private concerns."  *Id.* Allowing the Commission to delay proceedings or to avoid or minimize its disclosure obligations based on a presumption that it acts like ordinary federal agencies would turn FACA on its head.

In any event, Defendants having raised the issue, there are strong reasons to question the motivations and work of this Commission.  Indeed, there is nothing "regular" about this Commission.  It was born out of the President's unfounded claim that 3 to 5 million persons voted illegally in a U.S. Presidential election.  And the person the President appointed to run the Commission, Mr. Kobach, has a documented history of being less than candid with courts.  In fact just last week, United States District Judge Julie A. Robinson affirmed an imposition of sanctions against Mr. Kobach for making misleading statements to the court.  *Fish*, 16-cv-02105-JAR-JPO (D. Kan. July 25, 2017), ECF No. 374.  In affirming the sanctions, Judge Robinson found that Mr. Kobach has engaged in a "pattern" of making misleading statements to the judiciary, including in that case by clearly mischaracterizing statements he had made earlier in the case.  *Id.* at 8 n.27.  And that assessment was before the aforementioned discrepancy between

14

Defendants' assertion in the present matter that "individual members do not advise the President directly," Opp. 11-12, and Mr. Kobach's assertion to Judge Robinson that he has "advise[d] the President privately on matters within the purview of the Commission," *Fish*, ECF No. 376 at 11 (July 28, 2017) (emphasis added).

## III.    This Court May Review the Lawyers' Committee's Claims

The balance of Defendants' brief (pages 15-19), arguing that the Lawyers' Committee lacks any means to obtain judicial relief under FACA, is both a renewal of arguments already addressed by the Court and a premature and procedurally improper preview of their Rule 12 motion.[8]  As with their prior brief, Defendants' analysis is wrong and is based on cherry-picked isolated phrases from the case law that fail to advise the Court that *every* one of the decisions cited found a basis to conduct judicial review of FACA claims.  Again, this Court should reject Defendants' invitation to be the first ever to conclude that the judiciary lacks power to adjudicate a FACA dispute.

*First*, as Defendants themselves recognize, the "APA provides for review of FACA-based claims against agencies."  Opp. 15.  Although Defendants concede that GSA is an agency for purposes of the APA, they nevertheless claim that GSA "is not relevant here because its role is limited to 'administrative support.'"  *Id.* at 16.  But Defendants do not dispute that GSA is the central agency in charge of organizing and convening the Commission's meetings, nor could they, given that GSA posted the Federal Register notice for the Commission's July 19 meeting.

---

[8] Although Defendants rely on Rule 12(a)(2) to assert that they need not file a responsive pleading until September, that rule also provides that defenses such as lack of subject matter jurisdiction and failure to state a claim "must be asserted in the responsive pleading."  Fed. R. Civ. P. 12(b).  If Defendants want these issues adjudicated now, nothing is preventing them from filing a Rule 12 motion before the deadline.  But Defendants' attempt to present such defenses in an opposition to a motion for discovery is improper under Rule 12.

82 Fed. Reg. 31063 (July 5, 2017). Part of the relief that the Lawyers' Committee seeks through the requested status conference and this motion is that the Commission not hold an additional meeting unless and until they affirm, or this Court directs them to comply with, their meeting-related disclosure obligations under FACA, which at minimum means producing in advance all documents that will be used or discussed at the meeting. Absent such disclosure, GSA will violate FACA if it schedules and holds another meeting.

GSA also maintains responsibility for instructing the Commission on their records preservation and disclosure obligations. One of the few documents posted on the Commission's website is a "GSA FACA Overview," which was a briefing GSA provided to the Commission on July 19, 2017. *See Presidential Advisory Commission on Election Integrity Briefing*, July 19, 2017, https://tinyurl.com/yb9ttrca. In that briefing, GSA instructed commissioners on "recordkeeping requirements" and other legal issues related to "commission records." *Id.* GSA, pursuant to the functions accorded to it under the Executive Order creating the Commission, has thus assumed the role of ensuring compliance with the Commission's records requirements. GSA is violating the APA in providing incorrect guidance to the Commission on the scope of Section 10(b), and in approving the Commission's release of records short of Section 10(b)'s requirements.

Defendants do not even attempt to address these facts, but instead attempt to bootstrap this Court's ruling with respect to GSA in the EPIC suit. *See* Opp. 16. But the role of GSA as relates to EPIC's claims (to compel a Privacy Impact Statement regarding voter data) is entirely different from its role in the Lawyers' Committee's claims (to require GSA to open GSA-organized meetings to the public and to ensure compliance with record disclosure obligations). Whether or not GSA is involved in the collection of data from states, it plainly has duties

16

pursuant to the Executive Order and FACA itself in convening the Commission's meetings, and in the preservation and disclosure of records under Section 10(b). The EPIC case is inapposite.

*Second*, if the Court determines that the APA does not provide full judicial review of the Lawyers' Committee's claims, mandamus relief would be available. This Court held that mandamus relief was not "presently available" prior to the July 19 meeting because, the Court concluded, FACA does not provide a right to "the imminent release" of all records subject to Section 10(b). Mem. Op. 14-15. But the Court recognized that mandamus could be available for the Commission's failure to disclose records in accordance with Section 10(b). *See id.* In other words, the Court held that the availability of mandamus depends on the merits regarding the scope of Section 10(b).

Consistent with this Court's prior ruling, the Lawyers' Committee has a clear right to any Commission records that will be used or discussed at future meetings, in advance of those meetings. And limited discovery and future briefing on the merits will establish that, for non-meeting related records, the Lawyers' Committee has a right to the many other records it has requested from the Commission, under the full scope of Section 10(b).

*Third*, this Court may conduct non-statutory review. *See* Reply in Supp. of Pl. Lawyers' Committee for Civil Rights Under Law's Mot. for TRO & Prelim. Inj. at 13 (July 14, 2017), ECF No. 16. Although Defendants do not address this argument in their brief, non-statutory review is available where, as here, the Executive Branch "has disregarded a specific and unambiguous statutory directive, or when [it] has violated some specific command of a statute." *Jasperson v. Fed. Bureau of Prisons*, 460 F. Supp. 2d 76, 85 (D.D.C. 2006). Defendants have already done so here in failing to disclose records used and discussed at the July 19 meeting in advance of that meeting. And Defendants will continue to violate Section 10(b) absent this Court's intervention.

17

# CONCLUSION

For the foregoing reasons, the Lawyers' Committee respectfully requests that the Court grant its motion for a status conference, for limited expedited discovery, and for appropriate relief based on Defendants' failure to honor commitments to the Court to produce relevant records prior to the July 19 meeting.

DATED:  August 4, 2017

Respectfully Submitted,

/s/  John A. Freedman

Kristen Clarke (D.C. Bar # 973885)
Jon Greenbaum (D.C. Bar # 489887)
Ezra D. Rosenberg (D.C. Bar # 360927)
Marcia Johnson-Blanco (D.C. Bar # 495211)
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1401 New York Ave., NW
Washington, DC  20005
Telephone:  +1 202.662.8600
Facsimile:  +1 202.783.0857
erosenberg@lawyerscommittee.org

John A. Freedman (D.C. Bar No. # 453075)
Robert N. Weiner (D.C. Bar # 298133)
David J. Weiner (D.C. Bar # 499806)
R. Stanton Jones (D.C. Bar # 987088)
Daniel F. Jacobson* (D.C. Bar # 1016621)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001
Telephone:  +1 202.942.5000
Facsimile:  +1 202.942.5999
John.Freedman@apks.com

Kathryn W. Hutchinson
ARNOLD & PORTER KAYE SCHOLER LLP
44th Floor
777 South Figueroa Street
Los Angeles, CA  90017-5844
Telephone:  +1 213.243.4000
Facsimile:  +1 213.243.4199

Counsel for Plaintiff Lawyers' Committee for
Civil Rights Under Law

*D.D.C. application pending