**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW,<br><br>               Plaintiff,<br><br>v.<br><br>PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; et al.,<br><br>               Defendants. | Docket No. 1:17-cv-01354-CKK<br><br>Electronically Filed |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
TO COMPEL COMPLIANCE WITH THE COURT'S AUGUST 30, 2017 ORDER
AND FOR ADDITIONAL APPROPRIATE RELIEF**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................. 1

ARGUMENT .......................................................................................................................... 2

I.    Defendants' *Vaughn* Index Does Not Comply With the Court's August 30 Order ............ 2

     A.    The Index Inappropriately Categorizes Many Records .......................................... 2

     B.    Defendants Failed To Collect and Properly List Text Messages ........................... 7

II.   Defendants' Filings Raise Serious Questions About the Completeness of the Index ........ 9

     A.    Defendants Failed To Issue a Litigation Hold Until Five Weeks After
           Commencement of Litigation ................................................................................ 9

     B.    Commissioners Received No Records Guidance Until More Than Two
           Months After the Commission Was Established ................................................. 10

     C.    There Are Strong Indications Commission Records Exist That Are Not
           Included in the Index, and Their Absence Warrants Investigation ...................... 11

          1.    The Index Contains Almost No Commissioner-to-Commissioner
               Communications ........................................................................................ 12

          2.    The Index Fails To Include Records Prior to May 11, 2017 .................... 14

     D.    Further Relief Is Necessary To Address Whether the Index Is Incomplete ......... 15

CONCLUSION ..................................................................................................................... 16

**INTRODUCTION**

Defendants' *Vaughn* index and declarations fail to comply with this Court's August 30, 2017 Order, and the delinquencies are material. The Court made clear that "a document-by-document analysis is likely necessary to determine whether a document is actually subject to disclosure pursuant to Section 10(b)." 08/30/17 Order at 2 (ECF No. 28). Yet, as previewed in the parties' joint status reports last month (ECF Nos. 30, 32), Defendants improperly lumped together in broad categories many records related to the Commission's substantive work. Following Defendants' filings, the Lawyers' Committee identified a narrow set of these categories most likely to contain materials subject to Section 10(b), such as "Internal discussions about subjects for potential Commission report," "Internal discussions about draft Commission documents," and "Emails and proposals with/from third-party data analysis entities**.**" But when the Lawyers' Committee asked Defendants to individually log the records in these specified categories, Defendants refused. *See* 10/11/17 Letter from J. Borson (DOJ) (attached as Exhibit A). Defendants also refused to list or even *collect* text messages from Commissioners, despite this Court's instruction that the index should include *all* communications in *all* mediums.

Beyond these deficiencies, there are significant reasons to question whether the index is complete and whether Commission records potentially subject to Section 10(b) were improperly withheld from Defendants' counsel or destroyed. The index includes almost no direct communications between Commissioners that do not copy Mr. Kossack or a Commission staffer. Several factors make this gap particularly troubling. First, according to Mr. Kossack's Fourth Declaration, Commissioners did not receive any training, guidance, or instruction on their records preservation obligations until July 19, 2017, more than two months after the formal creation of the Commission. That is the earliest the Commissioners could have been told (one

1

Commissioner claims he was never told) that the Presidential Records Act requires them to copy Ms. Kossack or a Commission staffer on all emails sent from or to their personal accounts. It is implausible that Commissioners—several of whom know each other well, have worked together on these issues for years, and communicate regularly—were not communicating privately during this two-month window when no one had told them not to do so. Our concern regarding the spottiness of the index is even more acute given Mr. Kossack's acknowledgement in his Fourth Declaration that the Commissioners did not receive any litigation hold until August 7, 2017, five weeks after the first lawsuit was filed against the Commission. Notwithstanding this lapse, nothing was done to address possibly deleted emails or texts.

As detailed further below, the Court should order Defendants to supplement the *Vaughn* index to individually log records in certain specified categories as well as all text messages, and should issue additional appropriate relief to address concerns about the index's completeness.

**ARGUMENT**

**I.      Defendants' *Vaughn* Index Does Not Comply With the Court's August 30 Order**

**A.      The Index Inappropriately Lumps Many Records into Categories**

As explained in the parties' prior joint status reports, the Lawyers' Committee objected to the categorization of records related to the Commission's substantive work, consistent with this Court's directive that "a document-by-document analysis is likely necessary to determine whether a document is actually subject to disclosure pursuant to Section 10(b)." Yet Defendants' *Vaughn* index improperly, indistinguishably, and inconsistently categorizes many such records, foreclosing the Lawyers' Committee and the Court from assessing whether the records are subject to Section 10(b).

For instance, while the index lists individual emails between Commission staff and U.S. government agencies (Entries 680-753), the index categorizes all emails between Commission

staff and other third parties (Entries 791-807). There is no principled basis to individually list the former while categorizing the latter. And many of the categorized emails with third parties appear to go to the heart of the Commission's substantive work, including plans by some Commissioners to retain "third-party data analysis entities" to analyze voter data provided by "states" and other "third parties." These improper categories include:

- Entry 794: "Emails and proposals with/from third-party data analysis entities"
- Entry 795: "Emails from third parties to Commission staff about potential collaboration"
- Entry 799: "Emails from third parties about data sources"
- Entry 805: "Emails between Commission staff and states about mechanics of data sources"

This categorical treatment of communications about data collection and analysis is inconsistent with other entries in the index where documents about the same subjects are logged individually. *See, e.g.*, Entries 174, 370, 411, 418, 419, 421, 464, 473, 588, 634, 637, 746, 748.

In addition, Defendants' index improperly categorizes all "internal" communications among Commission staff (entries 754-790). A number of these categories likewise appear to contain records that involve substantive Commission work, including:

- Entry 756: "Internal communications: re data collection process"
- Entry 758: "Internal discussions and documents re: potential Commission members"
- Entry 761: "Internal briefing memos about Commission activities"
- Entry 769: "Internal discussions about responding to inquiries from public officials"
- Entry 771: "Internal discussions re vendors/consultants (emails, documents)"
- Entry 780: "Internal discussions about subjects for potential Commission report"
- Entry 781: "Internal emails re: discussing next steps for Commission"
- Entry 787: "Internal discussions about draft Commission documents"

3

Again, lumping communications about the substance of the Commission's work into an undifferentiated mass under anodyne labels is inappropriate, as well as inconsistent with other entries in the index where documents about the same subjects are logged individually. *See, e.g.*, Entries 165, 434, 459, 543.

The index also unjustifiably categorizes records regarding the substance of the Commission's previous meetings, including:

- Entry 759: "Internal discussion and documents re: potential panelists"
- Entry 764: "Internal discussions about June 28 call"
- Entry 770: "Internal discussions of July 19 meeting (agenda, remarks)"
- Entry 796: "Third party provided list of suggested witnesses"
- Entry 798: "Emails with potential panelist about participation (and declines)"

This categorical treatment of records concerning the Commission's public meetings is inconsistent with other entries where documents about the same subjects are logged individually. *See, e.g.*, Entries 153, 155-57, 186, 280, 284, 293, 308, 376, 377, 390, 393, 428, 483, 635.

The Lawyers' Committee believes that all records falling into the categories listed above—communications with third parties as well as internal Commission communications or documents—are at least potentially subject to disclosure under Section 10(b), for the reasons set forth in the Lawyers' Committee's prior filings and to be detailed further in future briefing on the merits. The records not only fall under General Records Schedule 6.2's definition of "substantive committee records" subject to disclosure, but their disclosure would be consistent with "the standard of openness in advisory committee deliberations" and for the public to "be informed with regard to the subject matter taken up by such committees." *Food Chem. News v. Dep't of Health & Human Servs.*, 980 F.2df 1468, 1472 (D.C. Cir. 1992).

4

Indeed, many of these records likely meet the approach to Section 10(b) preliminarily outlined in the Court's August 30 Order. Many of the records may contain materials or discuss issues "intended for" the Commission's "eventual use," or could have been created "with an intent to eventually disclose the finished product to the committee." 8/30/17 Order at 2. For example, under any standard, a document-by-document analysis is necessary to determine whether Section 10(b) requires disclosure of records concerning "draft Commission documents," "subjects for potential Commission report," "briefing memos about Commission activities," and the Commission's "data collection process." Yet there is no way for the Court to conduct the necessary analysis given Defendants' gross categorization of these records.

In response to the Lawyers' Committee's request that Defendants supplement the index to individually log the improperly categorized records identified above, Defendants asserted that "the individual listing of each of these documents is neither practical nor required." Ex. A at 1. But the Lawyers' Committee has focused its request for document-by-document presentation to only those specific categories most likely to contain records subject to Section 10(b)—*i.e.*, those pertaining to the substance of the work being performed by the Commission and in furtherance of Commissioners' deliberations. There is no reason to believe that the volume of individual records in these categories is so enormous that Defendants are unable to review and list them. Indeed, were that the case, it would further corroborate the Lawyers' Committee's belief that these are substantive documents. Defendants' primary argument against individualized identification of these documents raises more troubling questions than it answers.

Defendants' assertion that they are not "required" to individually log these records rests entirely on Defendants' view that the records are not subject to disclosure under Section 10(b)— under Defendants' own narrow legal interpretation of Section 10(b). Ex. A at 1. But as the

Court previously instructed, the *Vaughn* index "needs to be sufficiently broad and detailed to permit *the Court* to ascertain" whether particular records must be disclosed under Section 10(b). 8/30/17 Order at 2 (emphasis added). That is the whole point of the index—to permit the Court to evaluate whether specific documents are subject to Section 10(b). Yet Defendants apparently still believe that they can unilaterally decide the merits of this case.

Worse, the "rationales" Defendants offer for why some of these categories supposedly fall outside the ambit of Section 10(b) are inconsistent. Defendants also describe some of the categories so vaguely that it is impossible to discern whether the *categories* could contain records subject to Section 10(b). For example:

- Defendants withhold an entire category of "Emails *from third parties* about data sources" (Entry 799) based on Rationale "(i)," but, according to Mr. Kossack's Third Declaration, Rationale (i) applies to "Emails *between* individual Commission members and Commission staff *discussing* potential third-party assistance." Third Kossack Decl. at 10.

- Defendants withhold the category of "Emails and proposals with/from third-party data analysis entities" (Entry 794) based on Rationale "(w)," but, according to Mr. Kossack's Third Declaration, Rationale (w) is for emails and documents received from third parties that were "not solicited by the Commission." Kossack Third Decl. at 13. Were all of the "Emails and proposals with/from third-party data analysis entities" really "unsolicited," when the index elsewhere shows that Commissioner Adams was proactively discussing "potential data analysts" with Mr. Kossack (Entry 174), and when the Commission's staff apparently has had "Internal discussions re vendors/consultants" (Entry 771)?

- The index includes a category for "Internal discussions re vendors/consultants (emails, *documents*)" (Entry 771), leaving the Court to guess as to the nature and substance of these "documents."

- The index includes categories for "briefing memos" and "draft Commission documents" (Entries 761 and 784), leaving the Court to guess as to the nature and substance of these "memos" and "documents."

These flaws only underscore how seriously Defendants' categorical treatment flouts this Court's instruction and why the individual logging of records is necessary.

6

Finally, some of the "rationales" Defendants offer for refusing to disclose some of these categories of records are inconsistent with Mr. Kossack's previous representations to the Court about the Commission's supposed plans to operate transparently. For example, contrary to Mr. Kossack's statement in his declaration in July that Commission staff had "posted all the documents pertaining to that [July 19] meeting that were provided to the Commission members" and would "continue to make documents available that relate to the July 19 meeting," 07/31/17 Kossack Decl. ¶¶ 7, 9 (ECF 23-1), the *Vaughn* index reveals that the Commission continues to withhold *extensive* materials related to July 19 meeting, including opening statements, presentations, and notes, *see* Entries 140, 143, 172, 255, 272, 439, 441, 518, 547, 549, 593, 730, 731, 770. Withholding these and countless other substantive Commission records contradicts Mr. Kossack's prior assurance to the Court that "[t]he Commission's intent is to operate transparently." 07/31/17 Kossack Decl. ¶ 2 (ECF 23-1).

The Lawyers' Committee respectfully requests that the Court direct Defendants to individually log all records in the categories identified *supra* at 3-4, so that the Court can meaningfully assess whether each is subject to disclosure under Section 10(b).

### B. Defendants Failed To Collect and Properly List Text Messages

This Court's August 30 Order directed that, "given the broad scope of the *Vaughn*-type index, Defendants' search for relevant materials must be . . . broad, and should include *all mediums* through which Commission members have engaged in work for the Commission." 8/30/17 Order at 2 (emphasis added). Of course, "[a]ll mediums" includes text messages sent from or to Commissioners related to the Commission's work. Defendants' index mentions only text messages from Vice Chair Kobach, and even for him, the generic description of this mode of communication is all it lists, without a single individual entry (Entry 508). This meta-categorical approach is especially troubling because, according to Mr. Kossack's Fourth Declaration, neither

7

Vice Chair Kobach nor any other Commissioner even *turned over* their text messages to Mr. Kossack. Mr. Kossack states that Commissioners did not turn over "certain documents that members noted they were retaining," including "some administrative text messages." Fourth Kossack Decl. ¶ 9.

As a threshold matter, there is no "administrative records" exception to the collection and preservation requirements of the Presidential Records Act (PRA). But the PRA aside, it is wholly inappropriate for Defendants to leave it to individual Commissioners to unilaterally decide what constitutes an "administrative" record. In response to the Lawyers' Committee' inquiry about this inadequate records collection, Defendants did not dispute that these messages remain uncollected, stating only that "Vice-Chair Kobach *described* these texts as non-substantive communications dealing with scheduling." Ex. A at 2 (emphasis added). Mr. Kobach's description of Commission records is insufficient. At a bare minimum, the Designated Federal Officer or Defendants' counsel should obtain and review Mr. Kobach's (and any other Commissioner's) text messages to determine whether they are merely administrative.

And there is reason to believe that the text messages are in fact substantive. Defense counsel's letter suggests that Vice Chair Kobach's texts were not with Commission staff, but rather with other Commissioners or third parties. It is not apparent why Vice Chair Kobach would be communicating directly with other Commissioners about "administrative topics such as scheduling," *id.*, rather than leaving such scheduling matters to the Designated Federal Officer or Commission staff. Because the index provides no details on the recipients of Vice Chair Kobach's texts, and because none of the other Commissioners reported text messages at all, including any they received from Mr. Kobach, we do not know whether he has been texting with other Commissioners on an individual basis, or perhaps on a group chain that discusses the

8

Commission's substantive work. Indeed, Commissioner McCormick testified in another case that Vice Chair Kobach regularly texts with her, and that her regular practice is to delete all of her text messages. *See League of Women Voters v. Newby*, No. 1:16-cv-00236-RJL, ECF No. 54-6 (D.D.C. Mar. 7, 2016). The Lawyers' Committee further notes that neither Kossack's Fourth Declaration nor the *Vaughn* index addresses whether Commissioners have exchanged messages through encrypted applications such as Signal or Confide, which reportedly are used by many within the White House. Josh Dawsey, *Kushner used private email to conduct White House business*, POLITICO (Sept. 24, 2017) http://www.politico.com/story/2017/09/24/jared-kushner-private-email-white-house-243071.

The Lawyers' Committee respectfully requests that the Court direct Defendants obtain from each Commissioner all electronic communications on any platform, including text messages, and that each such record be identified on a document-by-document basis in the index.

## II.     Defendants' Filings Raise Serious Questions About the Completeness of the Index

Beyond Defendants' failure to individually log records in the index and collect text messages as required by the Court's August 30 order, Defendants' filings raise serious concerns as to whether the index is materially incomplete and whether Commissioners have failed to properly archive or report records relating to the Commission's substantive work.

### A.     Defendants Failed To Issue a Litigation Hold Until Five Weeks After Commencement of Litigation

During the meet-and-confer process before Defendants' filings, the Lawyers' Committee asked Defendants' counsel what steps, if any, would be taken to search for emails or other records that Commissioners may have deleted from their personal email accounts and devices. Defendants' counsel responded that no search for deleted records was necessary because a

9

proper litigation hold had been issued after the onset of litigation. But we now know that this was not accurate and no litigation hold was issued until nearly *five weeks* after litigation began.

The Electronic Privacy Information Center (EPIC) filed the first lawsuit related to the Commission on July 3, 2017. The Lawyers' Committee and the American Civil Liberties Union (ACLU) filed their respective FACA lawsuits a week later on July 10, 2017. Mr. Kossack's Fourth Declaration vaguely states that he "was advised of the need to retain records" shortly after EPIC filed its suit, but he notably does *not* state that he advised Commissioners of the need to preserve records for litigation purposes at that time. Fourth Kossack Decl. ¶ 2. Rather, Mr. Kossack says that he received "formal litigation hold instructions on August 4, 2017," which he first forwarded to Commissioners on August 7, 2017. It thus appears that Commissioners inexplicably received no litigation hold until more than a month after EPIC filed its suit and four weeks after the Lawyers' Committee and the ACLU filed their suits. That delay is unfathomable, especially given that:

- Commissioners, by their own admission, use personal email accounts to conduct Commission business, and thus Commissioners' emails are not automatically archived as they would be if they were using official federal government accounts;

- Commissioners, according to Mr. Kossack, received no guidance *at all* on the need to preserve records until July 19, 2017 (as described *infra*); and

- The Lawyers' Committee and ACLU suits relate specifically to the disclosure of Commission records.

**B.     Commissioners Received No Records Guidance Until More Than Two Months After the Commission Was Established**

The failure to issue a timely litigation hold is particularly concerning because of the delay in providing Commissioners any guidance at all about their records obligations under the Presidential Records Act and FACA. The Commission was formally established by Executive Order on May 11, 2017, and the *Vaughn* index indicates that Commissioners engaged in

10

substantial work in the two following months, including significant work leading to the June 28, 2017 letter to states requesting voter data, as well as preparations for the July 19, 2017 hearing. *See, e.g.*, *Vaughn* Index Entries 367, 373. Yet, Mr. Kossack's Fourth Declaration indicates that Commissioners received *zero* training on their records management and their preservation obligations until July 19, 2017, when GSA counsel purportedly advised Commissioners on the requirements of the Presidential Records Act. Fourth Kossack Decl. ¶ 1.

What's more, there is reason to believe that Mr. Kossack's account of even this belated records training may be inaccurate. Mr. Kossack's Fourth Declaration asserts that GSA counsel advised Commissioners of the requirement, which derives from 44 U.S.C. § 2209, to either copy a Commission staff member's government email address or to forward emails to a staff member's email address within 20 days. Fourth Kossack Decl. ¶ 1. But the GSA PowerPoint presentation that Kossack says served as the basis for this guidance contains no discussion of the need to take these steps, or of 44 U.S.C. § 2209 at all. *See* https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/PACEI-GSA-FACA-Overview.pdf (attached as Exhibit B). And Commissioner Matthew Dunlap has publicly stated that he received no directive on the need to take these steps to properly preserve emails. *See* Jessica Huseman, *Experts Say the Use of Private Email by Trump's Voter Fraud Commission Isn't Legal*, ProPublica (Sept. 15, 2017) (attached as Exhibit C).

    **C.**    **There Are Strong Indications Commission Records Exist That Are Not Included in the Index, and Their Absence Warrants Investigation**

The delay in issuing a litigation hold and record guidance provides critical context in assessing questions raised by the face of the index concerning its completeness. In particular, there is strong reason to believe that the index does not include at least two types of records that exist: (i) direct communications between Commissioners and (ii) records relating to the

11

Commission's work pre-dating May 11, 2017. For the reasons explained below, there is a substantial need to investigate whether such records exist or have been deleted.

### 1. The Index Contains Almost No Commissioner-to-Commissioner Communications

The index includes only a small handful of communications sent directly from one Commissioner to another or involving a small subset of Commissioners without Mr. Kossack or another member of the Office of the Vice President copied. *See, e.g.*, Entries 229, 359, 363, 460, 549 and 561. The index does not list a single direct communication among Commissioners Adams, von Spakovsky, and McCormick, even though the three are close friends and former colleagues at the Department of Justice. *See, e.g.*, Alex Horton & Gregory S. Schneider, *Trump's pick to investigate voter fraud is freaking out voting rights activists*, Wash. Post (June 30, 2017). And the index contains just two direct communications between Vice Chair Kobach and von Spakovsky (359, 460), one between Kobach and Adams (363), one between Kobach and McCormick (561), and none among Adams, McCormick, and van Spakovsky, even though the four of them have worked together closely on these issues for years. That is not plausible. As a comparison, Commissioner McCormick testified in another case last year that she had exchanged "[h]undreds and hundreds of emails" with Commissioner Adams, a former colleague and personal friend. *League of Women Voters v. Newby*, 16-cv-00236-RJL, ECF No. 54-6 at 127. Commissioner McCormick further testified that she regularly exchanges text messages with Mr. Kobach, and that she regularly deletes her text messages with Mr. Kobach and others. *Id.* at 132-33. She even testified that she had deleted text messages with Mr. Kobach the night before her deposition, even though a subpoena had been issued for those records. *Id.*

The notion that these Commissioners have not been communicating directly with one another regarding the Commission is especially implausible given that they received no records

guidance until July 19, 2017. By Defendants' own account, Commissioners received no guidance informing them that they were not allowed to communicate directly with one another until July 19, over two months after the Executive Order formally establishing the Commission on May 11. Kossack Fourth Decl. ¶ 1. In other words, it was not until over two months after the Commission began that Commissioners were purportedly told to copy Mr. Kossack or another official government email account on their communications. And the index clearly indicates that Vice Chair Kobach and Commissioners Adams and von Spakovsky were actively working on Commission matters during this two-month period. It is impossible to fathom that these Commissioners were not communicating directly with one another during this time, even though they are longtime collaborators who have worked together on these issues, *and even though nobody had told them they were not allowed to do so*. That strains all credulity.

In fact, there is concrete evidence that Commissioners Adams and von Spakovsky failed to report direct communications with one another that occurred even after the Commissioners allegedly received records guidance. On August 2, 2017, these Commissioners co-authored a Wall Street Journal op-ed specifically about their work on the Commission. Hans von Spakovsky & J. Christian Adams, *Critics Try to Smear Trump's Election-Integrity Commission*, Wall St. J. (Aug. 2, 2017), https://tinyurl.com/y8klxgjr. But the *Vaughn* index does not list *any* communications between Commissioners Adams and von Spakovsky—related to this op-ed or otherwise—no emails, no texts, no drafts exchanged, no other communications related to drafting this article concerning their work on the Commission, nor any communications with third parties about the article. All of this raises a lot of questions. And it may just be the tip of the iceberg.

## 2. The Index Fails To Include Records Prior to May 11, 2017

As the Lawyers' Committee previously explained (ECF Nos. 30, 32), the *Vaughn* index should include relevant records dating back to the beginning of this Administration, not merely to the May 11, 2017 Executive Order. The index confirms that pre-May 11 records are potentially subject to disclosure under Section 10(b) and thus should be included in the index.

The index demonstrates that Commissioners von Spakovsky and Adams were heavily engaged in Commission work before their formal appointments to the Commission. Notably, Commissioners von Spakovsky and Adams were not appointed to the Commission until June 29 and July 10, respectively. But on June 21, 22, 23, and 27, they were on an email chain with just them, Vice Chair Kobach, Mr. Kossack, and other OVP Staff regarding the "letters to state officials re data collection," and those emails included "draft letter attachments" and "information requests." *See* Entry 367, 373. Commissioners Adams and von Spakovsky were also on email chains limited to these same individuals on June 14 regarding "potential Commission members." *See* Entries 357, 361, 371, 379, and 578.

Given that these Commissioners were performing Commission work prior to their appointments, there is no reason to believe that they and Mr. Kobach were not engaged in Commission work prior to its formal announcement on May 11. The Commissioners themselves have said they were. Vice Chair Kobach stated in separate litigation that he met with President Trump during the Presidential transition period "to advise the President . . . on matters within the purview of the Commission." *Fish v. Kobach*, 16-cv-02105 (D. Kan. July 25, 2017), ECF No. 376 at 11. And Commissioner von Spakovsky was advising the Administration about the Commission as early February 22, 2017, writing in an email that the Commission should not be "bipartisan" and should not include any "Democrats," "mainstream Republicans," or "academics." *See* http://goo.gl/QdvsKH; http://goo.gl/MtSwdt.

14

The Lawyers' Committee therefore requests that the Court direct Defendants to supplement the *Vaughn* index to include pre-May 11 records related to the Commission.

### D. Further Relief Is Necessary To Address Whether the Index Is Incomplete

In addition to the above relief and that requested in Section I *supra*, the Lawyers' Committee respectfully requests further relief to address whether there are other Commission records missing from the *Vaughn* index. Taken together, the lack of Commissioner-to-Commissioner communications in the index, the delay in providing records guidance, the delay in issuing a litigation hold, and the track record of Commissioners such as Vice Chair Kobach of not being forthright with courts all speak to the need for the Court to take supplemental measures to ensure that the relevant records have been properly preserved, collected, and indexed for the Court's evaluation of whether they must be disclosed to the public under Section 10(b).

While Mr. Kossack states that each Commissioner signed a "certification" that he or she provided all relevant records, that certification provides no assurance because it is not sworn under penalty of perjury. And the "certification" notably fails even to inquire whether Commissioners are aware of any Commission records that have been deleted or destroyed.

The Lawyers' Committee therefore respectfully requests that this Court provide further relief to address the completeness of the index. In addition to requiring Defendants to include records pre-dating May 11, such relief could take the form of ordering Commissioners (or a subset such as Vice Chair Kobach and Commissioners Adams, von Spakovsky, and McCormick) to provide testimony or declarations attesting to whether each has had communications, or created or received other records, about the Commission that are not included in the index, and if so, to explain why not. Similar relief may be appropriate from Commission staff to explain the delay in giving records guidance and issuing a litigation hold, as well as the acknowledged

15

failure to collect or index certain Commission records.  Further relief, in some form, is necessary to ensure proper compliance not only with FACA, but also with this Court's orders.

## CONCLUSION

For the foregoing reasons, the Court should order Defendants to file a supplemental index individually logging certain records previously categorized as well as all text messages, and should order appropriate relief to address concerns about the index's completeness.

DATED: October 13, 2017

Respectfully Submitted,

/s/ John A. Freedman

| | |
|---|---|
| Kristen Clarke (D.C. Bar # 973885) | John A. Freedman (D.C. Bar No. # 453075) |
| Jon Greenbaum (D.C. Bar # 489887) | Robert N. Weiner (D.C. Bar # 298133) |
| Ezra D. Rosenberg (D.C. Bar # 360927) | David J. Weiner (D.C. Bar # 499806) |
| Marcia Johnson-Blanco (D.C. Bar # 495211) | R. Stanton Jones (D.C. Bar # 987088) |
| LAWYERS' COMMITTEE FOR | Daniel F. Jacobson (D.C. Bar # 1016621) |
| CIVIL RIGHTS UNDER LAW | ARNOLD & PORTER KAYE SCHOLER LLP |
| 1401 New York Ave., NW | 601 Massachusetts Ave., NW |
| Washington, DC  20005 | Washington, DC  20001 |
| Telephone:  +1 202.662.8600 | Telephone:  +1 202.942.5000 |
| Facsimile:  +1 202.783.0857 | Facsimile:  +1 202.942.5999 |
| erosenberg@lawyerscommittee.org | John.Freedman@apks.com |

Kathryn W. Hutchinson
ARNOLD & PORTER KAYE SCHOLER LLP
44th Floor
777 South Figueroa Street
Los Angeles, CA  90017-5844
Telephone:  +1 213.243.4000
Facsimile:  +1 213.243.4199

Counsel for Plaintiff Lawyers' Committee for Civil Rights Under Law