# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW,

    Plaintiff,

v.

PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; et al.,

    Defendants.

Docket No. 1:17-cv-01354-CKK

Electronically Filed

### REPLY IN SUPPORT OF PLAINTIFF'S MOTION
### TO COMPEL COMPLIANCE WITH THE COURT'S AUGUST 30, 2017 ORDER
### AND FOR ADDITIONAL APPROPRIATE RELIEF

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 3

I. Defendants' *Vaughn* Index Does Not Comply With the Court's August 30 Order ............ 3

    A. Defendants Should Be Directed to Individually Log Records in the Specific Categories That the Lawyers' Committee Identified .............................................. 3

    B. Defendants Must Collect and List All Commissioner Text Messages ................... 5

II. Further Relief is Necessary to Address Serious Concerns Regarding the Completeness of the Index and Possible Spoliation ............................................................ 7

    A. The Index Contains Almost No Direct Communications Between Commissions, Even During the Over 10-Week Period When Nobody Told Them They Had to Copy Commission Staff ............................................................ 7

    B. Defendants Must Address and Search for Deleted Records ................................ 10

    C. The Index Should Include Records Prior to May 11, 2017 ................................. 12

    D. Further Relief To Address Whether the Index is Incomplete Is Both Appropriate and Necessary ................................................................................ 13

CONCLUSION .............................................................................................................. 15

**INTRODUCTION**

In its August 30 Order, this Court directed Defendants to provide a "document-by-document" list of records held by the Commission. ECF No. 28 ("8/30/17 Order") at 2. They did not do that. Defendants offer a litany of excuses for categorizing records, but Defendants cannot rewrite the clear language of the order, nor did they ask the Court to reconsider it. They instead resorted to self-help. Defendants complain about the burden of complying with this Court's directive, ECF No. 36 ("Opp.") at 11, but ignore that during the recent meet-and-confer, the Lawyers' Committee voluntarily limited its request to individually list records to the 17 specific categories most likely to include records subject to disclosure under FACA. Defendants attack a straw man in claiming they would face a significant burden in individually listing records; they would not for just these 17 categories. Defendants also offer no explanation for failing to collect or individually log text messages from Commissioners, despite this Court ordering Defendants to collect and index Commission-related records in "all mediums through which Commission members have engaged in work for the Commission." 8/30/17 Order 2.

Defendants also fail to address the unavoidable conclusion that there are records missing from the index. For example, Defendants claim that "the index contains numerous Commissioner-to-Commissioner emails," Opp. 19, but almost all of the 30 documents they cite are not direct Commissioner-to-Commissioner communications but rather involve Commission staff. The index shows just two direct communications over the 10-week period before Commissioners received guidance that they should copy a staff member on communications. In other words, according to Defendants, from May 11 to July 19, there were only two Commissioner-to-Commissioner communications that did not copy a staff member—two communications over 70 days, even though several Commissioners are close friends who have

1

worked together on these issues for years, were doing substantive Commission work during this time, and had received no guidance against directly communicating with one another during this period. That is utterly implausible.

Nor do Defendants adequately address the obvious shortcomings in their preservation and collection procedures—shortcomings that, in conjunction with the other facts of this case, raise serious concerns that Commission records have been deleted or destroyed. Defendants do not credibly explain the failure to timely instruct Commissioners on their records preservation obligations, the failure to issue a timely litigation hold notice, and the exclusive reliance on unsworn "certifications" by Commissioners. Given the failure to ask in the certification whether Commissioners are aware of any records that have been deleted or destroyed, Defendants have no idea whether or not any documents responsive to the Lawyers' Committee request have been destroyed. Indeed, even had Defendants timely instructed Commissioners regarding their preservation obligations, the unsworn "certifications" would still provide insufficient assurance given the track record of the Commission and certain Commissioners and the gaping holes that exist in the index.

Finally, Defendants' suggestion that the relief the Lawyers' Committee seeks is unrelated to the claims in this case makes no sense. Prior to filing this lawsuit, the Lawyers' Committee requested disclosure of the Commission's records under Section 10(b) of FACA, and when the Commission failed to provide them, the Lawyers' Committee filed this suit seeking Commission records. Whether Defendants have withheld, destroyed, or made misstatements about those records bears directly on the Lawyers' Committee's claims and the ultimate relief it seeks. The Court, moreover, has inherent authority to deal with possible spoliation, to enforce its orders, and

to insist that representations to the Court be correct and not misleading. Defendants unsworn "certifications" do not obviate that authority.

## ARGUMENT

### I. Defendants' *Vaughn* Index Does Not Comply With the Court's August 30 Order

#### A. Defendants Should Be Directed to Individually Log Records in the 17 Specific Categories That the Lawyers' Committee Identified

In the August 30 Order, the Court concluded that a "document-by-document analysis is likely necessary to determine whether a document is actually subject to disclosure pursuant to Section 10(b)." 8/30/17 Order at 2. Nowhere in their brief do Defendants discuss this language. Rather, Defendants provide a laundry list of *post hoc* justifications why they categorized certain records in their *Vaughn* index in contravention of the August 30 Order. Defendants cite to case law from other contexts (Opp. 11-13), cherry-pick excerpts from the court hearing preceding the August 30 Order (Opp. 4-5), and generally complain about having already been put through "such an extraordinary exercise" (Opp. 11). None of these *post hoc* justifications alter the clear terms of this Court's August 30 Order, or the reasons why such relief is necessary and appropriate. This Court should reject Defendants' efforts to re-litigate the terms of a court order after having failed to comply with that order.

During the meet-and-confer process and in its opening brief, the Lawyers' Committee made clear that it seeks only that Defendants individually log records in the 17 specific categories identified on pages 3-4 of the Lawyers' Committee's opening brief.[1] *See, e.g.*, ECF 35-1 ("Opening Br.") at 7, ("The Lawyers' Committee respectfully requests that the Court direct

---

[1] Defense counsel's letter to the Lawyers' Committee following the meet-and-confer acknowledged that the Lawyers' Committee sought individual listing of records only in the 17 categories. *See* ECF No. 35-2 ("[Y]ou identified specific entries where Defendants had provided a categorical identification of materials, and where you take the position that a document-by-document identification is required.").

Defendants to individually log all records in the categories identified [on pages] 3-4.").[2] The Lawyers' Committee identified these categories to significantly reduce the burden on Defendants while focusing on those categories most likely to have records subject to Section 10(b). In their brief, Defendants profess uncertainty whether the Lawyers' Committee seeks individual listings of just these 17 categories or of all communications with third parties and all internal communications, and based on the latter and broader possibility, they claim that there are "thousands of emails" they would need to index. Opp. 11 & n.5. The Lawyers' Committee was clear during the meet-and-confer and in its opening brief that it seeks individual logging of just the 17 categories, and Defendants do *not* assert that there are "thousands of emails" in just those categories. Indeed, Defendants nowhere advise the Court how many records are in these 17 categories. Opp. 11 n.5. Individually logging records in these 17 categories should not impose a significant burden on Defendants. But even if the categories did contain a large volume of records, that would only show that the categories go to the heart of the Commission's substantive work and should be included in the index.

Defendants also tellingly do not address the inconsistencies between several of their category descriptions and the proffered "rationales" for why the categories fall outside of Section 10(b). Opening Br. 6. Defendant do not dispute, let alone address, the discrepancies

---

[2] These 17 categories are: (1) Entry 794: "Emails and proposals with/from third-party data analysis entities"; (2) Entry 795: "Emails from third parties to Commission staff about potential collaboration"; (3) Entry 799: "Emails from third parties about data sources"; (4) Entry 805: "Emails between Commission staff and states about mechanics of data sources"; (5) Entry 756: "Internal communications: re data collection process"; (6) Entry 758: "Internal discussions and documents re: potential Commission members"; (7) Entry 761: "Internal briefing memos about Commission activities"; (8) Entry 769: "Internal discussions about responding to inquiries from public officials"; (9) Entry 771: "Internal discussions re vendors/consultants (emails, documents)"; (10) Entry 780: "Internal discussions about subjects for potential Commission report"; (11) Entry 781: "Internal emails re: discussing next steps for Commission"; (12) Entry 787: "Internal discussions about draft Commission documents"; (13) Entry 759: "Internal discussion and documents re: potential panelists"; (14) Entry 764: "Internal discussions about June 28 call"; (15) Entry 770: "Internal discussions of July 19 meeting (agenda, remarks)"; (16) Entry 796: "Third party provided list of suggested witnesses"; (17) Entry 798: "Emails with potential panelist about participation (and declines)".

between the category descriptions and proffered withholding rationales for "Emails from third parties about data sources" (Entry 799) and "Emails and proposals with/from third-party data analysis entities" (Entry 794). Yet Defendants still ask this Court to rely on these deficient category descriptions rather than individually logging the relevant records. And with respect to the vague category descriptions that the Lawyers' Committee identified, Opening Br. 6, Defendants offer "to provide further clarification of these entries," Opp. 15, but they give no explanation how, short of individually listing each record, this Court can meaningfully assess records in categories such as "briefing memos" and "draft Commission documents."[3]

The Lawyers' Committee respectfully requests that the Court direct Defendants to individually list in the *Vaughn* index all documents in the 17 specific categories, consistent with the Court's August 30 Order.

### B. Defendants Must Collect and List All Commissioner Text Messages

Defendants fail to explain why they did not log—or even collect—Commissioner text messages. Defendants assert that they "appropriately relied on Vice Chair Kobach's representations" that his Commission-related text messages were administrative in nature. Opp. 21. But it is entirely inappropriate for Defendants to allow Commissioners to make their own self-serving determinations regarding what records are potentially subject to disclosure under Section 10(b).

This categorical treatment also violates this Court's August 30 Order. This Court instructed that "[t]o the extent a document was created or obtained by a Commission member in

---

[3] Defendants incorrectly assert that, with respect to emails that were individually listed, the Lawyers' Committee "identified only two entries that it stated were too vague to allow for a proper assessment of whether section 10(b) applied." Opp. 8. Depending on the legal standard for Section 10(b) that the Court adopts in ruling on the merits, further details or inspection by the Court may be necessary to determine whether a particular record meets the legal standard adopted by the Court.

5

the course of his or her work for the Commission, it should be included in the index." 8/30/17 Order 2. Defendants simply ignored this directive. In fact, Defendants' failure to collect text messages is contrary to their own certification form. The form asked Commissioners to attest that they had "searched for . . . and *sent* any responsive documents to Andrew Kossack." ECF No. 33-2 ("Fourth Kossack Decl.") at 9 (emphasis added). Mr. Kobach presumably signed this certification, but he never sent Mr. Kossack his text messages. *Id.* ¶ 9.[4]

As explained in the Lawyers' Committee's opening brief, there are also reasons to believe that Mr. Kobach's text messages are not administrative in nature. Opening Br. 8-9. Defendants' submissions are troubling in this regard. Nowhere in the brief, the *Vaughn* index, or the Kossack declarations do Defendants indicate the person or persons with whom Mr. Kobach was texting. And Defendants carefully state multiple times—in the passive voice—that no other Commissioner "reported" text messages. Opp. 21. It remains a mystery whom else Mr. Kobach would be texting with about the Commission: if it was an Office of the Vice President staff member such as Mr. Kossack, Mr. Kossack's declaration would appear to be inaccurate. The prospect that other Commissioners or Commission staff failed to report or provide text messages raises serious concerns regarding possible spoliation, as described further *infra*.

The Lawyers' Committee respectfully requests that the Court direct Defendants to take supplemental measures to collect and individually list in the *Vaughn* index all Commissioner text

---

[4] The failure to collect text messages also violates the White House's own policies regarding text messages. The White House Counsel reportedly sent guidance requiring employees to "screenshot any personal text messages about government business," presumably to then send the screenshots to the White House Counsel's Office to preserve the records. Josh Dawsey & Bryan Bender, *National Archives warned Trump White House to preserve documents*, POLITICO, Oct. 17, 2017, https://tinyurl.com/ybm8htox. Defendants offer no reason why Commissioners are exempt from this requirement, even though the Commission has publicly stated that Commissioners are special government employees (presumably of the Executive Office of the President). *See* Bryan Lowry & Hunter Woodall, *Is Kobach a private citizen on Trump commission? Question will test transparency law*, Kan. City Star, Sept. 18, 2017, https://tinyurl.com/ycs25dhq.

messages, as well as any staff text messages regarding the substantive work of the Commission, consistent with the Court's August 30 Order.

## II. Further Relief is Necessary to Address Serious Concerns Regarding the Completeness of the Index and Possible Spoliation

Defendants' response regarding the completeness of the index and the potential that there are records missing or destroyed is deeply disconcerting. Defendants asks this Court to accept on faith that no records are missing, despite all evidence and common sense to the contrary.

### A. The Index Contains Almost No Direct Communications Between Commissioners, Even During the Over 10-Week Period When Nobody Told Commissioners They Had to Copy Commission Staff

The Lawyers' Committee's opening brief explained that the index includes barely any communications sent directly from one Commissioner to another "without Mr. Kossack or another member of the Office of the Vice President copied." Opening Br. 12. In response, Defendants claim that "contrary to plaintiff's claim, the index contains numerous Commissioner-to-Commissioner emails," and Defendants then cite 30 index entries that purportedly support this assertion. Opp. 19. This statement is misleading to say the least: 22 of the 30 emails cited had Mr. Kossack or another Office of the Vice President staff member on the email, and therefore they are not direct communications between Commissioners of the type that the Lawyers' Committee described in its opening brief.[5] Two more of the emails were from a third party *to* multiple Commissioners, and thus were not communications *between* Commissioners at all.[6] Of the remaining 6 emails that were between Commissioners only, only 2 were during the 10-week

---

[5] *See* Entries 168, 171, 175, 178, 180, 199, 201, 295, 357, 360, 361, 367, 373, 379, 387, 418, 421, 474, 578, 587, 588, 598.

[6] *See* Entries 436, 496.

7

period when Commissioners had not yet received instructions to copy Mr. Kossack on any Commission-related communications. *See* Entries 359, 363.

Defendants thus ask this Court to believe the following: that from May 11 to July 19, Commissioners had a grand total of two communications with one another that did not copy Mr. Kossack or another a staff member, even though nobody told Commissioners during this period that they could not communicate directly with one another. That would be impossible to believe no matter the composition of the Commission, but it is particularly implausible here given that several Commissioners are close friends who have worked together on these issues over the years and have testified in other cases that they email and text each other regularly. *See* Opening Br. 12-13. Defendants argue that the "simpler explanation" for the lack of such records is that "the Commission was still in the early stages of its work during this time period," Opp. 19-20, but Defendants' own index utterly belies this claim. For example, during this 10-week period:

- Commissioners Kobach, Adams, and von Spakovsky planned and drafted the request to states for voter data (Entries 367, 373, 378, 382);

- The Commission held the June 28 teleconference, during which Commissioners deliberated upon the data request;

- Commissioners Kobach, Adams, and von Spakovsky repeatedly discussed "data availability" issues after sending the request to states for voter data (Entry 418, 588);

- Commissioners Kobach, Adams, and McCormick discussed the hiring of at least one potential staff member (Entries 162, 361, 379, 542, 554, 578);

- Commissioners Kobach and McCormick each coordinated with the Department of Justice on Commission-related issues, and Mr. Kobach engaged in ongoing discussions with the Department of Homeland Security as well (Entries 383, 384, 541, 687, 693, 701, 703, 705, 706);

- All Commissioners prepared for the July 19 meeting.

These are just the matters we know about, but even the index entries produced thus far show that Commissioners were performing a great deal of substantive work during this period.

8

Defendants also claim that the Lawyers' Committee "speculates" that there are communications missing from the index. Opp. 18. The footnotes of Defendants' brief confirm that there were, in fact, documents missing from the index. *See* Opp. 18 n.9. And the Lawyers' Committee provided a concrete example of missing communications in its opening brief. The Lawyers' Committee explained that Commissioners Adams and von Spakovsky co-authored a Wall Street Journal editorial regarding the Commission on August 2, but the index contains no emails, drafts, or any other records relating to this publication. Opening Br. 13. Defendants are conspicuously silent regarding this example in their brief. They do not explain why records relating to this editorial were not included in the index, nor do they suggest they have taken any steps since the Lawyers' Committee opening brief to locate these records and any other communications between Commissioners Adams and von Spakovsky that were not included in the index. If Commissioners Adams and von Spakovsky failed to report these communications, there is every reason to believe they failed to report other communications as well. Indeed, Mr. Adams authored another editorial on August 31 regarding the Commission's work, but there are no documents in the index regarding this editorial either. J. Christian Adams, *Why I'm sticking with Trump's election commission*, The Hill, Aug. 31, 2017, https://tinyurl.com/y7dfw444.

What's more, Mr. Kobach authored a widely-debunked Breitbart article on September 7 purporting to show statistical proof of voter fraud in New Hampshire. *See* Kris W. Kobach, *Exclusive – Kobach: It Appears That Out-of-State Voters Changed the Outcome of the New Hampshire U.S. Senate Race*, Breitbart, Sept. 7, 2017. Mr. Kobach presented and discussed this article at the Commission's September 12 meeting in New Hampshire, and the Commission concedes that the article is a Commission record subject to Section 10(b), as the Commission has posted the article to its website. *See* https://tinyurl.com/y7j4qbtv. Mr. Kobach based the article

on data that the Republican Speaker of the New Hampshire House released on September 7, the same day Mr. Kobach published the article, but we know Mr. Kobach was planning the article before that day since the *Vaughn* index shows a communication between Mr. Kobach and Mr. Kossack on September 6 about a "NH voting study." Entry 484. However, the index shows no other communications or records from Mr. Kobach related to the article's preparation: it does not show any drafts, any communications reflecting how Mr. Kobach received the data in advance (from the New Hampshire House Speaker or otherwise), or any communications between Mr. Kobach and other Commissioners such as Mr. Adams who also wrote about the data on the same day. *See, e.g.*, J. Christian Adams, *New Data: Illegal Voters May Have Decided New Hampshire in 2016*, PJ Media, Sept. 7, 2017, https://tinyurl.com/yc84xtsm.

As mentioned, Defendants admit elsewhere in the brief that there are records missing, Opp. 18 n.9, further conceding the insufficiency of the Commission's collection efforts.[7] Nowhere do Defendants explain why Commissioners were invited to self-collect, nor do Defendants explain why Commissioners are using personal email addresses rather than federal government addresses that would automatically archive each message as required by federal law, *see* 44 U.S.C. § 2209, which would prevent such issues from arising.

### B. Defendants Must Address and Account for Deleted Records

The Lawyers' Committee believes there is a substantial possibility that Commission records subject to disclosure under Section 10(b) are not only be missing from the index, but also have been deleted. The Lawyers' Committee's opening brief detailed that Commissioner

---

[7] Defendants assert that "Commissioner Gardner recently sent to counsel a number of additional communications" that were not reported in the index. Opp. 18 n.9. The Lawyers' Committee does not question the assertion that this particular oversight was "inadvertent[]," *id.*, but Defendants do not explain why they have not updated the index to include these materials.

McCormick has testified that she typically deletes her text messages, including messages with Mr. Kobach. Opening Br. 12 (citing *League of Women Voters v. Newby*, 16-cv-00236-RJL, ECF No. 54-6 at 132-33). And Mr. Kobach testified in August in another litigation that he similarly "delete[s]" substantive emails in his personal Gmail account. *See Fish v. Kobach*, 16-cv-02105, ECF No. 417 at 37:1-8. That is the same personal email account that Mr. Kobach uses to conduct Commission business. *See* Jessica Huseman, *Experts Say the Use of Private Email by Trump's Voter Fraud Commission Isn't Legal*, ProPublica, Sept. 15, 2017, https://tinyurl.com/y99dv2kr ("Kobach confirmed that he plans to continue to use his personal gmail account to conduct commission business.").

The risk that Commissioners have deleted records is particularly acute given the inexplicable delay in issuing a litigation hold and in providing Commissioners any records preservation guidance at all. Defendants assert that the litigation hold was "timely," Opp. 17, but it was anything but that. While Defendants state that "[t]he Commission was advised orally of the need to retain records related to the lawsuits shortly after the first lawsuit was filed," this appears to be referring to Mr. Kossack's statement in his Fourth Declaration that he *personally* "was advised of the need to retain records" shortly after EPIC filed its suit. Fourth Kossack Decl. ¶ 2. Defendants do not dispute that nobody informed *Commissioners* of the need to preserve records in relation to litigation until August 7, 2017—over a month after EPIC filed its action and four weeks after the Lawyers' Committee filed the instant case specifically seeking Commission records. Nor do Defendants dispute that Commissioners received zero guidance at all on records preservation obligations until July 19, 2017, when GSA purportedly advised Commissioners on the requirements of the Presidential Records Act. *See* Opp. 16. The

undisputed fact is that during the ten-week period from May 11 to July 19, nobody told Commissioners that they were not permitted to delete records relating to the Commission.[8]

Against this backdrop, inquiry is necessary into whether Commissioners have deleted records and, if so, whether those records can be recovered. Defendants have declined to conduct such an inquiry themselves. The certification form that Mr. Kossack requested Commissioners complete pointedly fails to ask Commissioners to attest whether they are aware of any deleted or destroyed records or to confirm that they have not deleted relevant records. *See* Fourth Kossack Decl. 9. It asked Commissioners only to search their records and forward responsive materials, but if Commissioners had already deleted records at the time they completed the certification form, such deleted records obviously would not show up in the search. The Lawyers' Committee accordingly requests that this Court order relief to assess whether Commissioners are aware of any deleted or destroyed records or have deleted records potentially subject to disclosure under Section 10(b). Such relief is particularly appropriate given that this is a lawsuit about records; if parties are free to spoliate on their own terms, then meaningful relief in a FACA case may never be possible.

### C. The Index Should Include Records Prior to May 11, 2017

Defendants argue that there is no textual basis under Section 10(b) to require disclosure of records created before the May 11 Executive Order, but a record may be "prepared . . . for" a committee even before its formal unveiling. 5 U.S.C. app. 2 § 10(b). A memorandum that a

---

[8] Defendants seek to excuse their delay in not providing records guidance until July 19, stating that there is "no authority for the proposition that member training must happen immediately upon the creation of the Commission." Opp. 16-17. But Mr. Kossack is the Commission's Designated Federal Officer, not to mention an attorney in the Office of the Vice President, and it is his responsibility to ensure that the Commission complies with applicable laws. The index demonstrates that Mr. Kossack was well-aware that Commissioners were engaging in substantive work during the 10-week period from May 11 to July 19, but Mr. Kossack failed to advise Commissioners of their records retention requirements.

Commissioner drafted on May 10 for the Commission's eventual use was "prepared for" the Commission just as a much as a memorandum created the next day. And here, we know that Commissioners Adams and von Spakovsky were performing Commission work before their formal appointments to the Commission. *See* Opening Br. 14. They likely were performing such work before May 11 as well. The Lawyers' Committee accordingly requests that this Court order the Defendants to supplement the *Vaughn* index with documents prepared for or related to the Commission prior to May 11.

> **D.    Further Relief To Address Whether the Index is Incomplete Is Both Appropriate and Necessary**

Defendants argument that the Lawyers' Committee's concerns regarding the completeness of the index "constitutes a collateral attempt to expand this suit beyond . . . FACA section 10(b)," Opp. 16, ignores the very nature of the Lawyers' Committee's claims. The Lawyers' Committee sent a July 3, 2017 request to the Commission for records pursuant to Section 10(b) of FACA, and subsequently filed this suit seeking the same. If Commissioners have deleted or failed to report records that were called for by the Lawyers' Committee request, that directly impacts the ultimate relief that the Lawyers' Committee seeks in this case. There is nothing collateral about the Lawyers' Committee's efforts to ensure that the Commission has preserved and accounted for all of its records that may be subject to disclosure under FACA.

Moreover, this Court has inherent authority to ensure compliance with its orders. *See Walters v. People's Republic of China*, 72 F. Supp. 3d 8, 10 (D.D.C. 2014); *see also Parsi v. Daioleslam*, 778 F.3d 116, 130 (D.C. Cir. 2015) ("[C]ourts have an inherent power . . . to protect their institutional integrity and to guard against abuses of the judicial process." (internal quotation marks omitted)). This Court directed in the August 30 Order that "[t]o the extent a document was created or obtained by a Commission member in the course of his or her work for

13

the Commission, it should be included in the index." 8/30/17 Order 2. For the reasons stated above, there is substantial reason to believe Defendants did not comply with this directive. And this would not be the first time that Defendants have failed to comply with an order in this case. *See* ECF No. 25.

Indeed, while Defendants assert that they "are entitled to rely on the[] representations from respected public officials" regarding the completeness of the index, Opp. 2, the facts speak for themselves. In addition to Defendants' failure to abide by their representations to the Court prior to the July 19 meeting:

- At least two federal judges have found that Mr. Kobach intentionally misled them. Judge O'Hara imposed sanctions on Mr. Kobach "for making material misrepresentations to the court." *Fish v. Kobach*, No. 16-2105-JAR-JPO, 2017 WL 2861668, at *1 (D. Kan. July 5, 2017). Judge Robinson upheld those sanctions, and in so doing, described Mr. Kobach as having engaged in a "pattern" of "misleading the Court about the facts and record." *Fish*, 2017 WL 3149289, at *3 n.27 (D. Kan. July 25, 2017).

- Commissioner McCormick testified in a case last year that she deleted records the night before a deposition, even though a subpoena required her to preserve and produce those very records. *League of Women Voters*, 16-cv-00236-RJL, ECF No. 54-6 at 132-33.

- Commissioner von Spakovsky flatly denied having sent an email stating that the Commission should not be "bipartisan" or include any "Democrats" or "mainstream Republicans," only to be contradicted later by his employer. Dell Cameron, *Jeff Sessions Was Lobbied to Exclude Democrats From Trump's Election Fraud Panel*, Gizmodo, Sept. 12, 2017, https://tinyurl.com/yd8ao8xg.

- Just last week, in response to a letter from Commission Dunlap requesting information because he has been excluded from communications among other Commissioners and generally been left in the dark regarding the Commission's activities, Mr. Kobach said he was "not aware of any information or discussions or exchange of materials from commission members that would exclude" Mr. Dunlap. Ellis Kim, *What's become of Trump's voter fraud commission? Even some of its members aren't sure*, PBS NewsHour, Oct. 24, 2017. https://tinyurl.com/ybh474zz. Mr. Kobach made that assertion even though he has personally been on hundreds of emails that excluded Mr. Dunlap, as the *Vaughn* index demonstrates.

This Court need not rely on these examples given the strong evidence that the index is not complete, but it certainly does not help Defendants' argument the Commissioners' representations should be accepted at face value.

## CONCLUSION

For the foregoing reasons and those stated in the Lawyers' Committee's opening brief, the Lawyers' Committee respectfully requests that the Court order Defendants to file a supplemental index individually logging records in the 17 categories identified by the Lawyers' Committee as well as all text messages, and order appropriate relief to address concerns about the index's completeness.

DATED: November 3, 2017                    Respectfully Submitted,

/s/  John A. Freedman

| | |
|---|---|
| Kristen Clarke (D.C. Bar # 973885) | John A. Freedman (D.C. Bar No. # 453075) |
| Jon Greenbaum (D.C. Bar # 489887) | Robert N. Weiner (D.C. Bar # 298133) |
| Ezra D. Rosenberg (D.C. Bar # 360927) | David J. Weiner (D.C. Bar # 499806) |
| Marcia Johnson-Blanco (D.C. Bar # 495211) | R. Stanton Jones (D.C. Bar # 987088) |
| LAWYERS' COMMITTEE FOR | Daniel F. Jacobson (D.C. Bar # 1016621) |
| CIVIL RIGHTS UNDER LAW | ARNOLD & PORTER KAYE SCHOLER LLP |
| 1401 New York Ave., NW | 601 Massachusetts Ave., NW |
| Washington, DC  20005 | Washington, DC  20001 |
| Telephone:  +1 202.662.8600 | Telephone:  +1 202.942.5000 |
| Facsimile:  +1 202.783.0857 | Facsimile:  +1 202.942.5999 |
| erosenberg@lawyerscommittee.org | John.Freedman@apks.com |
| | |
| | Kathryn W. Hutchinson |
| | ARNOLD & PORTER KAYE SCHOLER LLP |
| | 44th Floor |
| | 777 South Figueroa Street |
| | Los Angeles, CA  90017-5844 |
| | Telephone:  +1 213.243.4000 |
| | Facsimile:  +1 213.243.4199 |
| | |
| | Counsel for Plaintiff Lawyers' Committee for Civil Rights Under Law |