**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW,<br><br>      Plaintiff,<br><br>v.<br><br>PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY; *et al.*,<br><br>      Defendants. | Civil Action No. 1:17-cv-1354 (CKK) |

**DEFENDANTS' MEMORANDUM IN SUPPORT**
**<u>OF THEIR MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 3

   I.   LEGAL BACKGROUND ................................................................................. 3

     A.  The Federal Advisory Committee Act ..................................................... 3

     B.  The Administrative Procedure Act ........................................................... 4

   II.  FACTUAL BACKGROUND .......................................................................... 4

   III.  PROCEDURAL BACKGROUND .................................................................. 6

STANDARD OF REVIEW ........................................................................................ 10

ARGUMENT .............................................................................................................. 11

   I.   THIS CASE IS LARGELY MOOT ............................................................... 11

     A.  Plaintiff's FACA Section 10(a) Claims Are Moot In Light Of The
         Commission's Dissolution ..................................................................... 12

     B.  Plaintiff's FACA Section 10(b) Claim Is Moot With Respect To All
         Records That Are Publicly Available ..................................................... 14

   II.  PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER FACA
       AND THE APA .............................................................................................. 16

   III.  MANDAMUS IS UNAVAILABLE TO PLAINTIFF ...................................... 19

     A.  The Mandamus Standards Are Stringent ............................................... 20

     B.  Plaintiffs Have Not Satisfied These Stringent Standards ...................... 21

        1.  FACA Does Not Require Advisory Committees to Provide an
           Opportunity for In-Person Attendance and Participation at
           Committee Meetings ..................................................................... 21

        2.  Staff Material Not Shared With Any Commission Member is
           Not Subject to Disclosure Pursuant to FACA Section 10(b) ......... 22

           a.  Existing precedent indicates that staff material is not subject
              to disclosure pursuant to FACA .................................................. 22

           b.  Existing agency practice indicates that staff material is not
              subject to disclosure pursuant to FACA ...................................... 26

c.  The requirement to affirmatively post FACA section 10(b)
materials is incompatible with subjecting staff materials to
section 10(b).............................................................................................. 27

d.  With respect to a dissolved commission, "intentionality" is
best determined by considering whether documents have actually
been disclosed to the advisory committee ................................................... 28

3.  The remaining commission-related materials are not subject to
public disclosure ............................................................................................ 30

a.  Attorney-client/attorney work product documents .................................... 30

b.  Personal documents .................................................................................... 31

c.  Documents related to the selection of commissioners ............................... 32

C.  Because Applying FACA To A Presidential Advisory
Commission Raises Serious Constitutional Concerns, Even If Plaintiff
Satisfied The Mandamus Standards – And It Does Not – This Court
Should Decline To Exercise Mandamus............................................................ 32

CONCLUSION............................................................................................................. 36

## TABLE OF AUTHORITIES

### Cases

*Adams v. Office of Att'y Gen.*,
  No. 2:11-CV-621-WKW, 2012 WL 1067978 (M.D. Ala. Mar. 29, 2012) ..................... 1

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ................................................................................................. 16

*Allied Chem. Corp. v. Daiflon, Inc.*,
  449 U.S. 33 (1980) ................................................................................................... 20

*Am. Methyl Corp. v. EPA*,
  749 F.2d 826 (D.C. Cir. 1984) ................................................................................. 26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................. 11

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
  997 F.2d 898 (D.C. Cir. 1993) ................................................................................. 33

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
  879 F. Supp. 103 (D.D.C. 1994) ................................................................. 16, 24, 30

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
  879 F. Supp. 106 (D.D.C. 1994) ............................................................................. 16

*Baptist Mem'l Hosp. v. Sebelius*,
  603 F.3d 57 (D.C. Cir. 2010) ................................................................................... 20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................. 11

*Cheney v. U.S. Dist. Ct. for D.C.*,
  542 U.S. 367 (2004) ......................................................................................... passim

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ................................................................................................... 21

*Ctr. for Biological Diversity v. Tidwell*,
  239 F. Supp. 3d 213 (D.D.C. 2017) ................................................................. passim

*Cummock v. Gore*,
  180 F.3d 282 (D.C. Cir. 1999) ........................................................................... 12, 15

*Dong v. Smithsonian Inst.*,
  125 F.3d 877 (D.C. Cir. 1997) ................................................................................. 18

*Citizens for Responsibility & Ethics in Wash. v. Duncan*,
    643 F. Supp. 2d 43 (D.D.C. 2009) ................................................................. 13, 16, 25

*Citizens for Responsibility & Ethics in Wash. v. Office of Admin.*,
    566 F.3d 219 (D.C. Cir. 2009) ............................................................................... 18. 19

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
    No. 17-CV-2361 (CKK), 2018 WL 3150217 (D.D.C. June 27, 2018) .......................... 8

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
    266 F. Supp. 3d 297 (D.D.C. 2017) ................................................................ 17, 18, 19

*\*Food Chem. News v. Dep't of Health & Human Services*,
    980 F.2d 1468 (D.C. Cir. 1992) ............................................................................ 27, 29

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ..................................................................................................... 4

*Freedom Watch, Inc. v. Obama*,
    807 F. Supp. 2d 28 (D.D.C. 2011) ............................................................................ 16

*Freedom Watch, Inc. v. Obama*,
    859 F. Supp. 2d 169 (D.D.C. 2012) .......................................................................... 13

*Friends of the Earth v. Laidlaw*,
    528 U.S. 167 (2000) ................................................................................................... 14

*Hewitt v. Helms*,
    482 U.S. 755 (1987) ................................................................................................... 13

*In re al-Nashiri*,
    791 F.3d 71 (D.C. Cir. 2015) .................................................................................... 22

*In re Cheney*,
    334 F.3d 1096 (D.C. Cir. 2003) ................................................................................ 33

*\*In re Cheney*,
    406 F.3d 723 (D.C. Cir. 2005) ................................................................ 21, 33, 34, 35

*Jerome Stevens Pharm., Inc. v. FDA*,
    402 F.3d 1249 (D.C. Cir. 2005) ................................................................................ 11

*Jones v. Exec. Office of the President*,
    167 F. Supp. 2d 10 (D.D.C. 2001) ............................................................................ 19

*Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*,
    219 F. Supp. 2d 20 (D.D.C. 2002) ........................................................................ 3, 21

*Kentucky v. Graham,*
  473 U.S. 159 (1985)......................................................................................... 1

*Kissinger v. Reporters Comm. for Freedom of the Press,*
  445 U.S. 136 (1980)....................................................................................... 18

*Larsen v. United States Navy,*
  525 F.3d 1 (D.C. Cir. 2008)........................................................................... 13

*Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory*
  *Comm'n on Election Integrity,*
  265 F. Supp. 3d 54 (D.D.C. 2017)......................................................... passim

*Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory*
  *Comm'n on Election Integrity,*
  No. 17-cv-1354 (CKK), 2018 WL 3213297 (D.D.C. June 28, 2018) ......... 12

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992)....................................................................................... 10

*Meyer v. Bush,*
  981 F.2d 1288 (D.C. Cir. 1993)....................................................................... 4

*Nader v. Baroody,*
  396 F. Supp. 1231 (D.D.C. 1975).................................................................. 33

*\*National Anti-Hunger Coalition v. Executive Committee of President's*
  *Private Sector Survey on Cost Control,*
  557 F. Supp. 524 (D.D.C. 1983), *aff'd,*
  711 F.2d 1071 (D.C. Cir. 1983)......................................................... 22, 23, 27

*NBC-USA Hous., Inc., Twenty-Six v. Donovan,*
  674 F.3d 869 (D.C. Cir. 2012)....................................................................... 13

*North States Power Co. v. U.S. Dep't of Energy,*
  128 F.3d 754 (D.C. Cir. 1997).................................................................. 20, 21

*Powell v. McCormack,*
  395 U.S. 486 (1069)....................................................................................... 12

*Pub. Citizen v. U.S. Dep't of Justice,*
  491 U.S. 440 (1989)................................................................................. passim

*Renne v. Geary,*
  501 U.S. 312 (1991)....................................................................................... 10

*Republic of Venezuela v. Phillip Morris Inc.,*
  287 F.3d 192 (D.C. Cir. 2002)....................................................................... 22

*Rhodes v. Stewart*,
   488 U.S. 1 (1988)................................................................................................ 13

*Schwarz v. U.S. Dep't of the Treasury*,
   131 F. Supp. 2d 142 (D.D.C. 2000),
   *aff'd*, 2001 WL 674636 (D.C. Cir. May 10, 2001).  ................................. 19

*Sierra Club v. Jackson*,
   648 F.3d 848 (D.C. Cir. 2011) ........................................................................ 12

*\*Soucie v. David*,
   448 F.2d 1067 (D.C. Cir. 1971) ........................................................ 17, 18, 19

*Stewart v. Nat'l Educ. Ass'n*,
   471 F.3d 169 (D.C. Cir. 2006) ........................................................................ 11

*Sweetland v. Walters*,
   60 F.3d 852 (D.C. Cir. 1995) .......................................................................... 18

*Tenn. Valley Auth. v. Whitman*,
   336 F.3d 1236 (11th Cir. 2003) ...................................................................... 26

*U.S. Parole Comm'n v. Geraghty*,
   445 U.S. 388 (1980)................................................................................... 12, 13

*United States v. Espy*,
   145 F.3d 1369 (D.C. Cir. 1998) ...................................................................... 19

*United States v. Nixon*,
   418 U.S. 683 (1974)......................................................................................... 35

*United States v. Philip Morris USA Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009) ...................................................................... 12

*United States v. W.T. Grant & Co.*,
   345 U.S. 629 (1953)......................................................................................... 14

*United to Protect Democracy v. Presidential Advisory Comm'n on
   Election Integrity*,
   288 F. Supp. 3d 99 (D.D.C. 2017)............................................................. 17, 18

*Wakat v. Montgomery Cty.*,
   471 F. Supp. 2d 759 (S.D. Tex. 2007),
   *aff'd sub nom.*, 246 F. App'x 265 (5th Cir. 2007) ....................................... 1

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of
   Keffeler*,
   537 U.S. 371 (2003)......................................................................................... 31

*Wilson v. Libby*,
     535 F.3d 697 (D.C. Cir. 2008) ................................................................. 19

*Wright v. Foreign Serv. Grievance Bd.*,
     503 F. Supp. 2d 163 (D.D.C. 2007) .......................................................... 10

*Yates v. United States*,
     135 S. Ct. 1074 (2015) ............................................................................. 31

## **Statutes**

5 U.S.C. app. 2 .................................................................................................. 1, 3

5 U.S.C. app. 2 § 2(b) ........................................................................................ 3

5 U.S.C. app. 2 § 5(b)(5) .................................................................................. 24

5 U.S.C. app. 2 § 10(a)(1) ............................................................................ 3, 13

5 U.S.C. app. 2 § 10(a)(2) ............................................................................ 3, 13

5 U.S.C. app. 2 § 10(a)(3) .................................................................................. 3

5 U.S.C. app. 2 § 10(a)-(b) ................................................................................. 6

5 U.S.C. app. 2 § 10(b) .............................................................................. passim

5 U.S.C. app. 2 § 10(c) ....................................................................................... 3

5 U.S.C. § 551 .................................................................................................... 4

5 U.S.C. § 551(1) ..................................................................................... 4, 17, 18

5 U.S.C. § 552(b) .............................................................................................. 31

5 U.S.C. §§ 701-706 ........................................................................................ 3, 4

5 U.S.C. § 702 ..................................................................................................... 4

28 U.S.C. § 1361 .............................................................................................. 20

44 U.S.C. § 2204(b)(2) ..................................................................................... 28

## **Rules**

Federal Rule of Civil Procedure 12(b)(1) ........................................................ 10

Federal Rule of Civil Procedure 12(b)(6) ............................................... 10, 11, 16

## Executive Orders

Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017)................................... 4, 32

Exec. Order No. 13,820, 83 Fed. Reg. 969 (Jan. 3, 2018)............................................ 1, 4

## Other Authorities

American Oversight, PACEI Records Released to Maine Secretary of State
  Dunlap, https://www.americanoversight.org/document/pacei-records-
  released-to-maine-secretary-of-state-dunlap.............................................................. 9, 15

Brennan Center for Justice, Investigating Trump's "Voter Fraud" Commission:
  Federal Records Requests (Feb. 18, 2018), https://www.brennancenter.org/
  foia-requests-presidential-advisory-commission-election-integrity .................. 9, 10, 15

Maine Secretary of State, Secretary Dunlap releases initial report on PACEI
  findings (Aug. 3, 2018), https://www.maine.gov/sos/news/
  2018/paceidocs.html ..................................................................................................... 9

Office of Federal High-Performance Buildings, https://www.gsa.gov/about-
  us/organization/office-of-governmentwide-policy/office-of-federal-
  highperformance-buildings ......................................................................................... 26

*Office of Legal Counsel, Disclosure of Advisory Committee Deliberative Materials
  12 U.S. Op. Off. Legal Counsel 73 (1988) ........................................................... 23, 24

PACEI Docs Page, Maine Secretary of State,
  http://paceidocs.sosonline.org/................................................................................ 9, 15

PACEI, Organizational Conference Call Agenda (June 28, 2017),
  https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/
  Agenda%20for%20June%2028%20Organizational%20Call.pdf.................................. 5

PACEI Resources, https://www.whitehouse.gov/articles/presidential-
  advisory-commission-election-integrity-resources-2/ .............................................. 5, 14

PACEI, Statements & Releases, https://www.whitehouse.gov/blog/2017/07/13/presidential-
  advisory-
  commission-election-integrity ........................................................................... 5, 14, 15

President's Commission on Combating Drug Addiction and the Opioid
  Crisis, https://www.whitehouse.gov/ondcp/presidents-commission/ .......................... 26

The Presidential Commission on Election Integrity (PCEI); Upcoming
  Public Advisory Meeting, 82 Fed. Reg. 31,063 (July 5, 2017) ...................................... 5

The Presidential Commission on Election Integrity (PCEI); Upcoming
    Public Advisory Meeting, 82 Fed. Reg. 40,581-01 (Aug. 25, 2017) ............................. 5

Presidential Executive Order 13,799, United States Department of
    Homeland Security, Publications Library, https://www.dhs.gov/
    publication/executive-order-13799 ....................................................................... 10, 15

## INTRODUCTION

This case is a challenge to a Presidential Advisory Commission that was terminated without issuing a report or making any findings.[1]  The former Commission's records, with the exception of internal staff communications, documents containing the personal information of former commission members, and certain litigation-related materials, are publicly available.  These facts resolve this case and require dismissal of plaintiff's Complaint, which seeks relief in connection to the manner in which the former Commission conducted its meetings, as well as disclosure of the former Commission's records.

Plaintiff, Lawyers' Committee for Civil Rights Under Law, filed this suit alleging violations of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2, on July 10, 2017, to prevent the Presidential Advisory Commission on Election Integrity ("Commission" or "PACEI") from holding meetings without an opportunity for in-person attendance and participation and to require the Commission to comply with a request for disclosure of essentially *all* of its records.  *See* Compl., ECF No. 1.  The Commission was terminated on January 3, 2018. *See* Exec. Order No. 13,820, 83 Fed. Reg. 969 (Jan. 3, 2018).  And the vast majority of its records – well beyond what FACA requires – are publicly available.  To the extent plaintiff seeks an order related to any claims regarding the former Commission's operations or the disclosure of records

---

[1] The Presidential Advisory Commission on Election Integrity, Vice President Pence, in his official capacity as Chair of the Commission, Kris Kobach, in his official capacity as Vice Chair of the Commission, and Andrew Kossack, in his official capacity as the Commission's Designated Federal Officer, ceased to be proper defendants when the Commission was terminated on January 3, 2018.  *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *see also Adams v. Office of Att'y. Gen.,* No. 2:11-CV-621-WKW, 2012 WL 1067978, at *3 (M.D. Ala. Mar. 29, 2012) ("to allow an official capacity claim against former officials would be 'to allow them to be sued as representatives of an entity that they . . . no longer represent.'") (citation omitted); *Wakat v. Montgomery Cty.*, 471 F. Supp. 2d 759, 767 (S.D. Tex. 2007), *aff'd sub nom.*, 246 F. App'x 265 (5th Cir. 2007) ("Since the plaintiffs specifically named Williams as a defendant in his official capacity, he ceased to be a defendant the moment he ceased to be sheriff.").

which have already been publicly released, those claims should be dismissed as moot pursuant to Federal Rule of Civil Procedure 12(b)(1) because plaintiff has effectively received the relief it sought.

Additionally, the Complaint should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6) because plaintiff has no viable claims against defendants. Plaintiff cannot state a claim for violation of FACA because that statute does not provide a private cause of action, and the Administrative Procedure Act's cause of action is unavailable here because neither the former Commission nor the other defendant entities that have custody of the former Commission's records are agencies. Plaintiff can proceed, if at all, only through the "drastic and extraordinary" writ of mandamus. But mandamus jurisdiction is also unavailable here because plaintiff cannot demonstrate that defendants violated a "clear, nondiscretionary duty" with respect to FACA's open meeting, public participation, and record disclosure provisions. The limited number of the former Commission's records that are not publicly available consist primarily of staff materials never shared with any of the former commissioners. Authority from this Circuit and the Department of Justice Office of Legal Counsel ("OLC") indicates that such materials are *not* subject to public disclosure pursuant to FACA. The practice of other advisory committees subject to FACA indicates the same. And even if there is any question as to the legal status of these records, such doubt must be resolved in favor of dismissal, as mandamus requires a right to relief (*i.e.*, entitlement to the remaining former Commission's records) to be clear and indisputable, which, in light of existing authority, it is not.

# BACKGROUND

## I.     LEGAL BACKGROUND

### A.     The Federal Advisory Committee Act

Congress enacted FACA, 5 U.S.C. app. 2 §§ 1-16, to reduce the growing cost of unnecessary blue ribbon commissions, advisory panels, and honorary boards set up by the government to advise the President and federal agencies. *See Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 446 (1989) (citing 5 U.S.C. app. 2 § 2(b)).  To achieve these goals, FACA imposes an array of procedural requirements.  As relevant here, advisory committees that are subject to FACA must give advance notice in the Federal Register of any meetings, 5 U.S.C. app. 2 § 10(a)(2), hold their meetings "open to the public," *id.* § 10(a)(1), allow "[i]nterested persons" to "attend, appear before, or file statements with" them, subject to reasonable rules or regulations, *id.* § 10(a)(3), keep minutes of each meeting and copies of all reports received, issued, or approved by the advisory committee, *id.* § 10(c), and make their records, subject to the exemptions in 5 U.S.C. § 552, available to the public "until the advisory committee ceases to exist," 5 U.S.C. app. 2 § 10(b).

FACA does not contain a provision for judicial review.  *See Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity* ("*Lawyers' Committee*"), 265 F. Supp. 3d 54, 66 (D.D.C. 2017) (citing *Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 220-21 (D.D.C. 2017)); *see also Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 2d 20, 33 (D.D.C. 2002) ("FACA creates no private right of action.").  In the absence of a private right of action, a claim to enforce FACA's requirements may only be brought pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-706. ("APA").  *See Judicial Watch, Inc.*, 219 F. Supp. 2d at 33-34; *Lawyers' Committee*, 265 F. Supp. 3d at 66.

### B.    The Administrative Procedure Act

The APA, 5 U.S.C. §§ 551, *et seq.*, establishes a waiver of sovereign immunity and a cause of action for injunctive relief for parties adversely affected either by agency action or failure to act. *See* 5 U.S.C. §§ 702, 706(1)-(2).  These provisions apply only to "agency" action.  "[A]gency" is defined as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency," with certain exceptions.  5 U.S.C. §§ 551(1), 701(b)(1).  This definition does not include the President, *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), or the Vice President, *Meyer v. Bush*, 981 F.2d 1288, 1295 (D.C. Cir. 1993).

## II.   FACTUAL BACKGROUND

The President established the Presidential Advisory Commission on Election Integrity through Executive Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017).  The Commission was charged with "study[ing] the registration and voting processes used in Federal elections," "consistent with applicable law," in order to provide a recommendatory report to the President. Exec. Order No. 13,799, § 3.  The Executive Order states that the Commission was to be "solely advisory."  *Id.*  Vice President Pence was the Chairman of the Commission.  *Id.* § 2.  Kansas Secretary of State Kris Kobach was the Vice Chair.  Compl. ¶¶ 6, 32.  The Commission was terminated on January 3, 2018, *see* Exec. Order No. 13,820; *see also* Notice of Executive Order, ECF No. 39, without having issued a report or making any findings or recommendations, *see* Third Decl. of Christopher C. Hendon ("Third Herndon Decl.") ¶ 5, *Joyner v. Presidential Advisory Comm'n on Election Integrity*, No. 17-cv-22568 (S.D. Fla. Jan. 16, 2018), ECF No. 82-2.

On June 28, 2017, members of the former Commission attended an organizational conference call.  *See* Decl. of Andrew J. Kossack ("First Kossack Decl.") ¶ 5, ECF No. 15-1.  The call focused on administrative and preparatory issues, including welcome remarks by the Vice

President, an overview of how the former Commission would operate (including its first meeting, introduction of its staff members, and potential schedules), and financial disclosures. *Id.*; *see also* PACEI, Organizational Conference Call Agenda (June 28, 2017), https://www.whitehouse.gov/ sites/whitehouse.gov/files/docs/Agenda%20for%20June%2028%20Organizational%20Call.pdf. The members also discussed information request letters that Vice Chair Kobach intended to send out to the states.  First Kossack Decl. ¶ 5.

The former Commission only held two meetings, one introductory meeting on July 19, 2017, and one substantive meeting on September 12, 2017.  The first meeting was held at the Eisenhower Executive Office Building and was open to the public through livestreaming on https://www.whitehouse.gov/live.  *See* The Presidential Commission on Election Integrity (PCEI); Upcoming Public Advisory Meeting, 82 Fed. Reg. 31,063, 31,063 (July 5, 2017); First Kossack Decl. ¶ 6.  Documents discussed at that meeting, including documents introduced and distributed at the meeting were posted on the former Commission's webpage.  *See* PACEI Resources, https://www.whitehouse.gov/articles/presidential-advisory-commission-election-integrity-resources-2/ ("PACEI Resources").  Minutes and a link to the video of the first meeting are also available on the former Commission's webpage, *see id.,* which is still accessible to the public.

The second meeting was held in Manchester, New Hampshire and was open to the public. *See* The Presidential Commission on Election Integrity (PCEI); Upcoming Public Advisory Meeting, 82 Fed. Reg. 40,581-01, 40,581 (Aug. 25, 2017); PACEI Resources.  Materials relating to this meeting, including minutes from the meeting, are available on the former Commission's webpage.  *See* PACEI's Resources.  Public comments submitted to the former Commission through January 3, 2018, are also available on the former Commission's webpage, *id.*, or on regulations.gov.  *See* PACEI, Statements & Releases, https://www.whitehouse.gov/blog/

2017/07/13/presidential-advisory-commission-election-integrity    ("PACEI    Statements    &

Releases").

## III.    PROCEDURAL BACKGROUND

Plaintiff submitted a request to the former Commission for essentially all of its records on

July 3, 2017.  *See* Compl. ¶ 43.  The request sought all email communications beginning on May

11, 2017, relating to the former Commission's "establishment, organization, operation, or work

sent from or to the Commission's Chair, Vice Chair, other Commission members, or any federal

employee . . . providing support to the Commission." *Id.* ¶ 44.  The request also sought "[a]ll other

documentary materials created or received since May 11, 2017," that "were made available to, or

prepared by, the Commission's Chair, Vice Chair, or other Commission members, or any federal

employee . . . providing support to the Commission."  *Id.*  Having not received a response to its

records request, plaintiff initiated this lawsuit on July 10, 2017, alleging violations of the open

meeting, public participation, and record disclosure provisions of the Federal Advisory Committee

Act, 5 U.S.C. app. 2 § 10(a)-(b).  *See generally* Compl.  Plaintiff immediately sought a temporary

restraining order and preliminary injunction to require the former Commission to hold its first

meeting on July 19, 2017, "open to in-person public attendance and participation" and to disclose

certain records to the public prior to the meeting.  *See* Compl.; Pl.'s Mot. for TRO and Prelim. Inj.,

ECF No. 3.

The Court denied plaintiff's motion for emergency relief, finding plaintiff had failed to

show a likelihood of success because FACA section 10(a) neither requires in-person public

attendance of advisory committee meetings or the opportunity for members of the public to present

oral comments at every advisory committee meeting.  *See Lawyers' Committee*, 265 F. Supp. 3d

54, 67.  The Court also concluded that, as of the date of the Court's order denying plaintiff's motion

for a temporary restraining order and preliminary injunction, the former Commission had complied with FACA section 10(b)'s document disclosure requirements.[2]  *See id.* at 59, 69-70.

Two days after the former's Commission's July 19, 2017, meeting, plaintiff moved for a status conference, expedited discovery, and other unidentified relief alleging that the former Commission had failed to comply with representations it had made to the Court and FACA section 10(b).  *See* Pl.'s Mot. for a Status Conference, For Limited Expedited Disc., and For Appropriate Relief, ECF No. 21.  The Court subsequently directed plaintiff to submit a proposed discovery plan by August 24, 2017, and scheduled a status conference for August 30, 2017.  Plaintiff's discovery plan sought broad and expedited merits discovery on the Commission's general document practices, the role of the General Services Administration, and the Commission's activities writ large through interrogatories, requests for document production, including the preparation of a *Vaughn* index, personal testimony from the former Commission's Designated Federal Officer and Vice Chair, and Rule 30(b)(6) depositions.  *See* Pl.'s Notice of Disc. Plan, ECF No. 26.

The Court granted-in-part and denied-in-part plaintiff's motion based on the defendants' agreement to provide certain information "in order for Plaintiff and the Court to be able to properly assess Defendant's anticipated arguments, in the form of a motion pursuant to Federal Rule of Civil Procedure 12(b)(1), regarding the availability of mandamus jurisdiction in this action[.]"  *See* Order, ECF No. 28.  In particular, the Court ordered defendants to produce a "*Vaughn*-type index detailing what specific documents have been collected with respect to the Commission to date, which of those have been disclosed, and if they have not been disclosed, on what basis."  *Id.*  The

---

[2] In addition, the Court concluded that mandamus jurisdiction was "not presently available," in part because plaintiff's emergency motion did not require the Court to determine whether judicial review pursuant to the APA was available.  *See Lawyers' Committee*, 265 F. Supp. 3d at 65-66.

Court also ordered defendants to submit two declarations detailing their position "on what categories of documents are appropriately included [or not included] in the universe of documents potentially subject to disclosure pursuant to FACA section 10(b)" and "the steps that the Commission has taken and will take to identify documents for collection and potential disclosure." *Id.*

Defendants submitted the *Vaughn*-type index and declarations on September 29, 2017. *See* Notice of Filing, ECF No. 33. Dissatisfied with defendants' submission – particularly with respect to defendants' categorization of internal Commission staff emails – plaintiff moved to compel compliance with the Court's Order. *See* Pl.'s Mot. to Compel Compliance with the Court's Aug. 30, 2017 Order and for Additional Appropriate Relief, ECF No. 35. After the President terminated the Commission on January 3, 2018, plaintiff reiterated its view that defendants' *Vaughn*-type index was inadequate, *see* Pl.'s Resp. to Defs.' Notice of Executive Order, ECF No. 40, and requested that the former Commission be ordered to update the *Vaughn*-type index to include documents created or received through January 3, 2018, *see* Pl.'s Supp. Req. for Relief in Conjunction with Mot. to Compel Compliance with the Court's Aug. 30, 2017 Order, ECF No. 41.

The Court denied both plaintiff's motion to compel and its supplemental request, and directed the defendants to file a motion to dismiss by July 30, 2018. *See* Mem. Op. and Order, ECF No. 43. In so doing, the Court noted that proceedings in *Dunlap v. Presidential Advisory Commission on Election Integrity* "may affect developments here" given that the Court ordered defendants to produce certain documents to a member of the former Commission by July 18, 2018. *Id.* (citing *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, No. 17-CV-2361 (CKK), 2018 WL 3150217 (D.D.C. June 27, 2018)). Indeed, shortly after defendants complied

with the Court's order in *Dunlap*, the former commissioner publicly released all of the documents that defendants had produced.  *See* Press Release, Maine Secretary of State, Secretary Dunlap releases initial report on PACEI findings (Aug. 3, 2018), https://www.maine.gov/sos/news/2018/paceidocs.html ("Dunlap Press Releases") (stating that on July 18, 2018, Secretary Dunlap received "1,800 PACEI records" and that he "has [] released the documents online to enable the public to assess the facts for themselves"); PACEI Docs Page, Maine Secretary of State, http://paceidocs.sosonline.org/ ("PACEI Docs Page"); *see also* American Oversight, PACEI Records Released to Maine Secretary of State Dunlap, https://www.americanoversight.org/document/pacei-records-released-to-maine-secretary-of-state-dunlap ("American Oversight") (advising that the "full set of documents" released to former commissioner Dunlap, with the exception of "several duplicate copies" are publicly available on American Oversight's "document cloud").  As explained in defendants' Notice of Compliance filed in the *Dunlap* matter, the documents released by former Commission member Dunlap include substantive documents generated or received by any of the former commissioners about the Commission's operations, activities, and future plans, as well as public comments submitted directly to several former commissioners, and several drafts of a staff-drafted outline for a potential staff or Commission report that was not shared outside of the Office of the Vice President or with any former commissioner.  *See* Notice of Compliance, *Dunlap*, No. 17-cv-2361, ECF No. 53.

Additionally, GSA, the Department of Homeland Security ("DHS"), and the Social Security Administration ("SSA") have released records related to the former Commission pursuant to Freedom of Information Act ("FOIA") requests submitted by Brennan Center for Justice, the Electronic Privacy Information Center, and plaintiff.  *See* Brennan Center for Justice, Investigating Trump's "Voter Fraud" Commission:   Federal Records Requests (Feb. 18, 2018),

https://www.brennancenter.org/foia-requests-presidential-advisory-commission-election-integrity ("Brennan Center"); Presidential Executive Order 13,799, United States Department of Homeland Security, Publications Library, https://www.dhs.gov/publication/executive-order-13799 ("DHS Publications Library").

**STANDARD OF REVIEW**

Defendants seek dismissal of this case under Federal Rule of Civil Procedure 12(b)(1) on the ground that the Court lacks subject matter jurisdiction because the case is moot for all claims except plaintiff's section 10(b) claim for records that defendants have withheld.  For that remaining claim, this case should also be dismissed for lack of subject matter jurisdiction because this Court lacks mandamus jurisdiction. Alternatively, defendants seek dismissal of this case under Federal Rule of Civil Procedure 12(b)(6) on the ground that plaintiff fails to state a claim upon which relief may be granted.

When a defendant files a motion under Rule 12(b)(1), the plaintiff bears the burden of demonstrating the existence of subject-matter jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Courts should "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record."  *Renne v. Geary*, 501 U.S. 312, 316 (1991) (citations omitted). "Although a court must accept as true all the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1)," the factual allegations in the complaint "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007), *aff'd* No. 07-5328, 2008 WL 4068606 (D.C. Cir. Mar. 17, 2008) (internal citations omitted). The Court "may consider materials outside the pleadings in deciding whether to grant a motion to

dismiss for lack of jurisdiction." *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

In order to withstand a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The plaintiff must, accordingly, plead facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged" and offer "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006).

## ARGUMENT

## I.     THIS CASE IS LARGELY MOOT

The Court lacks jurisdiction to consider plaintiff's claims under FACA section 10(a) because they depend on a purported injury-in-fact – the alleged attempt to circumvent FACA's open meeting and public participation requirements – which is no longer viable (assuming it ever was) in light of the Commission's dissolution. The Court further lacks jurisdiction to consider plaintiff's claims under FACA section 10(b) to the extent plaintiff seeks records that are already publicly available because plaintiff has ultimately received the relief it seeks – public disclosure of those records.[3]

---

[3] As this Court noted in its June 28, 2018, Order, the right to records to which former commissioner Dunlap is entitled may exceed that to which plaintiff, as a member of the public, is entitled under FACA section 10(b). *See Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory*

The doctrine of mootness derives directly from Article III's case-or-controversy limitation. *See Sierra Club v. Jackson*, 648 F.3d 848, 852 (D.C. Cir. 2011). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1069); *see also U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).") (citation omitted). Stated differently, "A case is moot when the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated in circumstances where it becomes impossible for the court to grant any effectual relief whatever to the prevailing party." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1135 (D.C. Cir. 2009) (citation omitted).

A.  **Plaintiff's FACA Section 10(a) Claims Are Moot In Light Of The Commission's Dissolution**

The ultimate relief plaintiff seeks with respect to its claims that the former Commission violated the open meeting and public participation requirements of FACA section 10(a) is an injunction enjoining the Commission from meeting unless it provides in-person public attendance and participation. *See* Compl., Prayer for Relief ¶ h. Plaintiff has effectively received this relief with the Commission's dissolution. Moreover, given the Commission's termination, even if FACA required in-person public attendance and participation (which, as this Court previously

---

*Comm'n on Election Integrity*, No. 17-cv-1354 (CKK), 2018 WL 3213297, at *2 (D.D.C. June 28, 2018) ("Whatever the extent of would-be overlap [between documents sought in *Dunlap* and here], it is not clear that Plaintiff could independently obtain the production that it seeks in this case" given that plaintiff "is and always has been a member of the public, rather than a member of the Commission, and so [] cannot avail itself of *Cummock* [*v. Gore*, 180 F.3d 282 (D.C. Cir. 1999).]").

held, it does not[4]), there is no longer a present or cognizable risk of injury to the plaintiff caused by the possibility that the Commission may hold future meetings that do not provide an opportunity for in-person public attendance and participation.  Because plaintiff can no longer show current injury with respect to its FACA section 10(a) claims, there is no reasonable prospect of a live controversy.  Plaintiff's FACA section 10(a) claims are, therefore, moot.[5]  *See U.S. Parole Comm'n*, 445 U.S. at 397.

Indeed, courts, including this Court, "have routinely held that claims based on FACA's [non-document disclosure] procedural requirements are moot when the relevant advisory committee ceases to exist." *Tidwell*, 239 F. Supp. 3d at 223 (public notice/participation requirements moot); *see also Freedom Watch, Inc. v. Obama*, 859 F. Supp. 2d 169, 174 (D.D.C. 2012)) (public notice/participation requirements moot); *Citizens for Responsibility & Ethics in Wash. v. Duncan*, 643 F. Supp. 2d 43, 51 (D.D.C. 2009) (opening meeting and charter requirements are moot); *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 879 F. Supp. 103, 106 (D.D.C. 1994).  Although, mootness does have a notable exception, namely that "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the

---

[4] *See Lawyers' Committee*, 265 F. Supp. 3d at 67 (finding that FACA section 10(a)(1) "does not prescribe the manner in which advisory committee meetings are supposed to be 'open to the public'" and that FACA section 10(a)(3) does not require that an "advisory committee provide an opportunity for in-person attendance at all").

[5] Although plaintiff also seeks declaratory relief for its FACA section 10(a) claims, *see* Compl., Prayer for Relief ¶¶ b-c, a request for declaratory relief is similarly moot when there is no ongoing case or controversy. "Where an intervening event renders the underlying case moot, a declaratory judgment can no longer 'affect[] the behavior of the defendant towards the plaintiff,' and thus 'afford[s] the plaintiffs no relief whatsoever.'" *NBC-USA Hous., Inc., Twenty-Six v. Donovan*, 674 F.3d 869, 873 (D.C. Cir. 2012) (quoting *Hewitt v. Helms*, 482 U.S. 755, 761 (1987) and *Rhodes v. Stewart*, 488 U.S. 1, 4 (1988)); *Larsen v. United States Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) ("any injunction or order declaring [the challenged practice] illegal would accomplish nothing—amounting to exactly the type of advisory opinion Article III prohibits").

practice[,]" *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 189 (2000) (citation omitted), the exception does not apply here.  It is well settled that the voluntary cessation exception is inapplicable where "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.*  The Commission was terminated more than eight months ago and there has been no indication that the President will re-constitute the Commission, let alone staff and operate it the same way, such that the newly constituted Commission would again allegedly violate FACA's open meeting and public participation requirements.  In short, because "there is no reasonable expectation that the [alleged] wrong will be repeated," *United States v. W.T. Grant & Co.*, 345 U.S. 629, 632-33 (1953) (footnoted omitted), plaintiff's FACA section 10(a) claims must be dismissed as moot.

### B.     Plaintiff's FACA Section 10(b) Claim Is Moot With Respect To All Records That Are Publicly Available

Similarly, no subject matter jurisdiction exists over plaintiff's FACA section 10(b) claim as it pertains to the former Commission's records that have been publicly released.  The public availability of those records has redressed any informational injury plaintiff allegedly suffered with respect to them, thereby rendering plaintiff's FACA section 10(b) claim, as it pertains to publicly available records, moot.  Many of the former Commission's records have long been posted on its webpage, including its charter, by-laws, meeting agendas, minutes, and other meeting materials.  *See* PACEI Statements & Releases; PACEI Resources.  Correspondence relating to the former Commission's request for state voter data are also posted on the former Commission's webpage.  *See* PACEI Resources.  And the majority of public comments submitted to the former Commission

are publicly available either on the former Commission's webpage, *see id.*, or on regulations.gov,[6] *see* PACEI Statements & Releases.

Additionally, emails exchanged between the former Commission's staff and certain government agencies, including GSA, DHS, and SSA have been publicly released pursuant to several FOIA requests.  *See* Brennan Center; DHS Publications Library.  As have certain GSA records relating to the reimbursement of travel for former commissioners attending one or both of the former Commission's meetings and the payment of fees associated with the transfer of some state voter data. *See* Brennan Center.

Furthermore, former commissioner Dunlap recently publicly released all of the records he obtained pursuant to this Court's interpretation of *Cummock v. Gore*, 180 F.3d 282 (D.C. Cir. 1999).  *See* Dunlap Press Release; PACEI Docs Page; American Oversight.  Among the records released by former commissioner Dunlap are emails sent by the former Commission's designated federal officer to the Commission's membership, including emails distributing the agenda for the June 28, 2017, organizational call and the July 19, 2017, and September 12, 2017, meetings.  Also included among these records are emails and other materials created or received by former commission members, emails between the former Commission's staff and panelists for the September 12, 2017, meeting, and several drafts of an outline of a potential staff and/or Commission report that were never shared with the former Commission's members.

Courts have recognized that when an advisory committee that no longer exists releases records that are subject to 10(b), no live controversy remains to be resolved with respect to the released records.  For example, in *Association of American Physicians and Surgeons, Inc. v.*

---

[6] The former Commission did not post on its webpage a small number of public comments submitted between May 2017 and June 2017 because the comments were overly profane and/or contained threats.  *See* Defs.' *Vaughn*-type Index, ECF No. 33-3.

*Clinton*, 879 F. Supp. 103, the district court rejected "[p]laintiff's suggestion that a declaratory judgment might be appropriate even if the working group ha[d] been terminated and all appropriate working group documents ha[d] been publicly released," and held that "[a]t that point, there will simply be no continuing case or controversy for judicial resolution." 879 F. Supp. at 106; *see also Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 879 F. Supp. 106, 107 (D.D.C. 1994) (dismissing same case as moot after records of alleged advisory committee were made publicly available). Similarly, in *Duncan*, the court dismissed as moot a FACA challenge where the agency had convened a new panel and released the section 10(b) documents from the previous panel. 643 F. Supp. 2d at 51. Accordingly, plaintiff's FACA section 10(b) claim is moot as it pertains to the former Commission's records that are publicly available.[7]

## II.   PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER FACA AND THE APA

In addition, plaintiff's FACA section 10(a) and section 10(b) claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. In order to state a statutory claim, as to which there may be a judicially cognizable remedy, a plaintiff must avail itself of a valid, congressionally created private cause of action. *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."). It is well established that "FACA does not provide for a private cause of action." *Lawyers' Committee*, 265 F. Supp. 3d at 66 (citing *Tidwell*, 239 F. Supp. 3d at 220-21); *see also Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 32 (D.D.C. 2011) (collecting cases holding that "FACA

---

[7] Plaintiff's FACA section 10(b) claim as it pertains to documents that defendants did not produce to former commissioner Dunlap, and thus are not publicly available, is addressed below. *See infra* Section III. Defendants acknowledge that plaintiff's section 10(b) claim is not moot with respect to these records. *See, e.g.*, *Tidwell*, 239 F. Supp. 3d at 227.

does not create a private right of action because there is no evidence of Congressional intent to confer a private remedy for FACA violations.").

Plaintiff can thus only proceed, if at all, under the APA. But the APA's cause of action is not available to plaintiff because the former Commission was not an agency subject to the APA. *See Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity* ("*EPIC*"), 266 F. Supp. 3d 297, 315-16 (D.D.C. 2017) (finding that former Commission is not an agency for purposes of the APA); *see also United to Protect Democracy v. Presidential Advisory Comm'n on Election Integrity*, 288 F. Supp. 3d 99, 115 (D.D.C. 2017) (finding that the former Commission is not an agency for purposes of the Paperwork Reduction Act). Nor can plaintiff seek relief against the other defendant White House entities that have custody of the former Commission's records because those entities are not agencies subject to the APA.[8]

The Supreme Court and D.C. Circuit have consistently recognized that, while the statutory definition of "agency" may be broad, it does not encompass entities within the Executive Office of the President ("EOP") that do not exercise substantial independent authority. In *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), the D.C. Circuit first considered the definition of "agency" under the APA, which then, as now, is defined as any "authority of the Government of the United States, whether or not it is within or subject to review by another agency." *Id.* at 1073 (quoting 5 U.S.C. § 551(1)). The Court concluded that the APA "apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions." *Id.* Following this reasoning, the Court held that the Freedom of Information Act, which at the

---

[8] Plaintiff does not make any specific allegations or seek relief against defendant GSA, which is an agency. GSA does not have custody of the former Commission's records. *See* Declaration of Philip C. Droege, *Dunlap*, No. 17-cv-2361 (CKK), ECF No. 44-1 (former Commission's records maintained by the White House Office of Record Management), and should, therefore  be dismissed from this action.

time incorporated the APA's definition of "agency," applied to the Office of Science and Technology Policy ("OSTP"), and entity within EOP. *Id.* at 1073-74. It reasoned that OSTP's function was not merely to "advise and assist the President," but it also had an "independent function of evaluating federal programs," and thus was an agency with substantial independent authority that was subject to the APA. *Id.* at 1075.

The Supreme Court has subsequently confirmed the principle that entities that "advise and assist the President" and that lack "substantial independent authority" are not "agencies." *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980). Further, the "substantial independent authority" definition of agency, and its construction, applies to the APA. To begin, *Soucie* itself was a case interpreting the APA's definition of "agency." *See Soucie*, 448 F.2d at 1073 ("The statutory definition of 'agency' is not entirely clear, but the APA apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions.") (emphasis added). The D.C. Circuit has since made clear that this definition applies to the APA generally. *See Dong v. Smithsonian Inst.*, 125 F.3d 877, 881 (D.C. Cir. 1997) ("Our cases . . . require[e] that an entity exercise substantial independent authority before it can be considered an agency for [5 U.S.C.] § 551(1) purposes.").

The controlling question in determining whether an entity within EOP is an "agency," therefore, is whether "the entity in question 'wield[s] substantial authority independently of the President.'" *Citizens for Responsibility & Ethics in Wash.* ("*CREW*") *v. Office of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009) (quoting *Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995)); *see also EPIC*, 266 F. Supp. 3d at 315 ("The most important consideration appears to be whether the 'entity in question wielded substantial authority independently of the President.'") (quoting *CREW*, 566 F.3d at 222); *United to Protect Democracy*, 288 F. Supp. 3d at 114-15. In conducting

this analysis, courts have looked to whether the EOP entity at issue has independent regulatory or funding powers or are otherwise imbued with significant statutory responsibilities. Moreover, the courts have recognized that the EOP in its entirety is not the proper unit of analysis for determining whether an EOP entity is an "agency." "[I]t has never been thought that the whole Executive Office of the President could be considered a discrete agency under FOIA." *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir. 1998); *EPIC*, 266 F. Supp. 3d at 318. Indeed, were it otherwise, none of the *Soucie* case law would make sense: if a party could simply sue the "EOP," there would be no need for a component-by-component analysis.

Here, none of the relevant defendants meet the tests for an "agency" under the APA. *See EPIC*, 266 F. Supp. 3d at 315-19. As stated, the EOP is not a discrete agency for these purposes. Nor is the Office of Administration, which provides "operational and administrative support of the work of the President and his EOP staff," including IT support. *CREW*, 566 F.3d at 224-225. The White House Office, whose component White House Office of Records Management has possession of relevant records, *see* Declaration of Philip C. Droege, *Dunlap*, No. 17-cv-2361 (CKK) (D.D.C.), ECF No. 44-1, is also not an agency. *Jones v. Exec. Office of the President*, 167 F. Supp. 2d 10, 13-14 (D.D.C. 2001). And the D.C. Circuit has concluded that the Office of the Vice President is not an agency under the Privacy Act and FOIA. *See Wilson v. Libby*, 535 F.3d 697, 707-08 (D.C. Cir. 2008); *see also Schwarz v. U.S. Dep't of the Treasury*, 131 F. Supp. 2d 142, 147 (D.D.C. 2000), *aff'd*, 2001 WL 674636 (D.C. Cir. May 10, 2001). Accordingly, plaintiff's APA claim must be dismissed because plaintiff lacks a cause of action.

## III.   MANDAMUS IS UNAVAILABLE TO PLAINTIFF

If this Court were to grant relief to plaintiff, it could only be through the "drastic and extraordinary" writ of mandamus. *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004).

But mandamus is unavailable here: as the Supreme Court and D.C. Circuit have repeatedly recognized, application of mandamus in a presidential context – and particularly in the FACA context, where advice to the president is at issue – raises serious constitutional concerns, which inform the mandamus analysis.  In any event, plaintiff cannot demonstrate that defendants violated a clear, nondiscretionary duty prescribed by FACA section 10(a) when it did not provide an opportunity for in-person public attendance and participation at the July 19, 2017, meeting.  Nor does plaintiff have a "clear and indisputable right" to the former Commission's records that have not been disclosed.  Those records (*i.e.* the records not posted on the former Commission's webpage, not released in response to FOIA requests, and not produced to and subsequently released by former commissioner Dunlap) primarily consist of internal staff emails and other materials not shared with any former commissioner, and neither existing case law nor agency practice indicates that such records are subject to public release pursuant to FACA section 10(b) – much less that such a right is "clear and indisputable," as it must be for mandamus to lie.

### A.    The Mandamus Standards Are Stringent

A writ of mandamus is "a drastic [remedy], to be invoked only in extraordinary situations." *N. States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 758 (D.C. Cir. 1997) (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980)).  The mandamus statute provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.  Mandamus relief is appropriate only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff."  *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 62 (D.C. Cir. 2010).  The party seeking mandamus "has the burden of showing that 'its right to issuance of the writ is clear

and indisputable.'" *N. States Power Co., 128 F.3d* at 758 (citation omitted).  Even if the plaintiffs

overcome all these hurdles, the district court must also consider whether mandamus relief should

issue as a matter of its discretion.  *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc)

(discussing mandamus standards).

### B.       Plaintiffs Have Not Satisfied These Stringent Standards

Some courts have assumed, but not definitively held, that mandamus claims may lie against

the Vice President and other non-agency participants on presidential advisory committees.  *See,*

*e.g.*, *Judicial Watch, Inc.*, 219 F. Supp. 2d at 44 (holding that "it would be premature and

inappropriate to determine whether the relief of mandamus [against the Vice President] will or will

not issue" at the motion to dismiss stage).  Nonetheless, mandamus is not appropriate here.

### 1.       FACA Does Not Require Advisory Committees to Provide an Opportunity for In-Person Attendance and Participation at Committee Meetings

Plaintiffs cannot demonstrate that the former Commission violated a clear,

nondiscretionary duty in violation of FACA section 10(a) when it did not provide an opportunity

for in-person public attendance and participation at its July 19, 2017, meeting because, as this

Court previously held, FACA section 10(a) "does not prescribe the manner in which advisory

committee meetings are supposed to be 'open to the public.'"  *Lawyers' Committee*, 265 F. Supp.

3d at 67.  Indeed, FACA section 10(a) does not "require that an advisory committee provide an

opportunity for in-person attendance [or participation] at all."  *Id.*   Absent a "clear and

indisputable" right, the extraordinary writ of mandamus is not available to plaintiff.[9]

---

[9] Further, plaintiff's FACA section 10(a) claims are based on purported past procedural injuries.
Past injury cannot, however, justify declaratory or injunctive relief.  *City of Los Angeles v. Lyons*,
461 U.S. 95, 101-02 (1983).  Given the Commission's dissolution, there can be no future injury,
and therefore, as discussed *supra*, these claims are moot.

### 2. Staff Material Not Shared With Any Commission Member is Not Subject to Disclosure Pursuant to FACA Section 10(b)

The majority of withheld records remaining at issue in this litigation are staff materials that were not shared with any former commission member.  *See* Third Kossack Decl. ¶¶ 12 (d), (e), (j), (q), (s), (t), (u), (v), (w), (x); Notice of Categories of Withheld Documents, at 6-12, *Dunlap*, ECF No. 58.  Because it is not "clear and indisputable" *ex ante* that these specific types of materials are those "which were made available to or prepared for or by each advisory committee," 5 U.S.C. app. 2 § 10(b), and therefore subject to disclosure under FACA section 10(b), this Court should conclude that it lacks mandamus jurisdiction over plaintiff's claims related to these documents. *Cheney*, 542 U.S. at 380; *see also In re al-Nashiri*, 791 F.3d 71, 86 (D.C. Cir. 2015) ("Legal aporias are the antithesis of the 'clear and indisputable' right needed for mandamus relief."); *id.* ("Even if we ultimately agreed with [petitioner on the merits, mandamus would not lie because the answer was hardly 'clear' *ex ante*."); *id.* (petitioners did 'not come close' to showing clear and indisputable right because they 'identified no precedent of this court or of the Supreme Court' on point.") (quoting *Republic of Venezuela v. Phillip Morris Inc.*, 287 F.3d 192, 199 (D.C. Cir. 2002)).

### a. Existing precedent indicates that staff material is not subject to disclosure pursuant to FACA

To begin, the conclusion that staff material is subject to disclosure pursuant to FACA section 10(b) is inconsistent with existing precedent.  That alone is fatal to plaintiff's mandamus claim, which requires a "clear and indisputable" right to relief.  *In re-al Nashiri*, 791 F.3d at 86. In *National Anti-Hunger Coalition v. Executive Committee of President's Private Sector Survey on Cost Control*, 557 F. Supp. 524 (D.D.C. 1983), *aff'd*, 711 F.2d 1071 (D.C. Cir. 1983), a court in this district considered whether FACA's disclosure requirements applied to "staff work."  *Id.* at 529.  They did not, the court concluded.  *Id.* ("The Act does not cover groups performing staff

functions such as those performed by the so-called task forces" because such groups do not provide advice directly to the President; instead they are utilized by the covered-committee to conduct preliminary activities necessary to the formulation of recommendations). The *National Anti-Hunger* court recognized that advisory committees necessarily depend on staff work to accomplish their mandates, and that "[b]efore [a] [c]ommittee can produce final recommendations, it must gather information, explore options with agencies to get comments and reactions, and evaluate alternatives." *Id.* The Court further reasoned that "surely Congress did not contemplate that interested parties like the plaintiffs should have access to every paper through which recommendations are evolved, have a hearing at every step of the information-gathering and preliminary decision-making process, and interject themselves into the necessary underlying staff work so essential to the formation of ultimate policy recommendations." *Id.* Were every piece of staff material subject to disclosure, a committee's activities "would come to a total halt and the attempt to formulate [recommendations to the President] would bog down in a plethora of hearings, demands for document access and increasing[ly] time-consuming litigation." *Id.* at 530.

The Department of Justice Office of Legal Counsel ("OLC") has similarly concluded that staff materials are not subject to public disclosure pursuant to section 10(b). In a published opinion, OLC has advised that "FACA compels disclosure [only] of a limited subset of information, namely the material used by the advisory committee." Disclosure of Advisory Committee Deliberative Materials, 12 U.S. Op. Off. Legal Counsel 73, 76 (1988). OLC explained that "[t]he courts and this Office have construed the concept of advisory committees established or utilized by the President or an agency to preclude section 10(b)'s application *to the work prepared by a staff member of an advisory committee* . . . so long as the material was not used by the committee as a whole." *Id.* at 75 (emphasis added). OLC reasoned that because these staff

entities "did not provide advice directly to the President," they "are not directly 'established or utilized' by the President." *Id.* at 75-76; *see also id.* at 76 (entities that "perform preparatory work or professional staff functions in aid of, but not displacing, the actual advisory committee function performed by the [FACA committee]" are not covered by FACA).

The *National Anti-Hunger* and OLC decisions make clear that an advisory committee's staff is generally not subject to FACA, including section 10(b), unless the materials generated are provided to the entirety of an advisory committee's membership (or, at a minimum, to at least one committee member) to facilitate the formulation of the committee's advice and recommendations to the President or an agency.

While defendants are not aware of any other courts that have squarely reached the issue of whether staff materials are subject to disclosure under FACA section 10(b), which itself indicates that the right to such materials is not "clear and indisputable," the reasoning of those courts that have considered the scope of section 10(b) suggest that staff materials are *not* subject to public disclosure. In *Association of American Physicians & Surgeons, Inc. v. Clinton*, 879 F. Supp. 103 (D.D.C. 1994), the court concluded that "[r]ecords pertaining to the expenses of such an advisory committee are not within the scope of section 10(b)." *Id.* at 105. Such financial records would likely constitute staff materials (since the staff would be responsible for budgeting, 5 U.S.C. app. 2 § 5(b)(5)), but do not constitute materials "prepared for or by each advisory committee" and therefore subject to disclosure. *Id.* § 10(b). The court's conclusion that this is so even though budgetary documents are, in some sense, prepared "for" an advisory committee suggests that FACA section 10(b)'s disclosure requirement ought to be narrowly construed. Moreover, in *Tidwell*, 239 F. Supp. 3d 213, this Court reviewed the *National Anti-Hunger* and OLC opinions discussed above. The Court concluded that the two decisions "stand for the . . . point that materials

produced by the *staff* of advisory committees . . . may not need to be disclosed under section 10(b)." *Id.* at 228.

Similarly, in *Duncan*, 643 F. Supp. 2d 43, the court considered a FACA claim brought against a Department of Education grant review panel.  The plaintiff requested materials subject to FACA section 10(b), and the agency produced these materials, which included: (a) versions of the grant applications submitted to the agency; (b) the review criteria provided to the committee members; (c) the summary sheets provided by the individual members; and (d) the committee chair summary forms relevant to the applications.  *Id.* at 46-47.  The court concluded that these documents constituted "all available documents."  *Id.* at 49-50.  Notably, neither the parties nor the court appeared to have considered staff materials *not* presented to the entire committee membership to fall within the ambit of section 10(b), even though, presumably, such materials would have existed.

Finally, the conclusion that staff materials are not subject to disclosure pursuant to FACA section 10(b) accords with the purpose of FACA.  While FACA was designed to increase openness (and, of course, the former Commission has already released an unprecedented amount of information), it was also intended to address the problem of "advisory bodies that are duplicative, ineffective and costly."  S. Rep. No. 92-1098, at 5 (1972).  The Supreme Court has also recognized that, in interpreting FACA's reach, courts must be mindful of the "specific ills" the Act was intended to remedy, "above all the wasteful expenditure of public funds for worthless committee meetings and biased proposals."  *Pub. Citizen*, 491 U.S. at 453.  Accordingly, the Supreme Court has rejected a "literal reading" of the statute that would broadly subject materials and meetings to FACA's scope.  *Id.* at 454-55; *see also id.* at 463-64 ("A literalistic reading [of FACA] would catch far more groups and consulting arrangements than Congress could conceivably have

intended.").  Requiring *all* staff materials to be released, even if they might in some sense be "prepared for" the advisory committee, would be inconsistent with this command.

### b.  Existing agency practice indicates that staff material is not subject to disclosure pursuant to FACA

Next, a review of the operation of FACA advisory committees indicates that the general practice of both agency and presidential advisory committees is to not publicly disclose staff materials pursuant to FACA section 10(b).  *See, e.g.*, *Am. Methyl Corp. v. EPA*, 749 F.2d 826, 837 (D.C. Cir. 1984) (considering "administrative practice" of agency in statutory interpretation analysis); *Tenn. Valley Auth. v. Whitman*, 336 F.3d 1236, 1241 (11th Cir. 2003) (same).

As detailed in the Third Kossack Declaration, prior presidential advisory committees, from multiple administrations, have not posted staff emails and other records that were not shared with or prepared by the committees as a whole.  *See* Third Kossack Decl. ¶¶ 8-9.  More recently, the President's Commission on Combating Drug Addiction and the Opioid Crisis have not posted staff emails and other staff materials on its webpage.  *See* President's Commission on Combating Drug Addiction and the Opioid Crisis, https://www.whitehouse.gov/ondcp/presidents-commission/. Similarly, as detailed in Appendix A to this motion, which identifies materials posted pursuant to section 10(b) from a sample of advisory committees, federal agencies hosting advisory committees have not posted staff material online; rather, they have posted the committees' founding documents (e.g., the charter), materials presented at meetings, and final reports, where applicable – all of which the former Commission posted publicly before its dissolution.  Even the General Services Administration, which issues government-wide regulations interpreting the FACA, does not affirmatively release staff materials pursuant to FACA section 10(b).  *See* Office of Federal High-Performance Buildings, https://www.gsa.gov/about-us/organization/office-of-governmentwide-policy/office-of-federal-highperformance-buildings.

While agency practice may not determinatively establish that staff materials are *not* covered by FACA section 10(b), the apparently unanimous weight of authority by the entities charged with applying FACA does suggest that – at a minimum – it is not "clear and indisputable" that these materials *are* subject to disclosure.

### c.   The requirement to affirmatively post FACA section 10(b) materials is incompatible with subjecting staff materials to section 10(b)

As this Court is aware, FACA section 10(b) materials must affirmatively be publicly disclosed: "the Government is required to make available all nonexempt section 10(b) materials regardless of whether a FOIA request was filed." *Food Chem. News v. Dep't of Health & Human Services*, 980 F.2d 1468, 1472 (D.C. Cir. 1992).   Because section 10(b) material must be affirmatively disclosed, if staff material were covered by FACA's disclosure requirement, an advisory committee could be forced to post interim staff materials – even those materials that were never shared with any committee member, relied upon by the commission in making its advice, or perhaps even shared with *any* other staff members.   This would essentially freeze internal staff member discussions – if even an idea that a staff member rejected would need to be affirmatively disclosed to the public (and the committee members), then those staff members would not be likely to reduce those ideas to writing.   This would lead to the type of malaise that so concerned the *National Anti-Hunger* court.   *See Nat'l Anti-Hunger Coal.*, 557 F. Supp. at 529 ("[S]urely Congress did not contemplate that interested parties like the plaintiffs should have access to every paper through which recommendations are evolved . . . .").

Moreover, FACA staff materials *are* available through alternative disclosure schemes; the public is not prevented from accessing these materials merely because they are not subject to FACA section 10(b).   If an advisory committee is housed in an agency, as most are, staff

documents can be requested pursuant to the Freedom of Information Act.  And for presidential

advisory committees, like here, requestors can seek such information subject to the timing

restrictions set out in the Presidential Records Act.  *See* 44 U.S.C. § 2204(b)(2).  But, particularly

when these well-established document access processes exist, plaintiff should not be allowed to

circumvent such mechanisms pursuant to an expansive view of section 10(b) that is not "clearly

and indisputably" compelled.

**d.      With respect to a dissolved commission, "intentionality" is best determined by considering whether documents have actually been disclosed to the advisory committee**

Earlier in this case, this Court indicated its "preliminary view" that FACA section 10(b)

required an inquiry into the "question of intentionality," i.e., whether a document was "created or

obtained with the intent to disclose it to the advisory committee."  *See* Order (Aug. 30, 2017), at

2, ECF No. 28 (citing *Tidwell*, 239 F. Supp. 3d at 228); Order (June 28, 2018), at 5, ECF No. 43.

For the reasons discussed above, defendants respectfully suggest that the intentionality test is not

clearly established in the existing case law, at least with respect to staff materials, and therefore,

cannot be a basis for mandamus jurisdiction in this context.

Even if this Court were to adopt the intentionality standard, however, it would not require

disclosure of the remaining materials under these circumstances.  Here, with the Commission long

since dissolved, the best way to judge intentionality is to look at the exercised intention of the

author. In other words, an individual who actually shared the document with the Commission

during the Commission's lifespan can be judged to have objectively "intended" to share the

document, or, in terms of section 10(b), can be said to have prepared the document for the

Commission (and thus the document may be subject to FACA section 10(b)), while an author who

never shared the document during the Commission's lifespan cannot be said to have intended to

28

have prepared that particular document for the Commission.  This standard judges "intent" by the author's objective actions, rather than requiring an inquiry, without statutory guidance, into the subjective thinking of an author at a moment in time.  That is particularly important here because, by definition, the author of any remaining documents at issue never actually shared the document with the former Commission or any of its members.

This reasoning also accords with the D.C. Circuit's guidance on FACA section 10(b), which looks to when materials are presented to a FACA committee.  In *Food Chemical News v. Department of Health & Human Services*, the D.C. Circuit made clear that "whenever practical, all 10(b) materials must be available for public inspection and copying before *or on* the date of the advisory committee meeting to which they apply."  980 F.2d at 1469 (emphasis added).  The D.C. Circuit explicitly permitted documents to be made public contemporaneous with their presentment to committee members – which suggests that FACA 10(b)'s disclosure regime only applies when a committee member actually receives a document.  Were it otherwise, the D.C. Circuit may have instructed that documents be released *before* a meeting, and thus before committee members had reviewed the materials.  It did not do so.

Furthermore, measuring intentionality by the Commission staff's actual activities accords with the practical realities of the advisory committee process.  A staff member could have initially thought he or she wanted to share information with the Commission's membership, only to decide not to share the information upon additional consideration.  If intentionality was judged at the *initial* moment of consideration, an advisory committee could be required to affirmatively make public information that its members never received, or were never intended to receive, and thus played no part in committee's deliberations.  That could freeze staff members' ability to conduct initial work, and hinder the ability of a committee's staff to offer effective advice.

29

### 3. The remaining commission-related materials are not subject to public disclosure

The remaining Commission-related materials are not subject to public disclosure pursuant to section 10(b), and therefore, plaintiff's claims related to these materials should be dismissed for lack of mandamus jurisdiction.

### a. Attorney-client/attorney work product documents

The first category of materials are attorney client or attorney work product materials.  These fall into three categories: (a) correspondence related to litigation about the Commission where former Vice Chair Kobach was consulted in his capacity as a named defendant; (b) litigation holds related to the litigation; and (c) correspondence related to the collection of materials for the purposes of preparing the *Vaughn*-type index in this litigation.  Notice of Categories of Withheld Documents, at 6, *Dunlap*, ECF No. 58.  These documents are not subject to disclosure pursuant to FACA section 10(b) for two independent reasons.

First, these documents are not documents which are intended to inform the substantive work of the Commission as an entity, or to help inform its deliberations; rather, they are documents that are prepared for or in the context of litigation *about* the Commission.  Similar to how the *Association of American Physicians & Surgeons* court concluded that "[r]ecords pertaining to the expenses of such an advisory committee are not within the scope of section 10(b)," 879 F. Supp. at 105, this Court should conclude that these types of documents, also not relating to the substance of the former Commission's work, are not subject to disclosure pursuant to FACA section 10(b).  This conclusion is supported by the text of section 10(b) itself.  Section 10(b) mentions "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents."  5 U.S.C. app. 2. § 10(b).  All but the last term in that listing refer to substantive documents intended to inform the advisory work of the committee, not procedural matters related

to ancillary issues not related to the commission's advice.  Furthermore, while "other documents" is a broader term, the ejusdem generis principle "counsels: 'Where general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.'"  *Yates v. United States*, 135 S. Ct. 1074, 1086 (2015) (plurality op.) (quoting *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003)).  Applying this principle, "other documents" should be interpreted in accord with the other listed terms, *i.e.*, substantive documents relied upon by the Commission in performing its task, not litigation documents separate from that core task.

Second, even if these documents are considered materials subject to FACA section 10(b), they would be exempt pursuant to FOIA exemption (b)(5), 5 U.S.C. § 552(b), as attorney work product or attorney client materials.  *See* 5 U.S.C. app 2 § 10(b) (FACA 10(b) materials "shall be available for public inspection" only "[s]ubject to [FOIA]").  The limited set of materials involve documents prepared in the context of pending litigation, or for the purposes of complying with this Court's order, and were exchanged, in some cases, between litigation counsel and members of an entity, the Commission, that was subject to litigation.  Accordingly, it is not clearly established that they are subject to release pursuant to FACA.

### b.    Personal documents

The second category of documents are personal materials gathered or received by the former commissioners, for example, travel documentation, ethics forms, and expense reimbursement forms.  Notice of Categories of Withheld Documents, at 6, *Dunlap*, ECF No. 58. These are the type of administrative documents that were not intended to inform the substantive deliberations of the Commission, but are rather administrative materials intended to assist in the

Commission's operation.  For the reasons stated above, they are not therefore subject to public disclosure pursuant to FACA section 10(b).  Moreover, these type of materials have not historically been subject to affirmative release (as is required for section 10(b) materials), as per agency practice.  *See* Appendix A.  Moreover, even if these materials were subject to FACA 10(b) – and they are not – the personal information reflected in these documents would be exempt pursuant to FOIA Exemption 6.  Accordingly, there is no mandamus jurisdiction to conclude that the former Commission had a clear duty to release these documents.

### c.      Documents related to the selection of commissioners

Finally, defendants have withheld a limited set of documents related to the selection of potential members of the former Commission.  Individuals who were or would be appointed to the Commission were copied on these materials.  Notice of Categories of Withheld Documents, at 6, *Dunlap*, ECF No. 58. These documents are not subject to release pursuant to section 10(b) because they were not "made available to or prepared for or by" the Commission.  5 U.S.C. app. 2 § 10(b).  Instead, they were discussions with White House officials about the appointment of individuals to the Commission – which is a task that is solely within the province of the President, not to the former Commission or its members.  *See* Exec. Order No. 13,799 § 2 ("The President shall appoint the additional members [along with the Vice President] . . . .").  Accordingly, these documents are not subject to public release pursuant to FACA section 10(b).

### C.      Because Applying FACA To A Presidential Advisory Commission Raises Serious Constitutional Concerns, Even If Plaintiff Satisfied The Mandamus Standards – And It Does Not – This Court Should Decline To Exercise Mandamus

Defendants do not concede that the FACA can be constitutionally applied to presidential commissions, such as the former Commission, which was created by the President and is chaired by the Vice President, a constitutional officer.  The Supreme Court and numerous judges have

noted that the application of FACA to govern the manner in which the President receives advice raises constitutional concerns with respect to the separation of powers and the right of the President to receive confidential advice.  *See Cheney*, 542 U.S. at 385 ("[T]he Executive's constitutional responsibilities and status are factors counseling judicial deference and restraint in the conduct of litigation against it." (citation omitted)); *In re Cheney*, 334 F.3d 1096, 1113 (D.C. Cir. 2003) (Randolph, J., dissenting) ("As applied to committees the President establishes to give him advice, FACA has for many years teetered on the edge of constitutionality." (citation omitted)), *vacated and remanded on other grounds sub nom. Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367 (2004); *see also Pub. Citizen*, 491 U.S. at 466 (noting that the application of FACA to the President "present[s] formidable constitutional difficulties."); *id.* at 488-89 (Kennedy, J., with whom, Rehnquist, C.J., and O'Connor, J. join, concurring in the judgment) ("The mere fact that FACA would regulate [so] as to interfere with the manner in which the President obtains information necessary to discharge his duty assigned under the Constitution is enough to invalidate [FACA]." (citation omitted)).

Similarly, the D.C. Circuit in *Association of American Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 908-10 (D.C. Cir. 1993) ("*AAPS*"), concluded that applying FACA and its disclosure requirements to a task force set up by the President to solicit advice from private citizens intermixed, or not, with government officials, on an issue of utmost concern to his Presidency – in that case, health care reform – would seriously burden the President's Article II right to confidential communications.  *See also In re Cheney*, 406 F.3d at 728 ("In making decisions . . . the President must be free to seek confidential information from many sources, both inside the government and outside." (citation omitted)); *Nader v. Baroody*, 396 F. Supp. 1231, 1234 (D.D.C. 1975) ("To hold that Congress intended to subject meetings of this kind to press scrutiny and public

participation with advance notice on formulated agendas, etc., as required by [FACA], would raise the most serious questions under our tripartite form of government as to the congressional power to restrict the effective discharge of the President's business." (citations omitted)).

For these reasons, even if plaintiffs could meet the other prerequisites to mandamus (and they cannot), the Court should decline to proceed in that manner as a matter of discretion. *Cheney*, 542 U.S. at 382 ("[S]eparation-of-powers considerations should inform a [court's] evaluation of a mandamus petition involving the President or the Vice President."); *see also In re Cheney*, 406 F.3d at 727 ("Although we do not reach the question whether applying FACA to Presidential committees . . . would be constitutional, separation-of-powers considerations have an important bearing on the proper interpretation of the statute."). Here, plaintiffs seek mandamus jurisdiction against the offices of the President and the Vice President. As discussed above, in the *Cheney* litigation the Supreme Court criticized the lower courts for failing to consider, in their consideration of mandamus jurisdiction, whether the wide-ranging discovery ordered against the Vice President "constituted an unwarranted impairment of another branch in the performance of its constitutional duties." *Cheney*, 542 U.S. at 390-91. This consideration weighs in favor of rejecting mandamus jurisdiction here. *See also Pub. Citizen*, 491 U.S. at 466 (recognizing that applying FACA to meetings between Presidential advisors and private citizens "present[s] formidable constitutional difficulties"); *AAPS*, 997 F.2d at 908-10 (finding that applying FACA and its disclosure requirements to a task force set up by the President to solicit advice from private citizens intermixed, or not, with government officials, on an issue of utmost concern to his presidency would seriously burden the President's Article II right to confidential communications).

"It is well established that 'a President's communications and activities encompass a vastly wider range of sensitive material than would be true of any ordinary individual.'" *Cheney*, 542 U.S. at 381 (quoting *United States v. Nixon*, 418 U.S. 683, 715 (1974)).  As the Supreme Court explained in *Cheney*, this does not mean that the President is above the law.  The point is, rather, that, "the public interest requires that a coequal branch of Government afford Presidential confidentiality the greatest protection consistent with the fair administration of justice, and give recognition to the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties." *Id*. at 382 (citations omitted).  The Supreme Court concluded that "[t]hese separation-of-powers considerations should inform a court of appeals' [or district court's] evaluation of a mandamus petition involving the President or the Vice President." *Id*.

Thus, to proceed under a mandamus theory on the basis of plaintiffs' allegations would have grave consequences for the operation of the Offices of the President and Vice President. Allowing suits of this nature would mean that a President's or Vice President's attempts to obtain advice and consultation would be frequently interrupted by litigation, frustrating their ability to obtain timely and valuable advice and information.  Moreover, the President's use of beneficial advisory groups would be greatly chilled if all that was required to impose the burden of litigation on the government was a complaint that stated that FACA violations occurred.  Indeed, if found sufficient for mandamus, plaintiffs' allegations would set the lowest of thresholds for putting the President to the burden of litigation, one that litigants would routinely meet, thus turning on its head the *Cheney* admonition that mandamus should be "hardly ever [be] granted."  406 F.3d at 729.

35

That is particularly true in this case.  First, as discussed above, the scope of documents remaining at issue in this case extend far beyond the core of materials which courts have found FACA section 10(b) apply.  The novel territory of this case – where mostly staff documents remain, for a Commission that was dissolved after only two meetings, without issuing a report or making conclusions, and where thousands of pages of material have already been released, counsels against mandamus.  Second, FACA section 10(b), by its terms, only provides a right of access "until the advisory committee ceases to exist."  5 U.S.C. app. 2 § 10(b).  The Commission, of course, ceased to exist on January 3, 2018.  While defendants acknowledge that such document claims are not moot for Article III purposes, the fact that Congress did not see fit to create a permanent right to these documents should counsel against granting mandamus long after the statutory right to the documents has expired.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint.


Dated:  August 29, 2018                    Respectfully submitted,

                                           CHAD A. READLER
                                           Acting Assistant Attorney General
                                           Civil Division

                                           BRETT A. SHUMATE
                                           Deputy Assistant Attorney General

                                           ELIZABETH J. SHAPIRO
                                           Deputy Director

                                           */s/ Kristina A. Wolfe*
                                           CAROL FEDERIGHI
                                           Senior Trial Counsel
                                           KRISTINA A. WOLFE
                                           JOSEPH E. BORSON
                                           Trial Attorneys
                                           United States Department of Justice

Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 353-4519
Email: kristina.wolfe@usdoj.gov

*Counsel for Defendants*